UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                           :

GOLDMAN SACHS EXECUTION & CLEARING, :
L.P. AND SPEARS, LEEDS & KELLOGG, L.P.,
                                           :

                     Petitioners,          :      10 Civ. 5622 (JSR)

                                           :

                 vs.                 :      ECF CASE

                                           :

THE OFFICIAL UNSECURED CREDITORS' :
COMMITTEE OF BAYOU GROUP, LLC, *et al.*, on :
behalf of BAYOU GROUP, LLC, BAYOU
MANAGEMENT, LLC, BAYOU ADVISORS, :
LLC, BAYOU EQUITIES, LLC, BAYOU FUND, :
LLC, BAYOU SUPERFUND, LLC, BAYOU NO :
LEVERAGE FUND, LLC, BAYOU AFFILIATES :
FUND, LLC and BAYOU ACCREDITED FUND, :
LLC,
                                           :

                     Respondents.      :

                                           :
-------------------------------------------------------------X

## MEMORANDUM OF *AMICUS CURIAE*
### SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION
### IN SUPPORT OF PETITION TO VACATE ARBITRATION AWARD

*Of Counsel*:

Ira D. Hammerman
Kevin M. Carroll
SECURITIES INDUSTRY AND
FINANCIAL MARKETS ASSOCIATION
1101 New York Avenue, NW
Washington, DC 20005
(202) 962-7382

Henry F. Minnerop
Daniel A. McLaughlin
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
hminnerop@sidley.com
dmclaughlin@sidley.com

Attorneys for *Amicus Curiae*
SECURITIES INDUSTRY AND
FINANCIAL MARKETS ASSOCIATION

## <u>TABLE OF CONTENTS</u>

Table of Authorities.................................................................................................... ii

I.   Introduction ..................................................................................................1

II.  Discussion.....................................................................................................1

  A.  Broker-Dealers Do Not Obtain Dominion And Control Over Customer
      Assets Transferred Into Or Between Accounts. ...........................................2

  B.  Clearing Arrangements – An Overview ......................................................4

      1.   The Clearing Relationship ................................................................4

      2.   Customers .........................................................................................7

      3.   Introducing Firms .............................................................................7

  C.  Regulatory Framework of Clearing Arrangements ......................................8

      1.   The Elimination of Fixed Commissions...........................................9

      2.   Net Capital and Related Rules.......................................................10

      3.   NYSE Rule 382 ..............................................................................10

      4.   Civil Liability ................................................................................11

III. Policy Considerations .................................................................................13

IV.  Conclusion ..................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Antinoph v. Laverell Reynolds Sec., Inc.,*
    703 F. Supp. 1185 (E.D. Pa. 1989) ..............................................................................13

*Bonded Financial Services, Inc. v. European American Bank,*
    838 F.2d 890 (7th Cir. 1988) .......................................................................................14

*Carlson v. Bear, Stearns & Co.,*
    906 F.2d 315 (7th Cir. 1990) .......................................................................................12

*Chase Manhattan Bank, N.A. v. Fidata Corp.,*
    700 F. Supp. 1252 (S.D.N.Y. 1988) ...........................................................................12

*Connolly v. Havens,*
    763 F. Supp. 6 (S.D.N.Y. 1991) ..................................................................................13

*Cromer Finance v. Berger,*
    137 F. Supp 2d 452 (S.D.N.Y. 2001) ..........................................................................13

*Dillon v. Militano,*
    731 F. Supp. 634 (S.D.N.Y. 1990) .............................................................................12

*Ferris, Baker Watts Inc. v. Stephenson (In re MJK Clearing, Inc.),*
    286 B.R. 109 (Bankr. D. Minn. 2002) ...........................................................................3

*Flickinger v. Harold C. Brown & Co.,*
    947 F.2d 595 (2d Cir. 1991) ........................................................................................12

*Greenberg v. Bear, Stearns & Co.,*
    220 F.3d 22 (2d Cir. 2000) ..........................................................................................13

*Lesavoy v. Lane,*
    304 F. Supp. 2d 520 (S.D.N.Y. 2004) .........................................................................12

*Mars v. Wedbush Morgan Sec., Inc.,*
    283 Cal. Rptr. 238 (Cal. Ct. App. 1991)......................................................................12

*Schruefer v. Winthorpe Grant, Inc.,*
    No. 99 Civ. 9365, 2003 WL 1108933 (S.D.N.Y. Mar. 12, 2003) .............................3

*SEC v. Upton,*
    75 F.3d 92 (2d Cir. 1996) ..............................................................................................3

*SFM Holdings v. Banc of America Securities,*
    600 F.3d 1334. (11th Cir. 2010) .......................................................................... 12

