# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Derivium Capital, LLC,<br><br>                                    Debtor(s). | C/A No. 05-15042-JW<br><br>Adv. Pro. No. 07-80119-JW<br><br>Chapter 7<br><br>**ORDER** |
| Grayson Consulting, Inc.,<br><br>                                    Plaintiff(s),<br><br>v.<br><br>Wachovia Securities, LLC, f/k/a First Union<br>Securities, Inc., and First Clearing, LLC,<br><br>                                    Defendant(s). | |

This matter comes before the Court on the Renewed Motion for Summary Judgment[1]
("Renewed Motion") and Motion for Summary Judgment as to Plaintiff's Alter Ego Theory
("Alter Ego Motion") filed by Wachovia Securities, LLC and First Clearing, LLC
(collectively, "Defendants" or "Wachovia"). Grayson Consulting, Inc. filed Objections to
the Renewed Motion and Alter Ego Motion. The Court has jurisdiction over this matter
pursuant to 28 U.S.C. § 1334, and this is a core proceeding pursuant to 28 U.S.C.
§ 157(b)(2)(A), (H), and (O).  Pursuant to Fed. R. Civ. P. 56(d), which is made applicable to

---

[1]     The original Motion for Summary Judgment was filed by Defendants on September 8, 2009.  In
response, Plaintiff filed an Objection to the Motion as well as a Motion Pursuant to Federal Rule of Civil
Procedure 56(f), wherein Plaintiff argued that it had not had a sufficient opportunity to discover facts relating
to Defendants' alleged dominion and control over the accounts at issue in this case.  The Court granted
Plaintiff's Rule 56(f) motion for the limited purpose of allowing discovery to proceed on the issue of dominion
and control and permitting Plaintiff to respond further to the Motion for Summary Judgment after completion
of that discovery.

this proceeding by Fed. R. Bankr. P. 7056, the Court makes the following Findings of Fact and Conclusions of Law.[2]

## **FINDINGS OF FACT**

**I.     Background**

1.     Derivium Capital, LLC ("Debtor") is a limited liability company organized under and pursuant to the laws of the State of South Carolina, which was engaged in the business of the marketing and administration of a stock loan program, known as the 90% Stock-Loan Program (the "Program"), whereby its customers ("Stock Loan Borrowers") pledged publicly traded stock to Debtor in exchange for a loan in the amount of 90% of the value of the stock. Upon maturity of the loan, the Stock Loan Borrowers had the option of tendering principal and interest and recovering their collateral, electing to surrender the stock in satisfaction of the loan with no further obligation, or refinancing the transaction for an additional term. Charles Cathcart, Scott Cathcart, and Yuri Debevc ("Derivium Owners") were the owners and operators of Debtor.

2.     The Stock Loan Borrowers were informed by the Derivium Owners or their agents that the Program, through a complex and secret hedging strategy, both protected against the risk of stock depreciation and allowed the Stock Loan Borrowers to recapture their stock if the stock appreciated over the term of the loan.  However, Debtor, under the control of the Derivium Owners, was immediately selling the stock and transferring the proceeds through various offshore businesses without the Stock Loan Borrowers' knowledge.  As a result, following the maturity of some of the stock loans, Debtor was

---

[2]     To the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such; and to the extent any of the Conclusions of Law constitute Findings of Fact, they are so adopted.

unable to satisfy its obligation to return the pledged stock. The Program is alleged to have been a complicated Ponzi scheme.[3]

3.　　To carry out the Program, Debtor used certain brokerage accounts with Defendants and other entities ("At-Issue Accounts").[4] These accounts were opened under the names of Debtor, Bancroft Ventures Limited ("Bancroft"), WITCO Services (UK) Ltd. ("WITCO"), and Optech Limited ("Optech"). The At-Issue Accounts were subject to certain account agreements with Wachovia or its predecessor, which outlined the parties' rights with respect to those accounts. Specifically, the account agreements provided Wachovia with the right to (1) liquidate positions in the At-Issue Accounts in any circumstance which in its opinion warranted such action, (2) require Debtor or the Stock Loan Entities to maintain positions as deemed necessary or advisable by Wachovia, (3) prevent Debtor or the Stock Loan Entities from closing the At-Issue Accounts if there were open short positions and outstanding debts to Wachovia, and (4) sell any or all assets in the At-Issue Accounts without demand for margin or additional margin or other notice. In addition, the account agreements provided that Wachovia retained a security interest in all securities and/or other property held in any At-Issue Account.

4.　　As part of the Program, Debtor accepted transfers of pledged stock from Stock Loan Borrowers into its brokerage account at Wachovia, as well as the brokerage accounts of the other Stock Loan Entities. The Derivium Owners would then direct a

---

[3]　　The Program is also the subject of related proceedings against the Derivium Owners and related individuals and entities before the United States District Court for the District of South Carolina: General Holding, Inc. v. Cathcart et al., No. 2:06-cv-01121; Campbell v. Cathcart et al., No. 2:06-cv-03283; Grayson and the AMG Trust v. Cathcart et al., 2:07-cv-00593; Sabelhaus v. Cathcart et al., No. 2:07-cv-00790; Newton Family LLC v. Cathcart et al., No. 2:07-cv-02964; WCN/GAN Partners, Ltd. v. Cathcart et al., No. 2:07-cv-02965; and Campbell v. Cathcart et al., No. 2:07-cv-2992.

[4]　　Two other brokerage firms, Janney Montgomery Scott and Morgan Keegan, were also defendants in this adversary proceeding, but the United States District Court granted their motion for withdrawal of reference. Accordingly, Plaintiff's claims as to these brokerage firms are pending before the District Court.

Case 1:10-cv-05622-JSR   Document 29-1   Filed 09/20/10   Page 4 of 30

transfer of the pledged stock from the initial account into another account held by the Stock Loan Entities, at which point the Derivium Owners would direct Wachovia to liquidate the stock, for which Wachovia would receive a brokerage commission and other fees for its services. Debtor would fund the loan to the Stock Loan Borrowers from the proceeds of the sale of the pledged stock.