**STATUTES**

Section 15(k)(1) of the Securities Exchange Act of 1934 ............................................. 12

Securities Investors Protection Act of 1970 (15 U.S.C. §§ 78aaa et seq) ...................... 7

U.C.C. § 8-102(a) cmt. 10 .......................................................................................... 14

U.C.C. § 8-503 cmt.1 .................................................................................................... 3

U.C.C. § 8-503 cmt. 3 .................................................................................................. 14

**OTHER AUTHORITIES**

17 C.F.R. § 240.15c3-1 (1992) .............................................................................. 7, 10

17 C.F.R. § 240.15c3-3 .......................................................................... 1, 2, 3, 8, 10

1975 Fed. Sec. L. Rep. (CCH) ¶ 80,212 ................................................................... 10

David M. Weiss, *After The Trade is Made: Processing Securities Transactions* ............ 5

Henry F. Minnerop, *Clearing Arrangements*, 58 Bus. Law 917 (May 2003) ............ 1, 11

Henry F. Minnerop, *"The Role and Regulation of Clearing Brokers,"* 48 Bus. Law 841
    (May 1993) ..................................................................................................... 1, 5, 11

Letter of Transmittal, H.R. Doc. No. 92-231 ................................................................ 8

LOSS & SELIGMAN, VI SECURITIES REGULATION 2897-907 ................................... 8

Louis Loss & Joel Seligman, FUNDAMENTALS OF SECURITIES REGULATION 745
    (2001) .......................................................................................................................... 9

No. 41,707, 1999 SEC LEXIS 1551 (Aug. 5, 1999) ...................................................... 6

NASD Rule 3230 ............................................................................................................ 11

NYSE Information Memo No. 82-18 (Mar. 5, 1982) ................................................... 10

NYSE Rule 382 ............................................................................................ 5, 7, 9, 10, 11

NYSE Rule 405 ....................................................................................................... 9, 10

*The Wall Street Journal*, July 29, 2010, Section C, page 11 ........................................ 9

www.sifma.org. ...................................................................................................................1

## I.     **Introduction**

This memorandum of law is respectfully submitted on behalf of the Securities Industry and Financial Markets Association ("SIFMA")[1] as amicus curiae in connection with petitioner's motion to vacate an arbitration award that has potential industry-wide implications, especially for clearing brokers.[2]  SIFMA submits this brief (i) to inform the Court as to the relevant regulatory context developed over many decades and (ii) to point out the extent to which the award departed from those laws and regulations, under which Congress, industry regulators (including the SEC) and the courts have uniformly recognized (a) that broker-dealers have no right to use customer assets for their own purposes and (b) that clearing brokers in particular have no obligation to monitor the accounts of investors whose transactions they settle and clear.

## II.    **Discussion**[3]

The implicit holding of the award that Goldman Sachs Execution and Clearing L.P. ("Goldman") was an "initial transferee" conflicts squarely with the current laws and regulations governing broker-dealers, and would – if it were the law – have a particularly significant and adverse impact on clearing firms, including those offering prime brokerage services.  A broker-dealer, such as Goldman, is legally incapable under SEC Rule 15c3-3 of exercising the kind of "dominion and control" over payments and transfers into accounts held with it to transform the broker into an "initial transferee" under the Bankruptcy Code.  Specifically, to characterize a

---

[1]     **Description of SIFMA/Interest of Amicus**
SIFMA brings together the shared interests of hundreds of securities firms, clearing and prime brokers, banks and asset managers.  SIFMA's mission is to support a strong financial industry, investor opportunity, capital information, job creation and economic growth, while building trust and confidence in the financial markets.  SIFMA, with offices in New York and Washington, D.C., is the U.S. regional member of Global Financial Markets Association (GFMA).  For more information, visit www.sifma.org.

[2]     SIFMA believes strongly in the principle of finality of arbitration awards and does not urge any deviation from the limited grounds for vacatur recognized under the Federal Arbitration Act.

[3]     The discussion relies on "Clearing Arrangements," 58 Bus. Law 917 (May 2003) and "The Role and Regulation of Clearing Brokers," 48 Bus. Law 841 (May 1993), both authored by undersigned counsel.

clearing broker such as Goldman, which merely processed and cleared trades, as an "initial transferee" is effectively to require it to restructure its business model. That business model, shaped by longstanding industry regulation, is not designed to monitor and investigate customer payments and transfers to detect possible wrongdoing. It contemplates no "know-your-customer" responsibilities and, consequently, employs no compliance staff charged with identifying "red flags" associated with its customers' possible misconduct. Clearing brokers are thus unlikely to be able to establish a "good faith" defense – the defense the Bankruptcy Code ordinarily grants to transferees – in accepting payments or transfers from customers into their own account. For clearing brokers to position themselves to carry the burden of showing that they acted in "good faith" as "initial transferees" would require a realignment of their business model and a revision of current regulations. This would not only add an extra layer of costs to the operations of clearing firms, costs that would ultimately be borne by customers, but would divert the focus of clearing firms from their public policy-mandated task to clear and settle transactions expeditiously to minimize the systemic risk of open unsettled transactions in the securities markets.