5.      The following facts regarding the transfers at issue in this case are undisputed:

    a.  At least $161 million in securities were transferred from the Stock Loan Borrowers into the At-Issue Accounts.

    b.  During the one-year pre-petition period, at least $828,500 in cash was transferred into the Bancroft At-Issue Account from bank accounts held in the names of Bancroft and Debtor.

    c.  During the three-year pre-petition period, Wachovia received at least $672,414.49 in commissions and margin interest payments from Debtor and the Stock Loan Entities.

    d.  During the one-year pre-petition period, Wachovia received at least $203,839.75 in commissions and margin interest payments from Debtor and the Stock Loan Entities.

**II.      Procedural History**

6.      Debtor filed this bankruptcy case as a case under chapter 11 of the Bankruptcy Code on September 1, 2005, in the United States Bankruptcy Court for the Southern District of New York. The Bankruptcy Court in New York subsequently converted the case to a case under chapter 7 and transferred venue to this District.

7.      On November 7, 2005, Kevin Campbell ("Trustee") was appointed as the Chapter 7 trustee for Debtor.

8.      On August 31, 2007, the Trustee commenced this adversary proceeding against Defendants by filing a complaint alleging eleven claims for relief: aiding and abetting fraud (First Claim); aiding and abetting breach of fiduciary duty (Second Claim); aiding and abetting fraudulent conveyance (Third Claim); aiding and abetting conversion (Fourth Claim); negligence (Fifth Claim); breach of fiduciary duty (Sixth Claim); conversion (Seventh Claim); civil conspiracy (Eighth Claim); constructive trust (Ninth Claim); and fraudulent conveyance (Tenth and Eleventh Claims).

9.      Grayson Consulting, Inc. subsequently purchased the Trustee's rights in this action for $25,000 and an agreement to pay the estate a percentage of any net recovery in this matter.   Grayson Consulting, Inc. ("Plaintiff") was substituted for the Trustee as Plaintiff and filed an Amended Complaint on December 21, 2007.

10.     Defendants moved to dismiss each claim asserted against them.  On June 10, 2008, the Court entered an Order dismissing the First through the Ninth Claims with prejudice based on the doctrine of *in pari delicto*, and dismissed the Tenth and Eleventh Claims with leave to amend.

11.     The June 10, 2008 Order identified three deficiencies with respect to the fraudulent conveyance claims: (1) the amended complaint "fails to specifically allege a transfer of Debtor's property to Wachovia;" (2) the amended complaint "fails to sufficiently set forth facts demonstrating that Debtor was indebted at the time of the alleged transfers" for purposes of the § 544 claim; and (3) the amended complaint "fails to provide sufficient

detail of when the alleged fraudulent transfers by Debtor to Wachovia took place and the particular source of these transfers" pursuant to Fed. R. Civ. P. 9(b).

12.    Plaintiff filed a Second Amended Complaint on June 24, 2008.    The complaint, as amended, alleges that Debtor had brokerage accounts with Defendants held both in Debtor's name and in the names of the Stock Loan Entities, and that such accounts were believed to be margin accounts over which Defendants exercised dominion and control.    Plaintiff seeks recovery of Debtor property that was fraudulently transferred to Defendants under 11 U.S.C. §§ 544 and 548, including all money or property that was transferred into the accounts held in the name of Debtor and the Stock Loan Entities, and commissions, interest, and other fees that were taken from those accounts by Defendants. Plaintiff alleges that the Stock Loan Entities are alter egos of Debtor and they "had no identit[ies] or existence independent of Derivium Capital, and were at all times under the complete domination and dominion of the Derivium Owners," and were formed for the sole purpose of aiding the Derivium Owners in their efforts to defraud the Stock Loan Borrowers and strip Debtor of its assets.

13.    On July 21, 2008, Defendants filed a motion to dismiss the Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 9(b).    Defendants contended that property transferred to them by alleged alter egos was not "property of the estate" and thus the claims under 11 U.S.C. §§ 544 and 548 should be dismissed under Fed. R. Civ. P. 12(b)(6).    Defendants further argued that Plaintiff failed to meet the particularity standard under Fed. R. Civ. P. 9(b) with regard to any transfers of Debtor's property.

14.    On September 19, 2008, the Court entered an order granting in part and denying in part Defendant's motion to dismiss ("September 19 Order").    The Court

concluded that property of alter egos of Debtor could be considered property of the Debtor under the broad definition of "property of the estate" under 11 U.S.C. § 541; thus, Plaintiff had sufficiently alleged claims under both 11 U.S.C. § 544 and 11 U.S.C. § 548 to defeat Defendants' motion to dismiss. The Court determined that Plaintiff had alleged with the requisite specificity transfers of Debtor's property to the Defendants during the relevant time periods and stated that "[c]onsidering the large number of transfers at issue and the complicated nature of the relationships between the Derivium Owners, Debtor, Bancroft and these other entities, the Court is satisfied that the details of the transfers are best addressed by the discovery process." The Court granted Defendants' motion to dismiss to the extent Plaintiff's Second Amended Complaint alleged claims under 11 U.S.C. § 544 and 548 for constructive fraud since Plaintiff had expressly stated in its objection that it need not rely on theories of constructive fraud and had not relied on a constructive fraud theory in its argument at the hearing or within its proposed order regarding the motion.

15. In light of the Court's September 19 Order and due to the withdrawal of the reference by two defendants who had been named in this action, Plaintiff filed its Third Amended Complaint on October 2, 2008, which deleted the two defendants who are not proceeding in this forum and deleted the nine causes of action that the Court dismissed on June 10, 2008. Plaintiff retained allegations regarding the fraudulent transfer claims in the Third Amended Complaint, including the allegations that the Derivium Owners' exercised dominion and control over the Stock Loan Entities, that Debtor had brokerage accounts with Defendants in the name of the Debtor and in the names of the Stock Loan Entities, and that those accounts were believed to be margin accounts over which Defendants exercised dominion and control.

16.    Defendants filed a motion to strike the Plaintiff's jury demand on November 21, 2008.  Defendants did not seek to strike any other allegations from the Third Amended Complaint.  Plaintiff filed a response that expressly consented to strike the jury demand from the Third Amended Complaint.  An order striking Plaintiff's demand for a jury trial was entered on December 8, 2008.

17.    Defendants filed their Answer to the Third Amended Complaint on November 3, 2008.

18.    Discovery followed pursuant to a number of scheduling orders, many of which were amended based upon the parties' consent.

19.    On September 8, 2009, Defendants filed their Motion for Summary Judgment, which was supported by the declarations of George M. Gordon, III, and Mark A. Lee.