The current regulatory and legal framework has served the securities markets and investing public well for many decades. SIFMA believes that the pending vacatur motion should be considered in the context of this framework.

### A.   Broker-Dealers Do Not Obtain Dominion And Control Over Customer Assets Transferred Into Or Between Accounts.

Under federal law, customer funds deposited with broker-dealers remain the customer's property. As discussed in more detail below, SEC Rule 15c3-3, referred to as the Customer Protection Rule, dates back to 1972 and requires broker-dealers to hold reserves sufficient to ensure the return of customer funds upon demand. It was designed, among other things, to

"prevent broker-dealers from using funds or securities held on behalf of customers to finance proprietary and other non-customer transactions." *SEC v. Upton*, 75 F.3d 92, 93 (2d Cir. 1996); *see also Ferris, Baker Watts Inc. v. Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 109, 130 (Bankr. D. Minn. 2002) ("The amount of funds to be deposited in the Reserve Account is computed on a weekly basis pursuant to [the] Formula For Determination for Reserve Requirements for Brokers and Dealers.  The Reserve Formula is designed to eliminate the use of customers' funds and securities by broker-dealers in financing firm overhead and such dealer activities as market making, proprietary trading, and underwriting.") (citation omitted).  One reason for this segregation of customer funds is "[t]o facilitate the liquidations of insolvent broker-dealers and to protect customer assets in the event of a SIPC liquidation through a clear delineation in Rule 15c3-3 of specifically identifiable property of customers."  SEC Release No. 34-9856 (Nov. 17, 1972); *see also MJK Clearing*, 286 B.R. at 130 ("The purpose of the Customer Protection Rule is also to ensure that customer property in a failed brokerage firm is available to satisfy the claims of customers . . . .").[4]  In other words, in the event of a brokerage firm's failure, customers are entitled to the return of ***their property***.[5]

Under this customer protection framework, a customer's deposits to, or transfers between, its own brokerage accounts remain the customer's property, and a broker such as

---

[4]  *See also Statement of SEC Div. of Trading & Markets Regarding the Protection of Customer Assets* (Sept. 20, 2008) ("Customers of U.S. registered broker-dealers benefit from the extensive protections provided by the Commission rules, including the Customer Protection Rule, as well as protection by the Securities Investor Protection Corporation (SIPC).  The Commission's Customer Protection Rule requires a broker-dealer to segregate customer cash and securities from a broker-dealer's own proprietary assets.").

[5]  State law generally is to the same effect. *See, e.g.,* U.C.C. § 8-503 cmt.1 ("[S]ecurities that a firm holds for its customers are not general assets of the firm subject to the claims of creditors.").  Broker-dealers that do use customer funds for their own purposes can be held liable for conversion. *See, e.g., Schruefer v. Winthorpe Grant, Inc.*, No. 99 Civ. 9365, 2003 WL 1108933, at *5 (S.D.N.Y.  Mar. 12, 2003) (granting plaintiff judgment on conversion claim where defendant broker-dealer and its personnel, instead of investing money as instructed, withdrew and redirected funds from plaintiff's account for defendants' use).

Goldman obtains no legal right to use them for its own purposes. As such, brokers in Goldman's position lack dominion and control over them and cannot be deemed to be "initial transferees." Such a rule would work a particularly dramatic change in the business of clearing brokers.

**B.      Clearing Arrangements – An Overview**

Clearing firms play a vital role behind the scenes of Wall Street. It is their unheralded role to process and clear transactions originated by other securities firms and their customers. In "carrying" the customer accounts of other broker-dealers, clearing firms provide their clients, the "introducing brokers," with a variety of services. These services include the maintenance of books and records; the receipt, custody, and delivery of customer securities and funds; and the extension of credit to finance customer transactions in margin accounts. Most important, clearing firms "clear" transactions – paying for securities purchased and delivering securities sold. Clearing firms perform this function as members of clearing houses that are organized in conjunction with the securities markets where the underlying transactions are executed. Clearing arrangements are integral parts of the securities industry. Approximately 90% of all broker-dealers registered with the SEC utilize clearing arrangements.[6] Without the availability of the capital, technology, and expertise of clearing brokers, the reliable functioning of modern securities markets would be impossible.