20.    On September 29, 2009, Plaintiff filed an Objection to the Motion, which was supported by the Declaration of Alisa Roberts, as well as a Rule 56(f) Motion.

21.    Following a hearing on both the Motion for Summary Judgment and the Rule 56(f) Motion, the Court issued an order granting Plaintiff's Rule 56(f) Motion for the limited purpose of allowing discovery to proceed on the issue of dominion and control and permitting Plaintiff to respond further to the Motion for Summary Judgment after completion of that discovery.

22.    On June 11, 2010, following the expiration of an extended discovery period, Defendants filed their Motion to Renew their Motion for Summary Judgment and their Motion for Summary Judgment as to Plaintiff's Alter Ego Theory.

Case 1:10-cv-05622-JSR   Document 29-1   Filed 09/20/10   Page 9 of 30

## CONCLUSIONS OF LAW

In their Renewed Motion, Defendants assert that they are entitled to summary judgment on Plaintiff's fraudulent transfer claims under 11 U.S.C. §§ 548 and 544,[5] as to the three categories of transfers at issue in this proceeding: 1) transfers of securities made by Stock Loan Borrowers to the At-Issue Accounts, 2) transfers of cash by Debtor or the Stock Loan Entities into their respective brokerage accounts at Wachovia, and 3) transfers of commissions, margin interest, wire transfer fees, prepayment fees, and other fees charged to Debtor or the Stock Loan Entities by Defendants for brokerage services. In their Alter Ego Motion, Defendants further assert that they are entitled to summary judgment as to Plaintiff's Alter Ego theory. Specifically, Defendants argue that Plaintiff's claims for cash transferred into the At-Issue Accounts and for commissions, margin interest, and wire and pre-payment fees paid from those accounts also fail to the extent that those transfers were made by the Stock Loan Entities because Plaintiff cannot meet its burden of establishing that these entities are alter-egos of Debtor.

### I.      Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "When a motion for summary judgment is filed, the Court does not weigh the evidence, but determines if there is a genuine issue for trial."

---

[5]      Further references to the Bankruptcy Code shall be by section number only.

T 2 Green, LLC v. Abercrombie (In re T 2 Green, LLC), 363 B.R. 753, 763 (Bankr. D.S.C. 2006)(citing Listak v. Centennial Life Insurance Co., 977 F. Supp. 739, 742 (D.S.C. 1997).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003), cert. denied, 541 U.S. 1042, 124 S.Ct. 2171, 158 L.Ed.2d 732 (2004). "When a party has submitted sufficient evidence to support its request for summary judgment, the burden shifts to the nonmoving party to show that there are genuine issues of material fact." Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1322-32 (4th Cir. 1995).

The obligation of the non-moving party to demonstrate evidence sufficient to create a genuine factual issue for trial is particularly strong when the non-moving party bears the burden of proof. T 2 Green, 363 B.R. at 763. "Summary judgment should be granted 'against a party who fails to make a showing sufficient to establish the evidence of an element essential to that party's case.' " Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## II.    Fraudulent Transfers

### A.    Transfers of Stock from Stock Loan Borrowers into the At-Issue Accounts

To establish a fraudulent transfer claim under either § 544 or § 548, Plaintiff must show that a "transfer of an interest of the debtor in property" occurred within the statutory time limit.  See 11 U.S.C. §§ 544(b)(1) and 548(a).  "The hallmark of a 'transfer' is a change in the rights of the transferor with respect to the property after the transaction." Barber v. Dunbar (In re Dunbar), 313 B.R. 430, 435 (Bankr. C.D. Ill. 2004). With respect to the transfers of stock from the Stock Loan Borrowers into the At-Issue Accounts ("Customer Transfers"), Defendants first argue that Plaintiffs' claims under §§ 544 and 548 fail as a matter of law because the transfers came directly to Defendants from the Stock Loan Borrowers and not by or through Debtor; thus, there was no transfer of an interest of Debtor in property. Plaintiff contends that by virtue of the terms of the At-Issue Account agreements, Defendants had dominion and control over the transfers sufficient to render the Defendants the initial transferees of the Customer Transfers under § 550 at the same moment that those securities became property of Debtor, which is tantamount to a transfer by Debtor to Wachovia.  As support for the argument that the Customer Transfers qualify as recoverable transfers under §§ 544 and 548, Plaintiff primarily relies upon In re Manhattan Inv. Fund Ltd., 397 B.R. 1 (S.D.N.Y. 2007) ("Manhattan Investment"), in which a district court affirmed a bankruptcy court's holding that a trustee could recover transfers made by the debtor into its margin account maintained by a brokerage firm because the brokerage firm had sufficient dominion and control over the account to be an "initial transferee" under 11 U.S.C. § 550 by virtue of its "prime broker" margin arrangement.

11

In this case, the Stock Loan Borrowers directly transferred the stock into Debtor's brokerage accounts at Wachovia. Therefore, the transfers in this case are distinguishable from the transfers by the debtor to the margin account in <u>Manhattan Investment</u>, because the transfers in <u>Manhattan Investment</u> came from the debtor itself and not directly from customers. <u>See</u> 397 B.R. at 5 ("To support its trading activity [the debtor] was required to keep a separate "margin account" at Bear Stearns…. During the year preceding [the debtor's] bankruptcy, [the debtor] transferred $141.4 million into this account…."). The <u>Manhattan Investment</u> court expressly recognized that "before each transfer, the … funds were completely controlled by the [debtor] and therefore, prior to the transfer, the money could have been available to creditors had a bankruptcy been declared at that moment." <u>Id.</u> at 9. As to the transfers alleged within this category, Plaintiff has not demonstrated that there were subsequent transfers from Debtor to Defendants with respect to this property, other than the transfers of commissions, margin interest payments, and other fees, which are discussed below.[6] Therefore, the Court is unable to conclude that the Customer Transfers can serve as the basis of a fraudulent transfer claim under § 544 or § 548. To hold otherwise would be an unwarranted extension of <u>Manhattan Investment</u>.