**1.      The Clearing Relationship**

Bayou Securities, LLC ("Bayou Securities"), an SEC registered broker-dealer, retained Goldman as its clearing broker pursuant to a standard fully disclosed clearing agreement

---

[6]      According to the SEC Office of Economic Analysis, there were a total of 5,218 broker-dealers doing business with the public and registered with the SEC, 573 of which were self-clearing and the balance, 4,645, utilized clearing brokers, as of January 31, 2004, the most recent date available.

approved by the New York Stock Exchange ("NYSE") under NYSE Rule 382.[7]  In accordance

with that agreement, Bayou Securities "introduced" its customers to Goldman for clearance

service.  Among its introduced customers were the Bayou Hedge Funds, which utilized

Goldman's prime brokerage services.[8]

To understand the nature of a typical clearing arrangement, it is useful to list the key

functions involved in the operation of customer accounts and the settlement and clearance of

transactions in such accounts:

1. opening, approving, and monitoring customer accounts;
2. providing investment recommendations or accepting customer orders;
3. executing customer orders;
4. extending credit in margin accounts;
5. providing written confirmations of executed orders to customers;
6. receiving or delivering funds or securities from or to customers;
7. maintaining books and records that reflect transactions, including rendering monthly or periodic statements of account to customers;
8. providing custody of funds and securities in customer accounts; and
9. clearing and settling transactions effected in customer accounts.[9]

A brokerage firm that performs all of these functions within its own organization is a

"self-clearing" firm (e.g., full-service firms such as Morgan Stanley, UBS, Charles Schwab – to

---

[7] In a "fully disclosed clearing agreement," the introducing firm identifies the names of its customers to the clearing firm.  This is in contrast to "omnibus" clearing agreement where the clearing firm is not advised of the identity of the customers.  For further details, see Henry F. Minnerop, *"The Role and Regulation of Clearing Brokers,"* 48 Bus. Law 841, 843 (May 1993).

[8] *"Prime brokers* act as a central custodial facility for institutions that utilize the services of many broker/dealers [to execute their trades].  Institutions get investment ideas from many broker/dealers that they do business with.  They compensate these broker/dealers by executing trades through them.  These trades are flipped to the prime broker, who maintains the institution's portfolio.  The institution receives one statement at the end of the month from the prime broker detailing all of their activity, which is preferable to receiving statements from many broker/dealers, each with a piece of the monthly activity."  David M. Weiss, *After The Trade is Made: Processing Securities Transactions*, Penguin Group (USA) Inc., 2006, p. 8.  Many large institutional investors, such as pension and hedge funds, increasingly utilize multiple prime brokers in large part to diversify their risk exposure in case a prime broker becomes insolvent as happened to Lehman Brothers in 2007.  These investors streamline their trade reporting internally to keep track of their transactions cleared by a number of prime brokers.

[9] See New York Stock Exchange ("NYSE") Rule 382, 2 NYSE Guide (Walters Kluver Financial Servies) ¶ 2382, NYSE INTERPRETATION HANDBOOK, Rule 382/02 (Basic Functions).

mention but a few).  Other brokerage firms, typically smaller in size, frequently become

introducing firms by hiring clearing brokers to perform some of these functions for them.  In

entering into clearing agreements, introducing firms uniformly retain all customer contact

functions (Functions 1 and 2) and generally execute their customers' and their own orders

themselves (Function 3), while out-sourcing the balance of functions (Functions 4-9) to a

clearing broker.  These out-sourced functions are referred to as "back office" functions to

distinguish them from the customer-contact "front-office" functions performed by the

introducing firm.  This division of labor enables introducing firms to pay for clearing and back

office services out of their current revenues in line with current business conditions and avoiding

the fixed overhead expenses associated with back office technology and infrastructure.  The

limited functions of clearing firms have been summarized by the SEC as follows:

> In the typical fully disclosed [clearing] relationship between a
> customer, an introducing firm and a clearing firm, the clearing
> firm's contact with the customer is limited to transmitting
> confirmations, account statements and other correspondence such
> as proxy statements or Regulation T notifications.  The introducing
> firm is responsible for accepting customer orders and other trading
> instructions.  Under these circumstances, the clearing firm's
> primary (and frequently only) source of information about the
> customer is the introducing firm.  Typically, the customer
> agreement between the clearing firm and the customer will
> authorize the clearing firm to accept instructions and orders from
> the introducing firm for the customer's account without inquiry or
> investigation, unless the clearing firm receives prior written notice
> from the customer to the contrary.

*In re Bear, Stearns Secs. Corp.*, Exchange Act Release No. 41,707, 1999 SEC LEXIS 1551, at

*15-16 (Aug. 5, 1999).