Section 548 allows a trustee to avoid any transfer of property that would have been "property of the estate" had it not been transferred. <u>In re French</u>, 440 F.3d 145, 151 (4th Cir. 2006). The purpose of the avoidance provisions is to prevent a debtor from diminishing, to the detriment of creditors, funds that are generally available for distribution to creditors. <u>Id.</u>; <u>Nordberg v. Sanchez ( In re Chase & Sanborn Corp.)</u>, 813 F.2d 1177, 1181 (11th Cir. 1987). This purpose is not served by the avoidance of the Customer Transfers. In this case, had

---

[6]     Plaintiff has conceded that it does not seek to recover transfers from one At-Issue Account to another At-Issue Account.

Debtor declared bankruptcy prior to the funds being transferred by the Stock Loan Borrowers into the At-Issue Accounts, these funds would not have been available to Debtor's creditors because they would not have been property of the estate.

In the alternative, Plaintiff argues that certain of the Customer Transfers made within one year of Debtor's bankruptcy filing are recoverable under § 548(a)(1)(A) because they were "margin payments" or "settlement payments" under § 546(e). The Court agrees that the stockbroker defense set forth in § 546(e) does not protect margin payments or settlement payments from recovery under § 548(a)(1)(A), to the extent that the margin payments or settlement payments were transfers of an interest of Debtor in property. See § 546(e) (providing that the trustee may not avoid a transfer that is a margin payment … or settlement payment … except under section 548(a)(1)(A)). However, § 546(e) does not provide the trustee with the right to recover transfers of non-debtor property. Section 546(e) operates only as a defense to the avoidance of transfers that would otherwise be avoidable under §§ 544, 545, 547, 548(a)(1)(B) and 548(b). Since the Customer Transfers were not transfers of an interest of Debtor in property, they are not avoidable under these sections. Accordingly, Defendants' Renewed Motion is granted with respect to the Customer Transfers.

**B.  Transfers of cash by the Stock Loan Entities into the At-Issue Accounts**

Plaintiff also seeks to recover cash transfers of approximately $828,500 that Debtor and Bancroft directly transferred to Defendants through deposits into their brokerage accounts in the year prior to Debtor's bankruptcy filing pursuant to § 548.[7] To recover these transfers under § 548, Plaintiff must establish that Wachovia was the initial transferee of

---

[7]  Plaintiff has conceded that these cash transfers are "settlement payments" or "margin payments" pursuant to 11 U.S.C. § 546(e) and are thus not recoverable under 11 U.S.C. § 544.

those transfers under § 550.  The term "initial transferee" is not defined by the Bankruptcy

Code, but the Seventh Circuit stated in <u>Bonded Fin. Servs., Inc. v. European Am. Bank</u>, 838

F.2d 890, 891 (7th Cir. 1988) that "the minimum requirement of status as a 'transferee' is

dominion over the money or other asset, the right to put the money to one's own purposes."

The Fourth Circuit has expressly adopted this definition and added the requirement that the

person or entity must have also exercised legal dominion and control over the property.

<u>Bowers v. Atlanta Motor Speedway, Inc. (In re Southeast Hotel Properties</u>, 99 F.3d 151, 156

(4th Cir. 1996).  Thus, to hold Wachovia liable as the "initial transferee," Plaintiff must

prove both that Wachovia had the right to exercise dominion and control over the property at

issue and that it actually exercised such dominion and control.  However, a demonstration of

complete unfettered control is not required—a party can be an initial transferee even if it

cannot use the funds it receives for purposes unrelated to the underlying transaction.  <u>Lowry</u>

<u>v. Security Pac. Bus. Credit, Inc. (In re Columbia Data Products, Inc.</u>, 892 F.2d 26, 29 (4th

Cir. 1989).

Wachovia argues that it is not liable to Plaintiff for any transfers into the At-Issue

Accounts, irrespective of their source, because it is not the initial transferee of those

transfers.  Relying on <u>Manhattan Investment</u>, Plaintiff contends that Wachovia was the

initial transferee of these transfers into those accounts because the accounts were governed

by margin agreements which empowered Wachovia with complete dominion and control

over the property within the accounts. Wachovia argues that <u>Manhattan Investment</u> involved

unique facts that are distinguishable from the facts presented here.

The <u>Manhattan Investment</u> case involved a hedge fund that entered into a prime

brokerage relationship with Bear Stearns in order to facilitate its trading activity, which

involved the short selling of technology stocks. 397 B.R. at 5. Bear Stearns required the
hedge fund to keep a separate margin account in addition to its trading account. In addition
to amounts required to be deposited into the margin account pursuant to federal regulations,
Bear Stearns required the hedge fund to maintain an amount equal to 35% of the value of its
open short positions on deposit in the margin account at all times. The margin account
agreement between Bear Stearns and the hedge fund contained certain provisions which
were designed for the protection of Bear Stearns. Specifically, Bear Stearns was allowed to
set any level of maintenance margin for the account, it had a security interest in the
account's contents, it could prevent the hedge fund from withdrawing money from its
account while there were open short positions supported by the account, and it could use the
funds in the account to liquidate the hedge fund's open short positions, with or without the
hedge fund's consent. Id. The Manhattan Investment court found that the powers vested in
Bear Stearns through the account agreement clearly demonstrated that the hedge fund did
not have access to its deposits once it placed them in the Bear Stearns account.
Furthermore, the court made findings that Bear Stearns actually prohibited the debtor from
withdrawing cash from its account when short positions were open, actually used transfers
from the debtor to purchase securities to cover the debtor's open trading positions (positions
for which Bear Stearns would have been liable if the transfers had not been made), and made
margin calls on a frequent basis by which it required the debtor to increase the flow of
transfers into the margin account. Id. at 522.

A close examination of the undisputed facts in this case reveals that Manhattan
Investment is distinguishable from this case. As discussed previously, in Manhattan
Investment, the account at issue was an entirely separate account from the hedge fund's

trading account, which was established for purpose of providing protection to Bear Stearns. In this case, the At-Issue Accounts were the trading accounts used by Debtor and the Stock Loan Entities to conduct their business. No similar separate account was established for the protection of Wachovia. While it does appear that Wachovia possessed similar rights with respect to the At-Issue Accounts under the margin agreements that Bear Stearns had in <u>Manhattan Investments</u>,[8] no facts have been presented which demonstrate that Wachovia actually exercised any dominion and control over the At-Issue Accounts. In particular, no showing has been made that Wachovia liquidated securities on its own accord or took any other action with respect to the assets in the accounts for its own use or benefit. Rather, the facts presented demonstrate that Debtor and the Stock Loan Entities exclusively controlled the flow of funds and securities into and out of the At-Issue Accounts.