The specific allocation of functions between an introducing firm and its clearing broker is

a matter of contract to be determined by the business needs of the introducing firm and the scope

of services offered by the clearing firm.  However, customer-contact and know-your-customer

functions are uniformly retained by the introducing firm. The party, be it the introducing firm or its clearing broker, to whom a specific function has been allocated in the clearing agreement has full and exclusive regulatory responsibility for its performance and supervision.[10]

### 2.   Customers

Introduced customers are the customers of the introducing firm.[11] Their accounts are serviced by brokers employed by the introducing firm. Among introduced customers may be those that utilize the clearing firm's prime brokerage services. In the instant case, Bayou Securities introduced its customers, the Bayou Fund, as prime brokerage customers.

### 3.   Introducing Firms

Introducing firms come in many shapes and sizes, covering a wide spectrum of business activities. These activities extend from retail brokerage to underwriting of newly-issued securities to making of markets in such and other securities. Introducing firms solicit prospective customers, approve the opening of new accounts, and monitor their customers' transactions, and determine their customers' investment objectives and the suitability of recommendations made to their customers by their brokers. Introducing firms are legally independent broker-dealers, registered with the SEC. As independent firms, they are required to

---

[10]   NYSE Interpretation Handbook, Rule 382/03 provides, in part:

EACH ORGANIZATION WILL BE ACCOUNTABLE FOR ACTUAL PERFORMANCE OF ALL FUNCTIONS PERFORMED BY EMPLOYEES AND OTHER ASSOCIATED PERSONS AS WELL AS FOR OVERALL SUPERVISION OF FUNCTIONS AND ACTIVITIES PERFORMED BY IT PURSUANT TO ANY CARRYING AGREEMENT.

[11]   There are two technical statutory exceptions to this, both carefully tailored by federal law to preventing the clearing broker from exercising dominion and control over the customer's assets. First, introduced customers are customers of the clearing firm for purposes of the Securities Investors Protection Act of 1970 (15 U.S.C. §§ 78aaa et seq), which provides insurance (the brokerage equivalent of the FDIC) for customer accounts against the risk of insolvency of the broker-dealer carrying their accounts. Second, introduced customers are customers of the clearing firm under related SEC financial responsibility and net capital rules. 17 C.F.R. § 240.15c3-1 (1992). Under those rules, all broker-dealers that carry customer accounts are required to (1) maintain minimum levels of net capital for all accounts carried by them and (2) provide custody of the funds and securities in all such accounts, including introduced accounts.

maintain written compliance procedures and compliance staff to, among other things, monitor

their customers and generally "know" their customers' financial circumstances.

### C.    Regulatory Framework of Clearing Arrangements

In 1975, Congress amended the Securities Exchange Act of 1934, finding that "[t]he

prompt and accurate clearance and settlement of securities transactions. . . are necessary for the

protection of investors. . . ."  Exchange Act of 1934, § 17A(a)(i).  Congress directed the SEC

"[t]o facilitate the establishment of a national system for the prompt and accurate clearance and

settlement of securities. . . ."  Exchange Act of 1934, § 17A(a)(2)(A)(i).

The 1975 Amendments to the Exchange Act were among a number of Congressional

responses to the "paper crunch" crisis of 1967-1970, a period of "the most prolonged and severe

crisis in the securities industry in forty years."[12]  During the height of the crisis, the exchanges

curtailed their trading hours and closed their markets entirely on Wednesdays to permit

brokerage firms to catch-up with their paperwork as Wall Street struggled with trading volumes

of 14 to 16 million shares per day in the context of a five day settlement cycle.  The severity of

the crisis, now only a distant memory, is hard to exaggerate.  Approximately 160 NYSE member

firms closed their doors, 80 through merger and the other 80 permanently.[13]  The Congress

created the Securities Investors Protection Corporation ("SIPC") in 1970 to afford some

protections against loss by investors resulting from broker-dealer failures.[14]

Responding to this crisis, the SEC took a number of steps, including the creation of a new

regulatory framework that governs clearing arrangements to this day. This framework

---

[12]    William J. Casey, SEC Chairman, Letter of Transmittal, H.R. Doc. No. 92-231, at 1 (1972) (transmitting and summarizing the SEC's Study of Unsafe and Unsound Practices of Brokers and Dealers).

[13]    See LOSS & SELIGMAN, VI SECURITIES REGULATION 2897-907 (3d ed. 1999).

[14]    The SEC also adopted the so-called Customer Protection Rule, Rule 15c3-3, in 1972.  See discussion supra at pp. 2-3.

successfully encouraged the development of a highly efficient clearance and settlement system which currently processes and clears nearly five (5) *billion* shares per day without operational difficulties[15] and does so during a shorter three (3) day settlement cycle. This is a far cry from the 14 to 15 *million* shares per day during a five (5) day settlement cycle that brought Wall Street to its knees during the 1967 "paper crunch" crisis.