The Court disagrees with Plaintiff's contention that Wachovia's deduction of fees, commissions, and margin interest payments out of the At-Issue Accounts is sufficient evidence of dominion and control to subject them to liability as the initial transferee of the entirety of the cash transfers. See <u>In re Coutee</u>, 984 F.2d 138, 141 (5th Cir. 1993) (holding that a law firm that accepted funds in settlement of its client's case, deposited the money in trust, kept as fees only what the client agreed to, and paid the rest to the bank on behalf of the client, was not the initial transferee of the settlement funds); <u>In re Moon</u>, 385 B.R. 541, 553 (Bankr. S.D.N.Y. 2008) (rejecting the trustee's contention that the attorney was "initial transferee" as to the entirety of settlement proceeds received in client trust account, and

---

[8]    Specifically, under the margin agreements governing the At-Issue Accounts, Wachovia had the right to liquidate positions in the At-Issue Accounts in any circumstance which in its opinion warrants such action, Wachovia could require Debtor or the Stock Loan Entities to maintain positions as deemed necessary or advisable by Wachovia, Wachovia could prevent Debtor or the Stock Loan Entities from closing the At-Issue Accounts if there were open short positions and outstanding debts to Wachovia, Wachovia could sell any or all assets in the At-Issue Accounts without demand for margin or additional margin or other notice, and Wachovia retained a security interest in all securities and/or other property held in any Account. It appears that these margin agreements are relatively standard, boilerplate margin agreements.

holding that the attorney was only the "initial transferee" of the settlement proceeds that the attorney actually retained for his fees and expenses); In re Cassandra Group, 312 B.R. 491, 496 (Bankr. S.D.N.Y. 2004) (attorney who received funds into client trust account was not the "initial transferee" of the funds, even though he paid his own attorney's fees from the fund).  The Court further rejects Plaintiff's argument that Wachovia's treatment of the At-Issue Accounts as "related" and as a "single household" is evidence that Wachovia exercised dominion and control over these accounts.

It appears that the separateness of the account and the evidence of Bear Stearns' exercise of control over the transfers at issue were critical factors in the Manhattan Investment court's conclusion that Bear Stearns was the "initial transferee." To the extent Manhattan Investment holds that a party can be liable as an initial transferee without a demonstration that the party actually exercised dominion and control, this Court declines to follow Manhattan Investment, since it is not binding precedent and the Fourth Circuit has clearly stated that a demonstration that the transferee actually exercised dominion and control is a required element to confer initial transferee liability in this Circuit. See Bowers v. Atlanta Motor Speedway, Inc. (In re Southeast Hotel Properties), 99 F.3d 151, 156 (4th Cir. 1996).

Based upon the foregoing, the Court finds that Wachovia has presented sufficient evidence demonstrating that it was not the initial transferee of the cash transfers that Debtor and Bancroft deposited into their brokerage accounts.  Since Plaintiff failed to demonstrate that a genuine issue of material fact exists with respect to this element of its claim, the Court grants summary judgment in favor of Defendants as to these transfers.

### C.    Transfers of commissions to Defendants

Plaintiff seeks to avoid transfers of commissions from the At-Issue Accounts to Defendants in connection with the purchase and sale of securities by Debtor or the Stock Loan Entities.   Defendants move for partial summary judgment with respect to these transfers on the grounds that the "stockbroker defense" bars Plaintiff's attempt to avoid these transfers under § 544.[9] Section 546(e), which is commonly referred to as the "stockbroker defense," provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a *margin payment*, as defined in section 101, 741, or 761 of this title, or *settlement payment*, as defined in section 101 or 741 of this title, made… to a … stockbroker, … that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e)(2004) (emphasis added). When applicable, § 546(e) is a complete defense to a § 544 claim. See In re Stewart Fin. Co., 367 B.R. at 916 ("§ 546(e) provides a complete bar and defense to avoidance claims brought by a bankruptcy trustee for any transfer that is a *margin payment* or *settlement payment* made to a stockbroker.") "The purpose of section 546 is 'to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions.' " In re Enron Corp., 341 B.R. 451, 456 (Bankr. S.D.N.Y  2006) (quoting Kaiser Steel Corp. v. Charles Schwab & Co., Inc. (In re Kaiser Steel Corp.), 913 F.2d 846, 848 (10th Cir. 1990)). "In enacting the section 546(e) exception to the avoidance powers, the goal was to preserve the stability of … settled transactions to the extent that they are not fraudulent as defined in section 548(a)(1)(A)." Enron, 341 B.R. at 456.

---

[9]    Defendants do not seek summary judgment with respect to Plaintiff's claims under § 548(a)(1)(A) as to these transfers.

Plaintiff contends that commission payments should be excluded from the purview of § 546(e) because they are allegedly not "necessary" and are "discretionary." However, neither the language of § 546(e), nor the case law interpreting this section, limits "settlement payments" to necessary or non-discretionary payments. See In re Enron Corp., 341 B.R. at 451 (payments made for the purchase of securities were "settlement payments," even where the price paid was above the market price and the purpose of paying an above market price was discretionary). Furthermore, Plaintiff's argument that the legislative purpose of the statute is not served by protection of stockbroker commissions from recovery under § 544 is inconclusive.[10]

Defendants argue that the commissions they received for the securities purchased and sold by Debtor and the Stock Loan Entities are encompassed within the definition of "settlement payment," and therefore, the stockbroker defense clearly applies to preclude recovery of the commissions under § 544.[11] Defendant's argument appears to be based upon the theory that commission payments are payments commonly used in the securities trade and thus fall within the definition of "settlement payment" set forth in § 741(8). See 11 U.S.C. § 741(8) (defining "settlement payment" as a "preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, *or any other similar payment commonly used in the securities trade*.") (emphasis added). The term "settlement payment" has been interpreted broadly. See Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel), 952 F.2d 1230, 1237 (10th

---

[10]     Defendants argue that the 2006 amendments to § 546(e) indicate that Congress intended to protect transfers that are beneficial to financial intermediaries in the market, which would reasonable include transfers of commissions to stockbrokers. See 11 U.S.C. § 546(e) (2006) (amending § 546(e) to expressly include a bar to recovery under § 544 for any "transfer made by or to (*or for the benefit of*) a … stockbroker … in connection with a securities contract")

[11]     It is undisputed that Wachovia is a stockbroker for purposes of the stockbroker defense. See 11 U.S.C. § 101(53A); In re Stewart Finance Co., 367 B.R. 909, 919 (Bankr. M.D. Ga. 2007) ("A stockbroker is a person that has customers and engages in the business of effecting transactions in securities.")