The new regulatory framework, commenced in 1975, consists of three key planks:

- the elimination of fixed commissions on May 1, 1975;
- the adoption of the first industry-wide Net Capital Rule on June 26, 1975; and
- the approval of amendments to NYSE Rule 382 and NYSE Rule 405 on February 19, 1982.

### 1.   The Elimination of Fixed Commissions

The modern era of securities clearing started on May 1, 1975, when the SEC outlawed fixed brokerage commissions.[16] To underscore the revolutionary nature of the occasion, the date was immediately called "May Day."[17] Prior to May Day, members of the NYSE and other national exchanges, including members acting as clearing brokers, were required by exchange rules to charge fixed minimum commissions for all but the largest transactions with non-members. This requirement placed introducing firms – which were usually not NYSE members – at a competitive disadvantage. To realize a profit, introducing firms were forced to add an extra commission to the exchange-mandated minimum charged by their clearing firms. The elimination of fixed commissions enabled clearing and introducing firms to negotiate clearing fees that reflected the economic value of only the services provided by the clearing firm. This

---

[15]   The composite volume for all U.S. securities markets on July 29, 2010 was nearly 5 billion shares. See The Wall Street Journal, July 29, 2010, Section C, page 11 (Composite Volume: 4,767,393,337 shares).

[16]   (Exchange Act Release No. 11,203 (Jan. 23, 1975)).

[17]   Louis Loss & Joel Seligman, FUNDAMENTALS OF SECURITIES REGULATION 745 (2001).

allowed introducing firms to compete more effectively for customers with NYSE member firms and lowered transaction costs for introduced customers generally.

### 2.    Net Capital and Related Rules

On June 26, 1975 – shortly after outlawing fixed commissions on May 1 – the SEC adopted its first uniform Net Capital Rule.[18]  The new Net Capital Rule required only modest net capital for brokerage firms that introduced their accounts to clearing firms.[19]  The new Rule encouraged the protection of customer funds and securities by motivating small brokerage firms to place these assets into the custody of well-capitalized clearing firms, subject to SEC's financial responsibility rules (see, e.g., Rule 15c3-3.).

### 3.    NYSE Rule 382

On February 19, 1982, the SEC approved amendments to NYSE Rule 382.[20]  This was a landmark development that shaped the regulatory regime governing clearing brokers.  Rule 382, as amended, permitted clearing and introducing firms to contractually allocate between themselves responsibility for the performance and supervision of specific functions related to transactions in customer accounts.  Equally important, amended Rule 382 relieved clearing firms from their prior regulatory duty under NYSE Rule 405 to supervise introducing firms.[21]  The

---

[18]   Exchange Act Release No. 11,497, 1975 Fed. Sec. L. Rep. (CCH) ¶ 80,212 (June 26, 1975) (codified at 17 C.F.R. § 240.15c3-1).

[19]   The original Net Capital Rule has been amended, but even today provides for lenient net capital treatment of introducing firms.  17 C.F.R. § 240.15c3-1(a)(2).  The current regulatory minimum net capital of introducing firms is, effectively, $50,000 although it is still possible to operate as an introducing firm with only $5,000 in net capital if the firm has no involvement with the receipt or delivery of customer assets at any point.  By contrast, virtually all clearing firms have well in excess of the required minimum of $250,000 in net capital.

[20]   Order Approving Proposed Rule Change, Exchange Act Release No. 18,497 (Feb. 19, 1982).

[21]   NYSE Information Memo No. 82-18 (Mar. 5, 1982), which announced the SEC's approval of the amendments to Rule 382, made it clear that Rule 405 had no further application to clearing brokers.  Prior to 1982, NYSE Rule 405 was interpreted by the Exchange as requiring its member clearing firms to treat their introducing firms as one of their own branch offices.  See also In Adler Coleman Clearing Corp., 198 B.R. 70, 73 n.4 (Bankr. S.D.N.Y. 1996) (summarizing the history of the 1982 Amendments to NYSE Rules

continuation of that duty could no longer be economically justified after May Day as clearing

firms were no longer receiving generous fixed commissions, which had permitted them to

maintain legal and compliance staff and systems to police introducing firms.  Under amended

Rule 382, "know your customer" responsibilities – became solely those of the introducing firm.

In brief, under amended Rule 382, clearing brokers became responsible for the performance of

only those functions allocated to them under the clearing agreement and eliminated heretofore

duplicative responsibilities of clearing firms, *e.g.*, to "know the customers" of introducing firms.