Cir. 1991) ("Kaiser II") (stating that the definition of settlement payment is extremely
broad). Nevertheless, the term has to be interpreted as it is "plainly understood within the
securities industry." Id. "[I]n the securities industry, 'any transfer of cash or securities made
to complete a securities transaction is considered a settlement payment.' " In re Enron Corp.,
341 B.R. 451, 456 (Bankr. S.D.N.Y 2006) (quoting Walsh v. The Toledo Hosp. (In re Fin.
Mgmt. Scis., Inc.), 913 F.2d 846, 848 (10th Cir. 1990)). Despite this authority, the parties
did not identify nor could the court locate any prior case that immunized commission
payments from such an action due to § 546(e). [12]

Defendants bear the burden of proving that § 546(e) is applicable to bar Plaintiff
from avoiding these transfers. See In re Stewart Fin. Co., 267 B.R. 909, 920-21 (Bankr.
M.D.Ga. 2007). The record before the Court does not adequately reflect facts regarding
whether the commissions in this case are customary or reasonable and therefore, the Court
denies Defendants' Renewed Motion as to this issue.

### D.      Transfers of Margin Interest Payments to Defendants

Defendants further contend that the stockbroker defense prevents Plaintiff from
recovering margin interest payments made to Defendants. Plaintiff argues that margin

---

[12]      In its September 19 Order, this Court observed in a footnote that there are cases where commission
payments to brokers have been recovered as fraudulent transfers. See In re Old Naples Securities, 343 B.R.
310 (Bankr. M.D. Fla. 2006); Bauman v. Bliese et al (In re McCarn's Allstate Finance, Inc.,), 326 B.R. 843
(Bankr. M.D. Fla. 2005); Cuthill v. Kime et al. (In re Evergreen Security, Ltd.), 319 B.R. 245 (Bankr. M.D.
Fla. 2003); Terlecky v. Abels, 260 B.R. 446 (S.D. Ohio 2001); In re Randy, 189 B.R. 425 (Bankr. N.D. Ill.
1995). However, none of these cases considers the applicability of the stockbroker defense and there is no
indication that the stockbroker defense was raised or considered in these cases. Moreover, none address the
payment of customary commissions for securities transactions. In Terlecky, the brokers were employees of the
debtors and thus were not "stockbrokers" as that term is defined by 11 U.S.C. § 101(53A). See Collier on
Bankruptcy ¶ 101.53A at 101-208 (rev. 15th ed. 2008) (an employee who effects transactions in securities is
not considered a stockbroker because that employee does not have a customer). In Evergreen, there were also
no "stockbrokers" under 11 U.S.C. § 101(53A). See 319 B.R. at 249-51 (investment advisors received
commissions from debtor for referrals of customers). The Bauman, Cuthill, and Randy cases addressed unusual
commissions paid to brokers for recruiting customers to participate in the Ponzi scheme. The Old Naples
Securities case addressed commission payments to a broker that were unusually large, constituting 73–109% of
the transaction.

20

interest payments are not embraced within the definitions of the term "margin payment" or "settlement payment," because a margin interest payment is merely "a payment towards interest [and] does not reduce the principal debt." A "margin payment" is defined by § 741(5) as a "payment or deposit of cash, a security, or other property, that is commonly known to the securities trade as original margin, initial margin, maintenance margin, or variation margin, or as a mark-to-market payment, or that secures an obligation of a participant in a securities clearing agency." The term "margin payment" has been interpreted broadly. In re Stewart Fin. Co., 367 B.R. at 917 ("'Margin payment' is a broadly construed term.")

The parties agree that the determination of whether a margin interest payment constitutes a "margin payment" turns on whether the payments reduced a deficiency in a margin account. See In re David, 193 B.R. 935, 940 (Bankr. C.D. Cal. 1996). While payment of margin interest does not reduce the initial principal debt in the account, payment of margin interest would appear to reduce the total deficiency in the account. When margin interest accrued in the At-Issue Accounts, the total debt owed by the Stock Loan Entities increased. When a margin interest payment was made to Defendants (or deducted from the account under the terms of the Account Agreement), the total debt, or deficiency, in the margin account decreased. For these reasons, the Court concludes that the margin interest payments at issue in this litigation are within the scope of § 546(e) and thus are not recoverable as fraudulent transfers under § 544. Accordingly, summary judgment is granted in favor of Defendants as to Plaintiff's § 544 claim with respect to the transfers that constitute margin interest payments.

### E.    Other Transfers

It appears that there are additional transfers embraced by the Third Amended Complaint which were not addressed by Defendants' Renewed Motion. Specifically, although settlement payments and margin payments are not recoverable under § 544 due to the stockbroker defense, transfers made during the one-year pre-petition period that constitute settlement payments or margin payments, including margin interest payments and commissions, may be recoverable under § 548(a)(1)(A).[13] It further appears that there may be transfers of other broker fees to Defendants, including wire transfer fees and prepayment fees, which have not been addressed by the Renewed Motion. In its Third Amended Complaint, Plaintiff sought recovery of transfers to Defendants including, but not limited to, commissions, investment advisory fees, professional fees, and sales, as well as other property and property interests received by the Defendants, directly or indirectly from Debtor or the Stock Loan Entities. While Defendants' assert in their Renewed Motion that payments of commission and margin interest payments were barred by the defense afforded to stockbrokers in § 546(e), the Renewed Motion did not address transfers of other fees such as wire transfer fees and prepayment fees. Defendants assert in their Reply to Plaintiff's Objection that Plaintiff should be barred from recovering these transfers based upon the Plaintiff's agreement during discovery to provide the details of all the transfers it was seeking to recover and subsequent failure to specify these transfers. Defendant cites the transcript of the July 27, 2010 hearing on the Renewed Motion as support for this claim. A

---

[13]    Pursuant to § 546(e), the stockbroker defense does not apply to claims made under § 548(a)(1)(A). See 11 U.S.C. § 546(e) ("Notwithstanding sections 544, … 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment… or settlement payment… made by or to (or for the benefit of a … stockbroker, *except under section 548(a)(1)(A)*). Section 548(a)(1)(A) requires Plaintiff to prove that the transfer was made "with the actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date such transfer was made or such obligation was incurred, indebted."

review of the transcript does not clearly indicate the terms of an agreement between the parties with respect to this issue and the Court is not aware of such an agreement being otherwise of record in this adversary proceeding.  The Court finds that the issues as to these transfers are not ripe for determination at this time and that Plaintiff is therefore not estopped from recovering these transfers.  Accordingly, to the extent Defendants' seek summary judgment as to these transfers, the Motion is denied.