Amended Rule 382 encouraged the rational and efficient division of labor.  The savings

realized from this division of labor benefited, not only introducing and clearing firms, but also

introduced customers in the form of lower commissions.  Most importantly, Rule 382, as

amended, advanced significant regulatory objectives of the SEC for the benefit of investors by

encouraging minimally-capitalized brokerage firms to place investor assets into the custody of

well-capitalized clearing firms, firms that possessed the operational capacity to process and clear

transactions promptly and accurately and maintain timely and accurate brokerage records.[22]

Each of these objectives addressed a substantial concern of Congress and the SEC in the

aftermath of the "paper crunch" of 1967-1970.[23]

### 4.    Civil Liability

Civil liability rules have similarly strictly limited the role and obligations of clearing

brokers.  For example, courts have repeatedly held under state law that clearing brokers have no

---

382 and 405); Henry F. Minnerop, *The Role and Regulation of Clearing Brokers*, 48 Bus. Law 841, 846-851 (May 1993) (same).

[22]    NYSE Rule 382 was further amended in 1999.  Those amendments did not change the relationship between clearing and introducing firm as contemplated in Rule 382.  See, Henry F. Minnerop, *Clearing Arrangements*, 58 Bus. Law 917, 936-37 (May 2003).

[23]    The NASD formulated its own clearing agreement rule, NASD Rule 3230, which is substantially identical to NYSE Rule 382.  Since the formation of FINRA, merging the SRO functions of the NYSE and the NASD, the two rules are in the process of being harmonized along the line of their existing provisions.

fiduciary duty vis-à-vis introduced customers.[24]   The Second Circuit in *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595 (2d Cir. 1991), applied New York law to the breach of fiduciary duty claims of an introduced customer: "no such [fiduciary] relationship exited between . . . the clearing agent and . . . the investor."   *Id.* at 599 (quoting *Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 676 (N.Y. App. Div. 1987)).   Other courts before and since have reached identical conclusions.[25]   Nor does a clearing firm owe a continuing duty of disclosure to convey warnings to successor clearing firms.[26]   As Judge Milton Pollock explained, regarding a federal securities claim against a clearing broker:

> Clearing firms . . . relieve brokerage firms . . . of the huge costs associated with 'back-office' operations. . . . In no way, shape or form does the complaint plead that [the clearing firm] was making decisions regarding the accounts.   The pleading indicates that [the clearing firm] simply executed the . . . transactions along with the other transactions sent to it by [the introducing firm].   *[The clearing firm] was not in a fiduciary relationship with [the introducing firm's] customers.*   This being so, no primary liability may attach to [the clearing firm] (Emphasis added.).

*Dillon v. Militano*, 731 F. Supp. 634, 636 (S.D.N.Y. 1990).

Courts have been similarly uniform in holding that clearing firms, performing routine functions, do not give the "substantial assistance" to a fraud or breach of duty necessary to

---

[24]   Federal law likewise does not impose any such duty.   See "Dodd-Frank" Amendments to Section 15(k)(1) of the Securities Exchange Act of 1934, mandating the SEC to study, among other things, adoption of a fiduciary standard for broker-dealers when providing personalized investment advice about securities to retail customers.   This prospective fiduciary standard, however, would obviously not apply to a clearing broker.

[25]   *See, e.g., Lesavoy v. Lane*, 304 F. Supp. 2d 520, 525, 526 (S.D.N.Y. 2004) (clearing firms owed no duty to accountholders' beneficiaries, as a broker "'has no duty to monitor a nondiscretionary account'" (quoting *De Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1302 (2d Cir. 2002)), *aff'd in part and rev'd in part on other grounds*, 170 Fed. Appx. 721 (2d Cir. 2006).   *Carlson v. Bear, Stearns & Co.*, 906 F.2d 315 (7th Cir. 1990) (clearing broker not a fiduciary under Illinois' blue sky law); *Mars v. Wedbush Morgan Sec., Inc.*, 283 Cal. Rptr. 238 (Cal. Ct. App. 1991) (clearing broker not a fiduciary of the customer under California law).