### III.     Waiver

Defendants contend that Plaintiff is prohibited from recovering transfers from Optech and Witco in this proceeding because it waived its right to assert that those entities are alter egos of Debtor by limiting its alter ego theory to Bancroft in its response to Defendants' Second Motion to Dismiss and proposed order.  Typically, waiver principles come into play when a party voluntarily or intentionally relinquishes a known right. In re Varat Enterprises, 81 F.3d 1310, 1317 (4th Cir. 1996). Defendants cite to Wojtas v. Capital Guardian Trust Co., 477 F.3d 924 (7th Cir. 2007) and Rosen v. Mystery Method, Inc., 2008 WL 723331 (N. D. Ill. 2008) as support for their claim that Plaintiff waived its right to recover transfers of Debtor's property made by Optech and WITCO as alter egos.  Wojtas and Rosen hold that the failure to oppose an argument raised in a motion to dismiss operates as a waiver as to that theory.  In both Wojtas and Rosen the plaintiffs entirely failed to respond to legal arguments raised by the defendants in their motions to dismiss. However, in this case, Defendants' arguments in connection with their motion to dismiss did not specifically address Optech and WITCO and therefore Plaintiff cannot be said to have intentionally failed to oppose that argument.  For this reason, this case is distinguishable

from <u>Wojtas</u> and <u>Rosen</u>, and the Court finds that Plaintiff has not waived its claims with respect to Optech and WITCO.

Defendants further assert that the Court, in its September 19 Order, limited Plaintiff's claims to transfers made by Debtor and Bancroft only.[14] The Court disagrees with Defendants' contention that its September 19 Order thereafter precluded Plaintiff's claims to transfers made by the Debtor by limiting them to a discussion of Bancroft. While it is true that Plaintiff's response to Defendants' Second Motion to Dismiss focused on allegations relating to Bancroft, the issue being decided was whether property of an alter ego of a debtor may be recovered at all. In their Motion to Dismiss, Defendants had argued that Plaintiff had failed to state a claim under §§ 544 and 548, which apply only to transfers of a debtor's property, because Plaintiff seeks to recover transfers from non-debtor entities, including Bancroft. In examining the sufficiency of the Second Amended Complaint, the Court concluded that, for purposes of deciding the Rule 12(b)(6) motion, Plaintiff had sufficiently alleged facts that, if true, could permit a finding that Bancroft was an alter ego of Debtor and that property of an alter ego could be considered property of Debtor. Therefore, the Court concluded that the allegations relating to Bancroft were sufficient to overcome Defendants' motion to dismiss the §§ 544 and 548 claims on the grounds that no transfers of Debtor's property had been alleged.

---

[14]     In its September 19 Order, the Court stated in a footnote that "Grayson's Objection and Proposed Order appear to limit the application of the alter ego theory to Bancroft." This observation was made for the limited purpose of deciding the motion to dismiss and was not intended to narrow the substantive issues in this case. This Court further stated in the September 19 Order that "considering the large number of transfers at issue and the complicated nature of the relationships between the Derivium Owners, the Debtor, Bancroft, and these other entities, the Court is now satisfied that the details of the transfers are best addressed by the discovery process."

For the foregoing reasons, Defendants' Renewed Motion is denied to the extent that it seeks to limit Plaintiff's claims to transfers made via accounts held in the names of Debtor and Bancroft only.

## IV.    Alter Ego Theory

In its Alter Ego Motion, Wachovia argues that Plaintiff's claims for transfers into the At-Issue Accounts and for commissions, margin interest, and wire and pre-payment fees paid from those accounts also fail to the extent those transfers were made by the Stock Loan Entities because Plaintiff cannot meet its burden of establishing that these entities are alter-egos of Debtor. Without a showing that the Stock Loan Entities are alter-egos of the Debtor, the transfers at issue would not be transfers of Debtor's property and thus would not be recoverable.

To recover these transfers using the alter ego theory provided by South Carolina law,[15] Plaintiff must show, by a preponderance of the evidence, total domination and control of the Stock Loan Entities by Debtor and inequitable consequences caused thereby. Colleton County Taxpayers v. School District of Colleton County, 638 S.E.2d 685, 692 (S.C. 2006). Control may be shown where the subservient entity manifests no separate interest of its own and functions solely to achieve the goals of the dominant entity. Id. "[C]ourts will look through the forms to the realities of the relation between the companies as if the corporate agency did not exist and will deal with them as the justice of the case may require." Osborn v. Univ. Med. Assoc. of the Med. Univ. of S.C., 278 F.Supp.2d 720, 727 (D.S.C. 2003) (quoting United States v. Reading Co., 253 U.S. 26, 63 (1920)). To overcome

---

[15]      State law applies to determine whether the corporate form should be disregarded under an alter ego theory. See Perpetual Real Estate Serv., Inc. v. Michaelson Properties, Inc., 974 F.2d 545 (4th Cir. 1992) (finding that Virginia state law should have been applied to determine whether the corporate form should be disregarded under an alter ego or veil piercing theory).

summary judgment, Plaintiff must demonstrate that a genuine issue of material fact exists regarding the total domination and control of the Stock Loan Entities by Debtor and the inequitable consequences caused thereby.

To support its alter-ego cause of action, Plaintiff presented deposition testimony of Timothy Scrantom and F. Ron Jenkins, who directly and through their law firm, Ten State Street, LLP, helped to form, and later represented the Stock Loan Entities at the direction of the Derivium Owners, primarily Charles Cathcart.  Mr. Scrantom's testimony indicated that the Stock Loan Entities were created in order to further Debtor's business purpose and Debtor controlled their assets, income and business activities. Mr. Scrantom further testified that all bills for legal services provided by Ten State Street, LLP, on behalf of the Stock Loan Entities were authorized for payment by the Derivium Owners.