[26]   *See Chase Manhattan Bank, N.A. v. Fidata Corp.*, 700 F. Supp. 1252 (S.D.N.Y. 1988) (clearing firm allegedly knew that its introducing firm had committed fraud, but failed to warn its successor clearing firm).   *See also, SFM Holdings v. Banc of America Securities*, 600 F.3d 1334, 1339-40. (11th Cir. 2010) (clearing firm offering prime brokerage service is not a fiduciary).

sustain an aiding and abetting claim.[27]  In a case with similar facts as alleged in this arbitration, *Cromer Finance v. Berger*, 137 F. Supp 2d 452 (S.D.N.Y. 2001), the district court granted a motion to dismiss a complaint alleging that the clearing and prime broker had enabled a Ponzi scheme by providing margin credit and by continuing to clear trades in spite of red flags.  In dismissing the claims brought by the hedge fund's investors, the district court, citing Second Circuit case law, held:  "The simple providing of normal clearing services to a [introducing] broker who is acting in violation of the law does not make out a case of aiding and abetting against the clearing broker."[28]  The *Cromer* court further stated that "[t]he plaintiffs [were] unable to cure the defect in their pleading of substantial assistance by emphasizing that the alleged fraud included a Ponzi scheme that could not have functioned but for the extension of credit and margin violations."  *Cromer* concluded its analysis by noting that:  "[w]hile the Ponzi scheme may only have been possible because of [the clearing broker's] actions, or inaction, [the clearing broker's] conduct was not a proximate cause of the Ponzi scheme."

## III.   Policy Considerations

In imposing liability on Goldman, the arbitrators disregarded the long-recognized principle that a clearing firm cannot be liable for merely processing transactions received from an authorized source.  Commercial law recognizes the firmly established principle that a clearing broker has no duty to inquire into the honesty and finances of its accountholders.  "Rather than imposing duties to investigate, the general policy of the commercial law of the securities holding and transfer system has been to eliminate legal rules that might induce participants to conduct

---

[27] *See Connolly v. Havens*, 763 F. Supp. 6, 11 (S.D.N.Y. 1991) (having no fiduciary relationship with introduced customers, "clearing broker's failure to disclose cannot constitute the requisite 'substantial assistance'"); *Antinoph v. Laverell Reynolds Sec., Inc.*, 703 F. Supp. 1185, 1189 (E.D. Pa. 1989) ("mere inaction or silence does not amount to substantial assistance").

[28] *Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22, 29 (2d Cir. 2000).

investigations of the authority of persons transferring securities on behalf of others for fear that

they might be held liable for participating in a wrongful transfer." U.C.C. § 8-503 cmt. 3.  Such

firms do not exercise investment discretion, but instead provide incidental financing and – for

just fractions of a penny per share – perform the ministerial "back office" functions necessary to

clear and settle the trades.  Given this carefully limited role, "it would impair rather than advance

the interest of investors in having a sound and efficient securities clearance and settlement

system to require intermediaries to investigate the propriety of the transactions they are

processing."  U.C.C. § 8-102(a) cmt. 10.  Any other rule, whether under the Bankruptcy Code or

otherwise, would increase system-wide costs, to no useful purpose.  *See Bonded Financial*

*Services, Inc. v. European American Bank*, 838 F.2d 890, 893 (7th Cir. 1988) ("Exposing

financial intermediaries . . . to the risk of disgorging a 'fraudulent conveyance' . . . would lead

them to take precautions, the costs of which would fall on solvent customers without

significantly increasing the protection of creditors.").

　　　　These principles have allowed the nation's securities clearance and settlement systems to

function effectively for decades.  Major clearing firms, such as Goldman, handle hundreds of

thousands of trades daily on behalf of the customers of hundreds of introducing firms, including

those that use their prime brokerage services.  They do so in an environment of extremely large

trading volumes, averaging billions of shares a day, and ever shorter settlement cycles.[29]  If

clearing firms were required to analyze trading in introduced accounts, or to make

determinations concerning whether the records and documents in their possession regarding the

---

[29]　　　See generally: SEC's Concept Release: Securities Transactions Settlements.  Securities Exchange Act
Release No. 49405 (March 11, 2004) (Discussing the shortening of the settlement cycle from 5 to 3 days
and the prospect of same day settlements in the future).

activities of an introducing firm's customers indicated possible wrong-doing, the speed and

efficiency demanded in the contemporary securities markets would not be possible.

**IV.**   **Conclusion**

SIFMA respectfully requests that the Court's decision and opinion on the pending

*vacatur* motion reflect the applicable law and regulations governing clearing brokers.


Dated:  August 5, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP

By: _____

*Of Counsel:*

    Henry F. Minnerop (HM 0013)
    Daniel A. McLaughlin (DM 2688)
787 Seventh Avenue
Ira D. Hammerman
New York, New York  10019
Kevin M. Carroll
Telephone:  (212) 839-5300
SECURITIES INDUSTRY AND
hminnerop@sidley.com
FINANCIAL MARKETS ASSOCIATION
dmclaughlin@sidley.com
1101 New York Avenue, NW
Washington, DC  20005
Attorneys for *Amicus Curiae*
(202) 962-7382
SECURITIES INDUSTRY AND
FINANCIAL MARKETS ASSOCIATION