### A. Bancroft

Mr. Scrantom's testimony indicated that Debtor and Bancroft had agreements in place which set forth the respective rights and limitations of the parties.  However, Mr. Jenkins' testimony indicated that Cathcart essentially set the terms of these agreements and there was no real negotiation of those terms. He further testified that these agreements did not function in accordance with their terms and that Bancroft's directors did not have the rights and authority in fact that was accorded to them in the agreements.  Significantly, Mr. Jenkins testified that the directors at Bancroft did not have the kind of information they needed in order to act independently.[16] It further appears that the majority of the board meetings that took place for Bancroft occurred after litigation against Bancroft was commenced in California in the fall of 2002. Seven records of minutes of Bancroft board

---

[16]      For example, the Bancroft directors were not provided with formal financial statements for fiscal year 2001 and 2002 until after May of 2003.  Minutes from meetings in April and May of 2005 reflect that the directors were not in possession of Bancroft's accounting books and financial records.

meetings were presented—five out of the seven minutes of board meetings presented were minutes of meetings held between April 19, 2005 and May 6, 2005, the date on which the board members tendered their resignations.  The minutes of board meetings also show the Board's authorization of a brokerage account to be opened to conduct business (with Yuri Debevc and his designees being authorized to use the account) and the approval of an asset acquisition that had occurred almost two months earlier.  It further appears from the testimony of Mr. Jenkins and the exhibits to his deposition that he hired counsel to defend Bancroft in the California litigation without the directors' authority and that Cathcart paid the associated bills. Mr. Jenkins also testified that Debtor was the ultimate beneficial owner of Bancroft because Debtor owned all the assets and cash and that the Bancroft and Derivium "structure" was designed to protect intellectual property belonging to Cathcart.

Viewing the facts in the light most favorable to the Plaintiff, the Court finds that these facts raise a genuine issue of material fact regarding whether Debtor exercised dominion and control over Bancroft. The facts presented are sufficient to support a finding that, despite its limited efforts to observe corporate formalities (the majority of which took place after litigation was commenced against it), Bancroft did not act independently and its actions and business decisions were directed by Debtor through the Derivium Owners.

Defendants argue that, under Osborn, total control cannot be found where the alleged alter ego observes corporate formalities. 278 F. Supp. 2d at 729.  In Osborn, the alleged alter ego had separate facilities, a separate Board of Directors, a separate Chief Executive Officer and President, and separate employees. The District Court found that the evidence presented in Osborn did not sufficiently indicate that total control had been exercised over the alleged alter ego and thus the alleged alter ego could not be held liable for the obligations of the

alleged dominant entity. However, <u>Osborn</u> also observes that courts must look through the forms to the realities of the relation between the companies. The observance of corporate formalities is certainly indicia of whether a corporation has a separate mind, will or existence of its own.   In some circumstances, however, it may be inequitable to deny liability based on an alter ego theory merely because a corporation observed certain limited corporate formalities, particularly where the corporation is a sham entity under the complete control of another entity. In this case, the deposition testimony and documents submitted by the parties raise a genuine issue of fact regarding whether Bancroft's exercise of corporate formalities were the legitimate practices of an independent entity or merely a façade for Debtor. The evidence presented could be viewed to indicate that Bancroft's directors merely rubber stamped documents in accordance with instructions from Debtor. Viewing the evidence in the light most favorable to the Plaintiff, there is sufficient evidence to support a finding that Debtor had total dominion and control over Bancroft's business affairs.

### B.  Optech and WITCO

No evidence was presented to demonstrate that Optech or WITCO held regular board meetings, prepared or maintained meeting minutes, or had an independent business purpose. The record includes evidence indicating that Optech and Witco were created solely to benefit Debtor and to further Debtor's business purpose.  The record lacks any evidence that Optech and WITCO observed any corporate formalities beyond its initial formation and execution of brokerage account agreements over which the Derivium Owners had control. The testimony of Mr. Scrantom indicated that all bills for services on behalf of Optech and WITCO were authorized for payment by the Derivium Owners. The record includes an e-mail sent by Cathcart where he instructs Optech's directors regarding which individuals

should have Optech business cards and stationary. The record also includes an indemnification agreement where Cathcart agreed to personally indemnify Optech's directors for any and all liability arising out of Optech's business. Additionally, Mr. Jenkins testified that the directors of Optech were mere fiduciaries, with no financial stake in the businesses other than their fees for administration and provision of directors, shareholders, and corporate services. These facts raise a genuine issue of material fact regarding whether Optech and WITCO were dominated and controlled by Debtor.

In summary, the Court finds that genuine issues of material fact exist regarding whether Debtor and the Derivium Owners exercised total domination and control of Bancroft, Optech and WITCO such that these entities manifested no separate interest of their own and functioned solely to achieve the goals of Debtor. Therefore, Defendants' Alter Ego Motion is denied.

<u>**CONCLUSION**</u>

Based on the foregoing, it is hereby

ORDERED that Defendants' Renewed Motion is granted as to the following issues:

1.    Plaintiff's fraudulent transfer claims pursuant to 11 U.S.C. §§ 544 and 548 with respect to transfers of stock from the Stock Loan Borrowers into the At-Issue Accounts;

2.    Plaintiff's fraudulent transfer claims pursuant to 11 U.S.C. § 544 with respect to transfers of margin interest payments; and

3.    Plaintiff's fraudulent transfer claims pursuant to 11 U.S.C. § 548 with respect to the cash transfers that Debtor and Bancroft directly deposited into their brokerage accounts with Defendants in the year prior to Debtor's bankruptcy filing.

IT IS FURTHER ORDERED that Defendants Renewed Motion is denied:

1.     To the extent that Defendants seek to bar Plaintiff's claims to transfers by Optech and WITCO based on waiver or prior court order; and

2.     As to Plaintiff's fraudulent transfer claims pursuant to 11 U.S.C. § 544 with respect to transfers of commissions, wire transfer fees, and prepayment fees.

IT IS FURTHER ORDERED that Defendants' Alter Ego Motion is denied.

**AND IT IS SO ORDERED.**


**FILED BY THE COURT**
**09/14/2010**



_John E Waites_

Chief US Bankruptcy Judge
District of South Carolina

Entered: 09/14/2010