**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL FROM, BUT HAS NOT BEEN APPROVED BY, THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X
                                       :

In re:                               :    Chapter 11
                                         :

BAYOU GROUP, LLC, et al.,           :    Case No.:  06-22306 (RDD)
                                         :

               Debtors.         :    Jointly Administered
                                         :

-------------------------------------------------------------------------X

---

**REVISED THIRD AMENDED DISCLOSURE STATEMENT WITH RESPECT TO SECOND AMENDED JOINT CHAPTER 11 PLAN OF BAYOU GROUP, LLC, BAYOU MANAGEMENT, LLC, BAYOU SUPERFUND, LLC, BAYOU NO LEVERAGE FUND, LLC, BAYOU AFFILIATES FUND, LLC, BAYOU ACCREDITED FUND, LLC, BAYOU FUND, LLC, BAYOU ADVISORS, LLC, AND BAYOU EQUITIES, LLC**

---

DECHERT LLP
1095 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 698-3500
Shmuel Vasser
Gary J. Mennitt
Jonathan D. Perry
Attorneys for the Debtors
and Debtors-in-Possession

Dated: November 3, 2009

Respondent Exhibit

43

## TABLE OF CONTENTS

**Page**

| | | | |
|---|---|---|---|
| I. | | INTRODUCTION ................................................................................ | 1 |
| | A. | Executive Summary of Primary Plan Provisions .................................... | 3 |
| | B. | Summary of Classification and Treatment Under the Plan......................... | 7 |
| | C. | Parties Entitled to Vote on the Plan .................................................... | 10 |
| | D. | Voting Procedures......................................................................... | 11 |
| | E. | Recommendation of the Debtors and the Creditors Committee .................. | 14 |
| II. | | THE PRE-PETITION STRUCTURE AND OPERATIONS OF THE DEBTORS.............. | 14 |
| | A. | Pre-Petition Corporate Structure of the Debtors ................................... | 14 |
| | B. | The Debtors' Pre-Petition Fraud........................................................ | 15 |
| | C. | Formation of the Unofficial Creditors Committee.................................. | 17 |
| | D. | Appointment of Sole Managing Member of the Debtors .......................... | 17 |
| III. | | THE DEBTORS' CHAPTER 11 CASES ................................................... | 18 |
| | A. | Commencement of the Chapter 11 Cases ............................................. | 18 |
| | B. | Appointment of the Creditors Committee............................................. | 19 |
| | C. | Significant Events During these Cases ................................................ | 19 |
| | D. | Adversary Proceedings Against Redeeming Investors .............................. | 21 |
| IV. | | OVERVIEW OF THE PLAN ................................................................ | 25 |
| | A. | General...................................................................................... | 25 |
| | B. | Assets for Distribution Under the Plan ................................................ | 27 |
| | C. | Description of Classification and Treatment of Claims and Equity Interests Under the Plan Against the Debtors........................................ | 27 |
| | D. | Reservation of "Cramdown" Rights .................................................... | 35 |
| | E. | Provisions Governing Distributions Under the Plan................................ | 35 |
| | F. | Means for Implementation and Execution of the Plan.............................. | 36 |
| | G. | Procedures for Disputed Claims ....................................................... | 52 |
| | H. | Treatment of Executory Contracts and Unexpired Leases......................... | 55 |
| V. | | Effects of Confirmation of Plan ....................................................... | 56 |
| | A. | Vesting of Assets in Litigation Trust ................................................. | 56 |
| | B. | Release of Assets from Bankruptcy Court Jurisdiction ........................... | 57 |
| | C. | Binding Effect.............................................................................. | 57 |
| | D. | Term of Injunctions or Stays............................................................ | 57 |
| | E. | Causes of Action........................................................................... | 57 |
| | F. | Retention of Jurisdiction by Bankruptcy Court .................................... | 59 |

**TABLE OF CONTENTS**
(continued)

Page

|  | G. | Dissolution of the Creditors Committee | 60 |
|  | H. | Exemption from Transfer Taxes | 60 |
|  | I. | Exculpation and Release | 61 |
| VI. | | **ALTERNATIVES TO THE PLAN** | **61** |
|  | A. | Liquidation Under Chapter 7 of the Bankruptcy Code | 61 |
|  | B. | Alternative Chapter 11 Plan | 62 |
|  | C. | Certain Risk Factors | 62 |
| VII. | | **CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | **64** |
|  | A. | Consequences to the Debtors | 65 |
|  | B. | Consequences to Holders of Allowed Investor Creditor Unsecured Claims | 66 |
| VIII. | | **VOTING PROCEDURES AND REQUIREMENTS** | **71** |
|  | A. | Ballots and Voting Deadline | 71 |
|  | B. | Holders of Claims Entitled to Vote | 72 |
|  | C. | Vote Required for Acceptance by a Class | 72 |
|  | D. | Voting Procedures | 72 |
| IX. | | **CONFIRMATION AND CONSUMMATION PROCEDURES** | **72** |
|  | A. | Conditions Precedent to Effectiveness of Plan | 73 |
|  | B. | Conditions Precedent to Effective Date | 73 |
|  | C. | Requirements of Bankruptcy Code § 1129(a) | 73 |
|  | D. | Best Interests Test | 75 |
|  | E. | Feasibility | 76 |
|  | F. | Requirements of Bankruptcy Code § 1129(b) | 76 |
|  | G. | Confirmation Hearing | 78 |
| X. | | **RECOMMENDATION AND CONCLUSION** | **79** |

# I.   INTRODUCTION

Bayou Group, LLC ("Bayou Group"), Bayou Management, LLC ("Bayou Management"), Bayou Advisors, LLC ("Bayou Advisors"), Bayou Equities, LLC ("Bayou Equities"), Bayou Fund, LLC ("Bayou Fund"), Bayou Superfund, LLC ("Bayou Superfund"), Bayou No Leverage Fund, LLC ("Bayou No Leverage"), Bayou Affiliates Fund, LLC ("Bayou Affiliates"), and Bayou Accredited Fund, LLC ("Bayou Accredited," and together with Bayou Fund, Bayou Superfund, Bayou No Leverage, and Bayou Affiliates, the "Bayou Hedge Funds") (collectively, the "Debtors"), as debtors and debtors-in-possession in chapter 11 cases pending before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), jointly administered under Case No.: 06-22306 (RDD), submit this third amended disclosure statement (the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), in connection with the solicitation of votes on the Second Amended Joint Chapter 11 Plan (the "Plan"), dated September 10, 2009, proposed by the Debtors.  A copy of the Plan is attached as Exhibit A to the Disclosure Statement.

This Disclosure Statement sets forth certain information regarding the Debtors' pre-petition structure and fraudulent business operations, the events leading up to the commencement of the Cases, and significant events that have occurred during these Cases.  This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain risk factors associated with the Plan, certain alternatives to the Plan, the manner in which distributions will be made under the Plan and the anticipated structure of the Litigation Trusts if the Plan is confirmed and becomes effective.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

Except as otherwise provided herein, capitalized terms not otherwise defined in the Disclosure Statement have the meanings ascribed to them in the Plan.  Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

On November 3, 2009, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject the Plan.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

ALL CREDITORS AND EQUITY INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ALL CREDITORS ENTITLED TO VOTE WITH RESPECT TO THE PLAN ARE ADVISED AND ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  THE SUMMARIES OF THE PLAN AND THE OTHER STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE § 1125 AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THESE CASES WITH "ADEQUATE

INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THOSE CREDITORS WHO ARE ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE. THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF THOSE CREDITORS WHOSE CLAIMS AGAINST THE DEBTORS ARE IMPAIRED UNDER THE PLAN, TO ENABLE SUCH HOLDERS TO MAKE AN INFORMED DECISION ABOUT THE PLAN. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS AND SCHEDULES ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS. ALTHOUGH THE DEBTORS WILL MAKE AVAILABLE TO ALL PARTIES ENTITLED TO VOTE ON THE PLAN SUCH ADDITIONAL INFORMATION AS MAY BE REQUIRED BY APPLICABLE LAW PRIOR TO THE VOTING DEADLINE, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUMMARIES THEREOF. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.

CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD CAREFULLY READ AND CONSIDER FULLY THIS DISCLOSURE STATEMENT, INCLUDING, BUT NOT LIMITED TO, ARTICLE VII, SECTION C, "ALTERNATIVES TO THE PLAN – CERTAIN RISK FACTORS," BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING OTHER THAN THE DEBTORS' CHAPTER 11 CASES, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS TO ANY PERSON OR ENTITY THAT MAY RESULT FROM CONSUMMATION OF THE PLAN OR THE TRANSACTIONS CONTEMPLATED BY THE PLAN. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND THE STATEMENTS MADE HEREIN SHALL NEITHER CONSTITUTE NOR BE CONSTRUED AS AN ADMISSION, STIPULATION, WAIVER, EVIDENCE OR FINDING OF FACT, BUT RATHER A STATEMENT OR STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS.

All Exhibits to the Plan will be filed with the Bankruptcy Court and will be available for review, free of charge, at (http://www.bayoubankruptcy.com) (the "Website") not later than 10 days before the Voting Deadline. Copies of all Exhibits to the Plan also may be obtained, free of charge, from The Garden City Group, Inc. ("GCG" or the "Notice and Balloting Agent") by calling (800) 327-3664.

A.      **Executive Summary of Primary Plan Provisions**

This executive summary highlights some of the information discussed in greater detail elsewhere in this Disclosure Statement. HOWEVER, THIS SUMMARY MAY NOT CONTAIN ALL OF THE INFORMATION THAT IS IMPORTANT TO YOU. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS THERETO IN THEIR ENTIRETY. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN AND ITS EXHIBITS.

The Plan seeks to liquidate the Debtors in order to provide fair, equitable, and reasonable treatment to all creditors of the Debtors.

The Plan is predicated on the following: (1) each of the Debtors was operated fraudulently pre-petition, each of the Investors who acquired membership interests in the Bayou Hedge Funds was fraudulently induced into doing so, and Redemption Payments from the Bayou Hedge Funds were knowingly inflated by the Debtors' pre-petition management. Thus, all of the Investors in the Bayou Hedge Funds have rescission and restitution claims against the Bayou Hedge Funds for return of their Investment; (2) it inures to the benefit of all Investor Creditors to treat the Bayou Hedge Funds on a consolidated basis and equalize the recoveries of the Investor Creditors from a common asset pool; and (3) the only Assets of the Debtors are the proceeds of settlements of legal claims, including fraudulent transfer claims against Redeemer Defendants (all but 8 of the Adversary Proceedings in which the Debtors asserted fraudulent transfer claims against Investors who received Redemption Payments have been settled), and pending and potential legal claims against redeeming investors and others.

A summary of the adversary proceedings pursued by the Debtors asserting fraudulent transfer claims against the Redeemer Defendants and others, the results of those adversary proceedings, and the principal achievements in connection with those adversary proceedings, is set forth below:

## BAYOU ADVERSARY PROCEEDINGS BY THE NUMBERS

### The Adversary Proceedings

\***152** adversary proceedings commenced and pursued against 151 redeeming investors and one non-investor recipient of proceeds of the Bayou fraud

### The Results

\***144** court-approved settlement agreements reached with adversary proceeding defendants, including:

--**75** settlements in which the defendants agreed to return at least
50% of redeemed principal and all redeemed "profits"

--**14** settlements in which the defendants agreed to return between
10% and 44% of redeemed principal and 100% of redeemed "profits"

--**52** settlements in which the defendants agreed to return 100% of redeemed "profits"

\***$56.5 million** in approximate total settlement proceeds <u>collected</u>

\***$24.7 million** in additional judgments <u>awarded</u> to the Debtors (now pending on appeal)

\***$81. 2 million** in approximate total settlements and judgments achieved by the Debtors

### How The Debtors Achieved Those Results

\*Comprehensively and efficiently analyzed the Debtors' prepetition books and records, investor account information and finances, including by consultative and testimonial forensic accountants

\*Marshaled and produced millions of documents to defendants during extensive discovery process

\*Effectively utilized numerous Rule 2004 subpoenas to obtain thousands of relevant documents bearing on the Debtors' prepetition conduct, redemption payments and potential claims

\*Conducted **58** depositions of adversary proceeding defendants and their investment advisors, and defended or otherwise participated in **15** fact and expert depositions conducted by defendants

\*Defeated motions to dismiss brought by **95** adversary proceeding defendants, and motions for leave to appeal the denial of those motions to dismiss brought by **71** defendants

\*Defeated motions for summary judgment for lack of standing, and <u>Daubert</u> motions to exclude the testimony of Debtors' expert, each brought by **24** defendants

\*Prevailed on summary judgment motions against **18** adversary proceeding defendants

\*Defeated cross-motions for summary judgment on the defendants' defenses to the Debtors' fraudulent conveyance claims brought by **26** adversary proceeding defendants

The Plan is entirely separate and independent from the distribution that has been made, and may be made in the future, by the United States of America as restitution to victims of the Bayou fraud. In connection with the criminal prosecutions of the Debtors' pre-petition principals, the United States has seized certain assets from the pre-petition principals, including more than $106 million in funds that the Arizona Attorney General initially had seized from several bank accounts relating to the Bayou fraud, as well as certain other private equity investments made with the proceeds of the Bayou fraud. The Debtors' understanding is that the United States has distributed restitution payments on a pro rata basis to Investors in the Bayou Hedge Funds and the Bayou Off-Shore Hedge Funds who did not redeem their entire Investment. The Debtors further understand that the United States has established a reserve sufficient at a minimum to make distribution payments to the existing defendants in the Adversary Proceedings in the event that such defendants return all or any portion of their Redemption Payments consisting of their Investment, as opposed to purported profits. The Debtors are not responsible for, and have no control over, the funds held by the United States or the amount, timing, or procedure of distribution of those assets. However, nothing in the Plan will preclude an Investor Creditor from seeking and recovering any distribution of those funds from the United States.

The most significant aspects of the Plan are as follows:

1. **Distributions to Investor Creditors and Redeemer Defendants Who Satisfy Judgments Entered Against Them**

At its core, the Plan provides for pro rata distributions to all Investor Creditors, as well as to Redeemer Defendants who satisfy judgments entered against them, if any, in satisfaction of their fraudulent inducement claims against the Bayou Hedge Funds and Bayou Management, such that each Investor Creditor or Redeemer Defendant will end up recovering approximately the same percentage of his outstanding Investment. Each Investor Creditor who did not receive any Redemption Payment from the Bayou Hedge Funds will have a single Allowed Claim against the Bayou Hedge Funds Litigation Trust and a single Allowed Claim against the Bayou Management Litigation Trust in the amount of its Investment in the Bayou Hedge Funds. Each Investor Creditor who received a Redemption Payment from the Bayou Hedge Funds will have a single Allowed Claim in the amount of the outstanding balance of its Investment in the Bayou Hedge Funds after deducting any Redemption Payments that were not returned to the Debtors pursuant to a judgment, settlement, or otherwise. Any Claim of a Redeemer Defendant will be deemed Disputed under the Plan. Only upon payment in full of the amount of the judgment against the Redeemer Defendant issued by a Final Order shall the Redeemer Defendant be deemed to have an Allowed Claim in an amount equal to such Redeemer Defendant's Investment less any unreturned Redemption Payments. No Claims will be allowed for interest, punitive damages, or purported profits reported by the Bayou Hedge Funds. Each Investor Creditor and Redeemer Defendant will be able to cast one vote in the amount of its Allowed Claim in favor or against the Plan as a creditor of the Bayou Hedge Funds and one vote in the amount of its Allowed Claim in favor or against the Plan as a creditor of Bayou Management.

As of June 30, 2009, the Debtors had Cash in the amount of $22,500,887.47 as a result of the settlement of nearly all of the Adversary Proceedings, net of expenses. Additionally, the Debtors were owed settlement payments in the amount of $13,950,124. Of the $36,451,011.47 in cash and receivables, $34,776,773.47 is the property of the Bayou Hedge Fund Debtors and $1,674,238.00 is the property of Bayou Management.

Other than cash on hand and outstanding settlement payments, the Debtors' only assets are pending legal claims. At least some of the amount of money available for distribution will depend on the outcome of these pending legal claims. At present, there are eight pending Adversary Proceedings

against Redeemer Defendants, and one potential claim against Hennessee Group, LLC for $751,864. The Debtors have been awarded summary judgment in those eight Adversary Proceedings in the total amount of $24,794,307, but the defendants in these eight Adversary Proceedings have filed appeals that are currently pending in the United States District Court for the Southern District of New York. In addition, the Creditors Committee has been authorized and appointed to prosecute legal claims against Goldman Sachs Execution and Clearing L.P., aggregating $20.5 million, which are pending in a FINRA arbitration. While the Debtors are not aware of any claims the Post-Effective Date Committee (defined below) might bring, the Plan retains the flexibility to bring such claims for the benefit of all creditors and investors.

## 2.   **Substantive Consolidation**

Under the Plan, the Bayou Hedge Funds are substantively consolidated into a single estate and the Bayou Non-Fund Debtors are substantively consolidated into a single estate. Substantive consolidation is an equitable remedy in which all of the entities in the substantively consolidated group are treated as if they were a single corporate and economic entity, and thus a creditor of one of the substantively consolidated entities is treated as a creditor of the entire substantively consolidated group of entities. As part of their request for confirmation of the Plan, therefore, the Debtors are seeking an order of the Bankruptcy Court approving substantive consolidation, which may be included in the Confirmation Order or a separate order.

## 3.   **The Government Funds**

In connection with the criminal prosecutions of the Debtors' pre-petition principals, the United States has seized certain assets from the pre-petition principals, including more than $106 million in funds that the Arizona Attorney General initially had seized from several bank accounts relating to the Bayou fraud, as well as certain other private equity investments made with the proceeds of the Bayou fraud. The Debtors' understanding is that the United States has distributed restitution payments on a pro rata basis to Investors in the Bayou Hedge Funds and the Bayou Off-Shore Hedge Funds who did not redeem their entire Investment. The Debtors further understand that the United States has established a reserve sufficient at a minimum to make distribution payments to the existing defendants in the Adversary Proceedings in the event that such defendants return all or any portion of their Redemption Payments consisting of their Investment, as opposed to purported profits. The Debtors are not responsible for, and have no control over, the funds held by the United States or the amount, timing, or procedure of distribution of those assets. However, nothing in the Plan will preclude an Investor Creditor from seeking and recovering any distribution of those funds from the United States.

## 4.   **Litigation Trusts**

The Plan establishes two Litigation Trusts – the Bayou Hedge Funds Litigation Trust and the Bayou Management Litigation Trust – for the sole purpose of liquidating and distributing the respective Debtors' Assets following confirmation of the Plan and prosecuting any pending legal claims and Adversary Proceedings. On the Effective Date, the Assets of the Bayou Hedge Funds estate and the Bayou Management estate, including the Adversary Proceedings and all Causes of Action, will be automatically deemed transferred to these Litigation Trusts.

The Litigation Trusts will be managed by a single trustee, Jeff J. Marwil, who is currently the Sole Managing Member of each of the Debtors. The Plan provides for the formation of a post-effective date committee (the "Post-Effective Date Committee") comprised of the current members of the Creditors Committee, as opposed to a governance structure involving multiple trustees or an oversight committee. The Debtors believe that a single Trustee is the most efficient, cost-effective governance structure for the Litigation Trusts and it continues the management structure that has been in place during these Cases.

6

Importantly, the Litigation Trusts will be governed by the independent individual, Jeff J. Marwil, selected by the Investor Creditors prior to the Petition Date.  The Litigation Trusts will continue to obtain Bankruptcy Court approval, after notice and a hearing in the Bankruptcy Court, to pay fees, resolve, settle, or compromise an Adversary Proceeding or compromise any claim.

B.      **Summary of Classification and Treatment Under the Plan**

The Plan classifies Claims against, and Equity Interests in, the Debtors for all purposes, including voting, confirmation, and distribution as set forth below.  The table is only a summary of the classification and treatment of Claims and Equity Interests under the Plan.  Reference should be made to the entire Disclosure Statement, the Plan, and the Exhibits thereto in their entirety for a complete description of each classification and treatment.

For certain classes of Claims estimated percentage recoveries are set forth below.  For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown.

| BAYOU HEDGE FUNDS | | | |
|---|---|---|---|
| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under the Plan |
| N/A | Administrative Expense Claims | $26 to $27 million of which approximately $6 to $7 million is unpaid | Estimated Recovery:  100% |
| | | | Each holder of an Allowed Administrative Expense Claim will receive Cash equal to the Allowed amount of such Administrative Expense Claim either (a) on the Effective Date or (b) if the Administrative Expense Claim is not Allowed as of the Effective Date, 30 days after the date on which an order allowing such Administrative Expense Claim becomes a Final Order or a stipulation of amount and nature of such Administrative Expense Claim is executed by the Bayou Hedge Funds Litigation Trustee and the holder of the Administrative Claim. |
| N/A | Priority Tax Claims | $733 | Estimated Recovery:  100% |
| | | | Except to the extent such holder has agreed to a less favorable treatment of such Allowed Claim, each holder of an Allowed Priority Tax Claim, if any, will receive from the Debtors, Cash equal to the amount of such Allowed Claim on the later of (a) the Effective Date and (b) the date that is 10 days after the Allowance Date. |
| Class 1 | Priority Non-Tax Claims | $0 | Estimated Recovery:  100%<br><br>**Unimpaired and not Entitled to Vote**<br><br>Except to the extent such holder has agreed to a less favorable treatment of its Allowed Claim , each holder of an Allowed Priority Non-Tax Claim, if any, will receive Cash equal to the amount of such Allowed Claim on the later of (a) the Effective Date and (b) the date that is 10 days after the Allowance Date. |
| Class 2 | Non-Investor General Unsecured Claims | $0 to $442,663 | Estimated Recovery: 100%<br><br>**Impaired and Entitled to Vote:**<br><br>Except to the extent such holder has agreed to a less favorable treatment of its Allowed Claim, each holder of an Allowed Non-Investor General Unsecured Claim, if any, will receive pro rata distributions from the Bayou Hedge Funds Litigation Trust until such Allowed Claim is paid in full. |

| BAYOU HEDGE FUNDS | | | |
|---|---|---|---|
| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under the Plan |
| Class 3 | Other Unsecured Claims | $245,432,103 to $299,822,635. | Estimated Recovery:  9.6% - 28.6% |
| | | | **Impaired and Entitled to Vote:** |
| | | | Subject to the payment in full or reserve of all Allowed Non-Investor General Unsecured Claims and except to the extent such holder has agreed to a less favorable treatment of its Allowed Claim, each holder of an Allowed Other Unsecured Claim shall receive pro rata distributions from the Bayou Hedge Funds Litigation Trust, in the time and manner as set forth in the Plan and the Bayou Hedge Funds Litigation Trust Agreement. Nothing herein shall limit, expand, or otherwise affect such holder's right, if any, to receive a distribution from the United States of the Government Funds. |
| Class 4 | Equity Interests | N/A | Recovery:  0% |
| | | | **Impaired and Not Entitled to Vote** |
| | | | Except as otherwise provided in the Plan, on the Effective Date, all outstanding Equity Interests in any of the Bayou Hedge Funds shall be cancelled and deemed terminated and of no force and effect and the Holders of such Equity Interests shall not be entitled to receive any property on account of such Equity Interests. |

| BAYOU NON-FUND DEBTORS | | | |
|---|---|---|---|
| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under the Plan |
| N/A | Administrative Expense Claims | $375,000 | Estimated Recovery:  100% |
| | | | Each holder of an Allowed Administrative Expense Claim will receive Cash equal to the Allowed amount of such Administrative Expense Claim either (a) on the Effective Date or (b) if the Administrative Expense Claim is not Allowed as of the Effective Date, 30 days after the date on which an order allowing such Administrative Expense Claim becomes a Final Order or a stipulation of amount and nature of such Administrative Expense Claim is executed by the Bayou Management Litigation Trustee and the holder of the Administrative Claim. |
| N/A | Priority Tax Claims | $3,818 | Estimated Recovery:  100% |
| | | | Except to the extent such holder has agreed to a less favorable treatment of such Allowed Claim, each holder of an Allowed Priority Tax Claim, if any, will receive from the Debtors, Cash equal to the amount of such Allowed Claim on the later of (a) the Effective Date and (b) the date that is 10 days after the Allowance Date. |

8

| BAYOU NON-FUND DEBTORS | | | |
|---|---|---|---|
| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under the Plan |
| Class 1 | Priority Non-Tax Claims | $0 | Estimated Recovery: 100% |
| | | | **Unimpaired and not Entitled to Vote** |
| | | | Except to the extent such holder has agreed to a less favorable treatment of its Allowed Claim, each holder of an Allowed Priority Non-Tax Claim, if any, will receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, Cash equal to the amount of such Allowed Claim on the later of (a) the Effective Date and (b) the date that is 10 days after the Allowance Date. |
| Class 2 | Non-Investor General Unsecured Claims | $8,511 to $527,160 | Estimated Recovery: 100% |
| | | | **Impaired and Entitled to Vote:** |
| | | | Except to the extent such holder has agreed to a less favorable treatment of its Allowed Claim, each holder of an Allowed Non-Investor General Unsecured Claim, if any, will receive pro rata distributions from the Bayou Management Litigation Trust until such Allowed Claim is paid in full. |
| Class 3 | Other Unsecured Claims | $282,672,103 to $300,034,635 | Estimated Recovery: De Minimis |
| | | | **Impaired and Entitled to Vote:** |
| | | | Subject to the payment in full or reserve of all Allowed Non-Investor General Unsecured Claims and except to the extent such holder has agreed to a less favorable treatment of its Allowed Claim, each holder of an Allowed Other Unsecured Claim shall receive pro rata distributions from the Bayou Management Litigation Trust, in the time and manner as set forth in the Plan and the Bayou Managements Litigation Trust Agreement. |
| Class 4 | Equity Interests | N/A | Recovery: 0% |
| | | | **Impaired and Not Entitled to Vote** |
| | | | Except as otherwise provided in the Plan, on the Effective Date, all outstanding Equity Interests in Bayou Management shall be cancelled and deemed terminated and of no force and effect and the Holders of such Equity Interests shall not be entitled to receive any property on account of such Equity Interests. |

**ALTHOUGH THE DEBTORS BELIEVE THAT THE ESTIMATED PERCENTAGE RECOVERIES SET FORTH ABOVE FOR CLASSES 2 and 3 ARE REASONABLE AND WITHIN THE RANGE OF ASSUMED RECOVERY, THERE IS NO ASSURANCE THAT THE ACTUAL PERCENTAGE RECOVERIES WILL NOT OTHERWISE BE SIGNIFICANTLY LESS THAN THE ESTIMATED PERCENTAGE RECOVERIES SET FORTH ABOVE.** The actual recoveries under the Plan by the Debtors' creditors in Class 2 and Class 3 will depend upon a variety of factors including, but not limited to, the actual value of the Litigation Trust Assets. Accordingly, no representation can be or is being made with respect to whether each of the estimated percentage recoveries with respect to Classes 2 and 3 will actually be realized by the holder of an Allowed Claim in such Classes.

The Debtors believe this Plan provides the best opportunity for all creditors to maximize their recoveries in these Cases, and accordingly, the Debtors urge all creditors to analyze the Plan and vote to accept the Plan.

C.    **Parties Entitled to Vote on the Plan**

Under the provisions of the Bankruptcy Code, not all parties are entitled to vote on a chapter 11 plan. Holders of Claims or Equity Interests whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote. Holders of Claims or Equity Interests whose claims or interests are impaired by the Plan, but will receive no distribution under the Plan, are not entitled to vote either because they are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

The following sets forth which Classes are entitled to vote on the Plan and which are not:

With respect to the Debtors' Plan, Class 1 (Priority Non-Tax Claims) is unimpaired by the Plan and the holders of Claims in such Class are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

Holders of Claims in Class 2 (Non-Investor General Unsecured Claims) and Class 3 (Other Unsecured Claims) are impaired by the Plan and the holders of Claims in such Classes are entitled to vote to accept or reject the Plan.

Because holders of Equity Interests in Class 4 are not entitled to receive or retain any property under the Plan, they are presumed to have rejected the Plan, and therefore, are not entitled to vote on the Plan as holders of Equity Interests.

The Bankruptcy Code defines "acceptance" of a plan (i) by a class of Claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims that cast ballots for acceptance or rejection of the plan, and (ii) by a class of Equity Interests as acceptance by holders in that class that hold at least two-thirds in amount of Allowed Equity Interests in such class that cast ballots for acceptance or rejection of the Plan. For a complete description of the requirements for confirmation of the Plan, *See* Article IX, "Confirmation and Consummation Procedures."

UNDER BANKRUPTCY CODE § 1129, A PLAN CAN BE CONFIRMED ONLY IF AT LEAST ONE IMPAIRED CLASS ACCEPTS THE PLAN. THEREFORE, IN ADDITION TO THE OTHER REQUIREMENTS FOR CONFIRMATION DESCRIBED BELOW, THE PLAN CAN BE

CONFIRMED ONLY IF IT IS ACCEPTED BY AT LEAST ONE OF THE FOLLOWING CLASSES: CLASS 2 (NON-INVESTOR GENERAL UNSECURED CLAIMS) OR CLASS 3 (OTHER UNSECURED CLAIMS). IF AT LEAST ONE IMPAIRED CLASS ACCEPTS THE PLAN, BUT ONE OR MORE OTHER CLASSES REJECTS THE PLAN, THE DEBTORS HAVE THE RIGHT TO REQUEST CONFIRMATION OF THE PLAN PURSUANT TO BANKRUPTCY CODE § 1129(b). BANKRUPTCY CODE § 1129(b) PERMITS THE CONFIRMATION OF A PLAN NOTWITHSTANDING THE NON-ACCEPTANCE OF ONE OR MORE IMPAIRED CLASSES OF CLAIMS OR EQUITY INTERESTS.  UNDER THAT SECTION, A PLAN MAY BE CONFIRMED BY A BANKRUPTCY COURT IF IT DOES NOT "DISCRIMINATE UNFAIRLY" AND IS "FAIR AND EQUITABLE" WITH RESPECT TO EACH NON-ACCEPTING CLASS.  FOR A MORE DETAILED DESCRIPTION OF THE REQUIREMENTS FOR CONFIRMATION OF A NONCONSENSUAL PLAN, SEE ARTICLE X, SECTION F, "CONFIRMATION AND CONSUMMATION PROCEDURES – REQUIREMENTS OF BANKRUPTCY CODE § 1129(b)."

The Debtors will request confirmation of the Plan over the deemed rejection of the Plan by Class 4 (Equity Interests) if the Plan is accepted by any of Class 2 (Non-Investor General Unsecured Claims) or Class 3 (Other Unsecured Claims), the other Classes entitled to vote on the Plan.  If each of Class 2 and Class 3 vote to reject the Plan, the Debtors will announce at or before the Confirmation Hearing whether the Debtors will still seek confirmation of the Plan pursuant to Bankruptcy Code § 1129(b).

D.      **Voting Procedures**

Section 1126(c) of the Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount (the so-called dollar test) and represent more than one-half in number (the so-called numerosity test) of the creditors that cast ballots for acceptance or rejection of the plan.

Any Claim to which an objection or request for estimation is pending, including Claims that are deemed Disputed under the Plan, or which is scheduled by the Debtors as unliquidated, disputed or contingent and for which no proof of claim has been filed, is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing the Claim for purposes of voting on the Plan.  As set forth in the order approving the Disclosure Statement (the "Approval and Procedures Order"), motions for the temporary allowance of Claims must be filed by the deadline set by the Bankruptcy Court or ten days after the service of an objection to the Claim.

Ballots cast by alleged creditors who timely filed Claims in unliquidated or unknown amounts, that are not subject to an objection but whose Claims are (a) not listed on the Schedules, or (b) listed on the Schedules as disputed, contingent and/or unliquidated, will have their Ballots counted for purposes of the numerosity test of Section 1126(c) of the Bankruptcy Code, but will not be counted towards the dollar amount test.

The Approval and Procedures Order sets forth in detail the deadlines, procedures, and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating ballots.  In addition, detailed voting instructions accompany each ballot.  Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Approval and Procedures Order, and the instructions accompanying the ballot in their entirety before voting on the Plan.  These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes or otherwise, and the tabulation of votes.  No solicitation of votes to accept the Plan may be made except pursuant to Bankruptcy Code § 1125.

Pursuant to the provisions of the Bankruptcy Code, only holders of Allowed Claims or Equity Interests in Classes of Claims or Equity Interests that are impaired under the terms and provisions of a Chapter 11 plan and that will receive distributions under the Chapter 11 plan are entitled to vote to accept or reject the plan. Classes of Claims or Equity Interests in which the holders will not receive or retain any property under a Chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan. Classes of Claims or Equity Interests in which the holders are unimpaired under a Chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for the purpose of voting on the Plan. Holders of impaired Claims voting on the Plan should complete and sign the ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan." In order for your vote to be counted, you must complete and sign your original ballot (copies will not be accepted) and return it in the envelope provided.

If you are a holder of a Claim entitled to vote on the Plan and did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting on the Plan, please contact the Notice and Balloting Agent:

> if by mail:
>
> The Garden City Group, Inc.
> Attn: Bayou Group LLC Balloting Agent
> Re:  Bayou Group, LLC
> PO Box 9000 #6510
> Merrick, NY 11566
>
> if by mail, hand delivery, or overnight courier:
>
> The Garden City Group, Inc.
> Attn: Bayou Group LLC Balloting Agent
> Re:  Bayou Group, LLC
> Melville, NY  11747

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN 4:00 P.M., PREVAILING EASTERN TIME, ON DECEMBER 14, 2009 (THE "VOTING DEADLINE").

PURSUANT TO THE APPROVAL AND PROCEDURES ORDER, THE BANKRUPTCY COURT HAS SET NOVEMBER 3, 2009 AS THE RECORD DATE FOR VOTING ON THE PLAN. ACCORDINGLY, ONLY HOLDERS OF RECORD AS OF NOVEMBER 3, 2009 THAT ARE OTHERWISE ENTITLED TO VOTE UNDER THE PLAN WILL RECEIVE A BALLOT AND MAY VOTE ON THE PLAN.

1.    **Ballots**

All votes to accept or reject the Plan with respect to any Class of Claims must be cast by properly submitting the duly completed and executed form of ballot designated for such Class.

In accordance with Bankruptcy Rule 3018(c), the ballots are based on Official Form No. 14, but have been modified to meet the particular needs of these cases.  PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT.

Each ballot enclosed with this Disclosure Statement has been encoded with the amount of the Allowed Claim for voting purposes (if the Claim is a contested Claim, this amount may not be the amount ultimately allowed for purposes of distribution) and the Class into which the Claim has been placed under the Plan.  In voting to accept or reject the Plan, you must use only the coded ballot or ballots sent to you with this Disclosure Statement.

## 2.     <u>Voting Multiple Claims</u>

Separate forms of ballots are provided for voting the various Claims and Classes of Claims.  A SEPARATE ballot must be used for each Claim.  Any Person who holds Claims in more than one Class that is entitled to vote or multiple Claims within a Class entitled to vote is required to vote separately with respect to each such Claim.  Please sign, and return in accordance with the instructions in this section, a separate ballot with respect to each such Claim.  Only ballots with original signatures will be accepted.  Ballots with copied signatures will NOT be accepted.

## 3.     <u>Confirmation Hearing</u>

The Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a Confirmation Hearing at which it will hear objections (if any) and consider evidence with respect to whether the Plan should be confirmed.  At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Bankruptcy Code § 1129 are met.

The Confirmation Hearing has been scheduled to begin on December 21, 2009, at 10:00 a.m. (Prevailing Eastern Time) before the Honorable Robert D. Drain., United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, White Plains Division, 300 Quarropas Street, White Plains, New York 10601.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

Any objection to the confirmation of the Plan must be made in writing and detail (a) the name and address of the objector, (b) the amount and nature of the Claim or Equity Interest held by the objector, and (c) all grounds for the objection.  Any such objection must be filed with the Bankruptcy Court, with a copy to Judge Drain's Chambers, and served so that it is received by the Bankruptcy Court, Judge Drain's Chambers, and the following parties on or before December 14, 2009 at 4:00 P.M. (Prevailing Eastern Time): (a) the Debtors, c/o Proskauer Rose LLP, 70 W. Madison St., Chicago, Illinois 60602-4252 (Attn: Jeff J. Marwil, Esq.); (b) Dechert LLP, Attorneys for the Debtors, 1095 Avenue of the Americas, New York, New York 10036 (Attn: Shmuel Vasser, Esq. and Andrew L. Buck, Esq.); (c) Klestadt & Winters LLP, 292 Madison Avenue, New York, New York 10017-6314 (Attention: Tracy L. Klestadt, Esq.); (d) Kasowitz Benson Torres & Friedman, LLP, Bankruptcy Counsel for the Committee, 1633 Broadway, New York, New York 10019 (Attention: Joseph A. Gershman, Esq.) and K & L Gates LLP, 1601 K Street, NW, Washington, DC 20006-1600 (Attention: Richard Kirby, Esq.); and (e) the Office of the United States Trustee for the Southern District of New York, 271 Cadman Plaza East, Suite 4529, Brooklyn, New York 11201 (Attn: Andy Velez-Rivera, Esq.).

E.     **Recommendation of the Debtors and the Creditors Committee.**

THE DEBTORS AND THE CREDITORS COMMITTEE BELIEVE THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND CREDITORS. THEREFORE, THE DEBTORS AND THE CREDITORS COMMITTEE RECOMMEND THAT ALL CREDITORS IN CLASSES 2 AND 3 VOTE TO ACCEPT THE PLAN.

## II.     THE PRE-PETITION STRUCTURE AND OPERATIONS OF THE DEBTORS

A.     **Pre-Petition Corporate Structure of the Debtors**

The Debtors are an affiliated group of entities that created, operated, comprised, and controlled private pooled investment funds (commonly known as "hedge funds"). As more particularly described below, prior to the Petition Date, the Debtors operated their hedge funds as a fraudulent scheme, and engaged in a series of fraudulent actions and transactions in furtherance of their criminal scheme.

Samuel Israel III ("Israel") and James G. Marquez ("Marquez") formed the Debtors in early 1996, and together with Daniel E. Marino ("Marino") they fraudulently operated the Debtors through the collapse of the Debtors' hedge funds in August 2005 (Marquez withdrew from the Debtors in or about October 10, 2001). The Debtors were headquartered in Stamford, Connecticut until August 2005 when all business operations ceased and the United States Attorney for the Southern District of New York seized all property of the Debtors.

Bayou Management and Bayou Fund are limited liability entities organized under the laws of the State of New York. Bayou Accredited, Bayou Advisors, Bayou Affiliates, Bayou Equities, Bayou Superfund, and Bayou No Leverage are all limited liability entities organized under the laws of the State of Delaware. Bayou Group is a limited liability entity organized under the laws of the State of Connecticut.

Investors in the Bayou Hedge Funds purchased non-voting, redeemable, participating shares in one of the Bayou Hedge Funds by executing a subscription agreement. Bayou Fund – the first of the Debtors' hedge funds -- was launched by Israel and Marquez in 1996 with $1.2 million in capital. The Bayou Fund was a single-manager hedge fund marketed to "accredited investors" and large institutions. During a corporate reorganization in February 2003, the Bayou Fund was liquidated and the four separate Bayou Hedge Funds were created. Investors exchanged their investments in the Bayou Fund to one of the four new hedge funds.

Between 1996 and 2005, the Debtors' principals also managed and operated various off-shore hedge funds that are exempted limited companies organized and incorporated under the laws of the Cayman Islands, including: Bayou Offshore Fund A, Ltd., Bayou Offshore Fund B, Ltd., Bayou Offshore Fund C, Ltd., and Bayou Offshore Master Feeder Fund, Ltd. (collectively, the "Bayou Off-Shore Funds"). The Bayou Off-Shore Funds were placed into liquidation under the laws of the Cayman Islands on or about September 2, 2005. By Orders of the Grand Court of the Cayman Islands (the "Cayman Grand Court"), Gordon I. MacRae and G. James Cleaver (the "Off-Shore Liquidators") were appointed Joint Official Liquidators of the Bayou Off-Shore Funds. The Off-Shore Liquidators commenced an ancillary proceeding under Bankruptcy Code § 304(b) in the United States Bankruptcy Court for the District of Connecticut, Bridgeport Division on September 9, 2005. On October 5, 2005, an Order for Preliminary Injunction and Granting of Petitions Under Section 304 was entered by the Connecticut bankruptcy court.

The Off-Shore Liquidators are legally responsible for the administration of the Bayou Off-Shore Funds, coordinating distribution to the Bayou Off-Shore Funds' creditors, and pursuing the claims of the Bayou Off-Shore Funds. Pursuant to the Appointment Order, the Off-Shore Liquidators have possession and control over all (i) claims, demands, and causes of action that are within the jurisdiction of the liquidation proceedings pending in the Cayman Grand Court, and (ii) any real property, equitable property, tangible and intangible personal property, interests, or assets of any nature that is within the jurisdiction of the liquidation proceedings now pending in the Cayman Grand Court; but excluding the Government Funds and any claims or assets of the Debtors. The Claims asserted by the Off-Shore Liquidators and the Bayou Off-Shore Funds' creditors are deemed Disputed under the Plan. At the outset, the Debtors believe the Bayou Off-Shore Funds' creditors have no standing to assert independent claims. Only the Off-Shore Liquidators can assert claims on behalf of the Bayou Off-Shore Funds and their creditors. Further, it is the Debtors' position that the Off-Shore Liquidators' claim, if it exists at all, is only against Bayou Management. Those investors who chose to invest through the Bayou Off-Shore Funds governed by Cayman law are relegated to the remedies available to them in the Bayou Off-Shore Funds' Cayman proceeding. Further, the Debtors reserve the right to maintain a defense of setoff, contribution, or otherwise for reduction of any such claim, including under § 508 of the Bankruptcy Code, as a result of distributions previously made to creditors of the Bayou Off-Shore Funds.

B.    **The Debtors' Pre-Petition Fraud**

The Debtors were operated as a massive fraudulent investment scheme that induced investments of a reported $450 million into the Bayou Hedge Funds and their off-shore counterparts. The Debtors' three pre-petition principals – Samuel Israel, Daniel Marino, and James Marquez – have pled guilty in the United States District Court for the Southern District of New York to conspiring to defraud investors in connection with the operations of the Bayou Hedge Funds. Israel and Marino further pled guilty in this District to federal counts of mail and wire fraud, investment advisor fraud, and conspiracy to commit fraud, in connection with their operation of the Bayou Hedge Funds.

In particular, from July 1996 to August 2005, the Bayou Principals perpetrated a fraud on investors by misrepresenting the performance of the Bayou Hedge Funds, falsely inflating the value of the Bayou Hedge Funds' assets and sending investors false information regarding the true status of their investment. From at least 1998 to August 2005, the Bayou Hedge Funds sustained trading losses. Throughout the fraud, the Bayou Principals disseminated various communications to investors, including monthly investor account statements, that were intentionally designed to conceal trading losses and give the appearance that the Bayou Hedge Funds were earning profits when in fact they were not. At all relevant times, the Bayou Principals acted with specific criminal intent to defraud current and prospective investors.

As the Bankruptcy Court concluded in granting summary judgment to the Debtors:

> The guilty pleas and allocutions of Israel, Marquez and Marino establish that Bayou Management "made up numbers" and knowingly and intentionally caused to be published weekly, monthly, quarterly and annual reports containing falsely inflated earnings and NAVs for the Bayou hedge funds and individual investor accounts, with the intent and purpose of deceitfully inducing present investors to retain their accounts and prospective investors to invest.

In re Bayou Group, LLC, 396 B.R. 810, 842.

The linchpin of the fraudulent scheme was the Bayou Principals' creation, in late 1998 or early 1999, of a "sham" accounting firm named Richmond Fairfield in order to conceal the true financial

performance of the Bayou Hedge Funds and deceive investors in the Bayou Hedge Funds. From at least 1999 to 2005, the Bayou Principals falsely represented to investors that Richmond Fairfield was providing an independent audit of the Bayou Hedge Funds; during that time, Bayou Hedge Funds' falsified annual financial statements contained a fictitious certification by Richmond Fairfield that the Bayou Hedge Funds had been audited and that the financial statements were accurate.

At all times during this fraudulent scheme, the Bayou Principals acted with specific criminal intent to defraud current and prospective investors. Israel, Marino, and Marquez all perpetrated their fraudulent scheme knowingly and willfully. Israel's and Marino's intent in reporting falsely inflated performance returns was to "induce . . . people to invest in Bayou or continue to keep their money in Bayou," and "to mislead investors." Israel understood at the time that reporting the falsely inflated performance returns was "wrong and fraudulent." The Bayou Principals' intent in forming Richmond Fairfield was to conceal the true financial performance of the Bayou Hedge Funds and deceive investors in the Bayou Hedge Funds.

During their respective plea allocutions, Israel and Marino both confessed that they:

> caused to be mailed quarterly reports to investors that contained fictitious rates of return on trading in the funds and annual financial statements that contained fictitious rates of return on trading and inflated net asset[] values. [They] also had faxed and mailed weekly newsletters that also misrepresented the performance of the funds at various times during the time period set forth in the information. All these communications to investors [] made it appear that Bayou was earning profits on trading when in fact it was not.

They both further confessed that:

> In furtherance of the scheme and because Bayou could not use an actual certified public accounting firm to audit the funds and certify the annual financial statements, [they] in early 1999 form[ed] a phony accounting firm [] name[d] Richmond Fairfield Associates. Year after year between 1999 and 2004, the co-conspirators had Bayou's false financial statements sent out with a fictitious certification by Richmond Fairfield Associates that the funds had been audited and the financial statements were accurate.

Israel further admitted that this false financial information concerning Bayou's performance was disseminated to "current and prospective clients of Bayou" in order to "induce [] people to invest in Bayou or continue to keep their money in Bayou."

During his plea allocution, Marquez confessed that:

> In order to establish these elements of this crime, the government would prove at trial, based on the documentary evidence and the testimony of witnesses, that from in or about July 1996 to on or about October 10th, 2001, James Marquez and his co-conspirators, Samuel Israel and Daniel Marino perpetrated a fraud on investors and potential investors in two hedge funds, the Bayou Fund, LLC and Bayou Fund Ltd., by misrepresenting the value of the hedge funds' assets and causing these misrepresentations to be disseminated to current and prospective investors in the Southern District of New York and elsewhere. These false and misleading statements and misrepresentations induced new investors to invest in the funds and lulled existing investors into retaining their investments in the funds.

> The evidence would establish that Mr. Marquez, who founded the original two hedge funds with Samuel Israel, was responsible for executing trades, investment management and

16

operations of funds. He and his co-conspirators caused to be mailed quarterly reports to investors that contained fictitious rates of return on trading in the funds and annual financial statements that contained fictitious rates of return on trading and inflated net asset value. The evidence would establish that Mr. Marquez and Mr. Israel made up numbers. All of these communications to investors made it appear that Bayou was earning profits on trading when, in fact, it was not.

In furtherance of this scheme, and because Bayou could not use an actual certified public accounting firm to audit the funds and certify the funds' annual financial statements, in or about 1998, Mr. Marquez and Mr. Israel and Mr. Marino devised a plan to form a phony accounting firm. Thereafter, Mr. Marino created Richmond-Fairfield Associates, a fake accounting firm, and year after year, between 1999 and 2001, the co-conspirator had Bayou's false financial statements sent out with a fictitious certification by Richmond-Fairfield.

Israel and Dan Marino each have been sentenced to 20 years in prison. Marquez and Matthew Marino, Daniel Marino's brother, have also been sentenced to prison terms in connection with the fraud.

## C.   Formation of the Unofficial Creditors Committee

In February 2006, following broad notice to similarly-situated investors in the Bayou Hedge Funds, a group of more than 60 creditors of the Debtors, holding more than $130 million in claims against the Debtors, formed the "Unofficial On-Shore Creditors' Committee of the Bayou Family of Companies" (the "Unofficial Creditors Committee"). On March 27, 2006, the Unofficial Creditors Committee filed a lawsuit (the "Unofficial Creditors Committee Action") in the United States District Court for the Southern District of New York against the Debtors, Israel and Marino, and others asserting violations of federal securities laws and claims for fraud and breach of fiduciary duty, and seeking various forms of equitable relief from the District Court.

## D.   Appointment of Sole Managing Member of the Debtors

On March 28, 2006, in connection with the Unofficial Creditors Committee Action, the Unofficial Creditors Committee filed a Motion to Appoint a Receiver for the Debtors. By Order dated April 28, 2006 (the "Appointment Order"), the District Court, pursuant to Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 thereunder, state law claims of fraud and breach of fiduciary duty, 28 U.S.C. §§ 754, 959, and 1692, Federal Rule of Civil Procedure 66, and the court's inherent authority, appointed Jeff J. Marwil ("Marwil" or the "Sole Managing Member") both as a "federal equity receiver" and "the sole and exclusive managing member" of each of the Debtors. With respect to the Debtors' corporate management, the Appointment Order decreed that:

> Pursuant to 28 U.S.C. § 959(b), [Marwil shall] succeed to be the sole and exclusive managing member and representative of each of the Bayou Entities with the sole and exclusive power and authority to manage and direct the business and financial affairs of the Bayou Entities, including without limitation, the authority to petition for protection under the Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Code"), for any of the Bayou Entities and in connection therewith be and be deemed a debtor-in-possession for any and all of the Bayou Entities in proceedings under Chapter 11 of the Code, and prosecute such adversary proceedings and other matters as may be permitted under the Code and/or applicable law.

The Appointment Order authorized and directed the Sole Managing Member, as corporate management of the Debtors, to "take any and all actions necessary and proper" towards, among other things, "locating, preserving, and protecting" the Debtors' assets and "distributing" the Debtors' assets

"as expeditiously as possible." Among the duties charged to the Sole Managing Member, on behalf of the Debtors, was the prosecution of causes of action.

Pursuant to the Appointment Order, the Debtors' Assets include: (a) all claims, demands, or causes of action of the Debtors against third parties, including but not limited to any avoidance actions under Chapter 5 of the Bankruptcy Code, applicable state fraudulent transfer law or applicable state common law (specifically including causes of action against redemption recipients), and (b) any real property, equitable property, tangible and intangible personal property, interests, or assets of any nature, wherever located; specifically excluding any assets subject to the an order of civil or criminal forfeiture and any asset of the Bayou Off-Shore Funds' Estates.

As noted above, the Debtors have not located Assets other than the legal claims, including fraudulent transfer claims.

## III.   THE DEBTORS' CHAPTER 11 CASES

### A.   Commencement of the Chapter 11 Cases

On May 30, 2006, at the direction of the Sole Managing Member, each of the Debtors filed separate voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, White Plains Division. Pursuant to Bankruptcy Rule 1015(b), the Debtors' cases have been procedurally consolidated and are being jointly administered by the Bankruptcy Court. As of the date hereof, under the control of the Debtors' Sole Managing Member, the Debtors are debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No trustee or examiner has been appointed in these cases.

As of the Petition Date, the Debtors did not have any cash-on-hand or other real, personal, or other property. The Debtors' only assets as of the Petition Date were the Debtors' legal claims against third parties and the proceeds from such claims.

The Debtors commenced these Cases in order to, among other things, (a) investigate and pursue causes of action against various third parties in order (i) to assure an equality of distribution among defrauded creditors and (ii) to maximize the value of claims against non-investor third parties who were complicit with the Debtors' former principals in perpetrating a fraud; (b) employ a fair and equitable claims and distribution process for all of the Debtors' creditors; and (c) avoid the costs and risk of defending claims of investors and other creditors in various other jurisdictions.

An immediate effect of the filing of these Cases was the imposition of the automatic stay under Bankruptcy Code § 362, which enjoined the commencement or continuation of: (a) collection efforts by creditors, (b) enforcement of liens against any assets of the Debtors, and (c) litigation against the Debtors. The imposition of the automatic stay, the right to bring avoidance actions under the Bankruptcy Code, the efficiency of the Chapter 11 claims administration process, the transparency of Chapter 11 proceedings, and the benefits of making distributions under a Chapter 11 plan were deemed to be in the best interests of all parties.

The Debtors have retained Dechert LLP as their general litigation and bankruptcy counsel and Klestadt & Winters, LLP as their special counsel. In addition, the Debtors have retained Navigant Consulting, Inc. as their financial advisors.

B.       **Appointment of the Creditors Committee**

On June 15, 2006, the United States Trustee for Region 2 appointed the Creditors Committee for these Cases, pursuant to Bankruptcy Code § 1102, to represent the interests of unsecured creditors.  The Creditors Committee consists of the following members:

> Silver Creek Capital Management
> Bermuda Fund, LLC
> Regent University
> Woodland Partners, LP
> John H. Williams

Silver Creek Capital Management, Bermuda Fund, Regent University, and John H. William were voting members of the Unofficial Creditors Committee.  On June 13, 2007, the Unofficial Creditors Committee was dissolved.  The members of the Unofficial Creditors Committee intend to seek reimbursement of professional fees and expenses paid in connection with the retention of counsel by the Unofficial Creditors Committee.

The Creditors Committee has retained K & L Gates LLP as its litigation counsel and Kasowitz Benson Torres & Friedman LLP as its bankruptcy counsel and special litigation counsel with respect to one of the Committee-Controlled Causes of Action.  In addition, the Committee has retained Klestadt & Winters, LLP as its special counsel in connection with the other Committee-Controlled Cause of Action.

The Debtors understand that the Creditors Committee has participated in these Cases by, among other things, monitoring the Debtors' activities and the pending Adversary Proceedings before the Bankruptcy Court.

One member of the Creditors Committee made a partial redemption from the Bayou Hedge Funds as described in Subsection D – Commencement of Adversary Proceedings, below.

C.       **Significant Events During these Cases**

1.       **First-Day Motions**

To minimize the possible disruption to the Debtors upon the filing of these Cases, among other reasons, on the Petition Date, the Debtors filed the following motions with the Bankruptcy Court:

- Motion of Debtors and Debtors in Possession Pursuant to Bankruptcy Rule 1015(b) Directing Joint Administration;

- Motion of the Debtors and Debtors in Possession Pursuant to Bankruptcy Rules 1015(c) Establishing Noticing Procedures;

- Application of the Debtors and Debtors in Possession Pursuant to 28  U.S.C. § 156(c) for an Order Authorizing the Retention and Employment of The Trumbull Group as Claims Agent; and

- Motion for an Administrative Order Under Local Bankruptcy Rule 2016-1 and Sections 105(a) And 331 of the Bankruptcy Code for an Order Establishing Procedures for Interim Monthly Compensation of Professional.

The Bankruptcy Court entered orders approving each of these motions, with certain modifications, as applicable.

### 2.    DIP Financing

On the Petition Date, the Debtors filed a motion seeking approval of a debtor-in-possession financing agreement (as amended, the "First DIP Financing Agreement") with Silver Creek Long/Short Holdings, L.L.C. ("Silver Creek"), an entity affiliated with a member of the Creditors Committee, pursuant to which Silver Creek agreed to provide the Debtors with secured advances in an aggregate amount not to exceed $500,000.  On June 28, 2006, the Bankruptcy Court entered an order approving that motion on a final basis and granted Silver Creek a perfected, first priority, senior priming lien on certain inchoate Assets of the Debtors, including the proceeds of Adversary Proceedings, and a super-priority administrative claim to Silver Creek pursuant to Bankruptcy Code § 364(c)(1).  The Debtors used the proceeds from the First DIP Financing Agreement to fund these Cases.

After fully drawing down the availability under the First DIP Financing Agreement, the Debtors considered several methods of obtaining replacement financing on the best terms possible.  On October 10, 2006, the Debtors filed a motion seeking approval of a replacement debtor-in-possession financing agreement (the "Second DIP Financing Agreement") with Kerwick Capital Funding One, LLC ("Kerwick"), pursuant to which Kerwick agreed to provide the Debtors with an $3.5 million senior secured revolving credit facility secured by a super-priority administrative claim and a security interest in and lien on certain inchoate assets of the Debtors, including the Adversary Proceedings.  On December 13, 2006, after notice and a hearing, the Bankruptcy Court entered a final order authorizing the Debtors to obtain secured replacement financing.  The Debtors used the proceeds of the Second DIP Financing Agreement to pay in full the secured claim of Silver Creek, to fund the operations of the Debtors, and pay ongoing administrative expenses of these Cases.  On or about September 18, 2007, the Debtors paid in full the secured claim of Kerwick and terminated the Second DIP Financing Agreement.

### 3.    Bar Date Order

On August 21, 2006, each of the Debtors filed Schedules and Statements of Financial Affairs (the "Schedules").  Because the Debtors did not have access to their books and records, the Debtors scheduled every known Investor Creditor as contingent, disputed, and unliquidated in an unknown amount in each of the these Cases.

On November 9, 2006, the Debtors filed a motion seeking an order fixing a bar date for the filing of proofs of claim against the Debtors' Estates.  By order dated November 22, 2006 (the "Bar Date Order"), the Bankruptcy Court set a bar date of January 17, 2007 (the "Bar Date").  The Debtors caused notices of the Bar Date and a proof of claim form to be sent to all of the entities identified in the Schedules.  Notice of the Bar Date was also published in the National edition of The Wall Street Journal and The New York Times.

Pursuant to the Bar Date Order, each creditor holding a prepetition Claim was required, subject to specific limited exceptions, to file a proof of claim on or before the Bar Date.

### 4.    The Trustee Motion and Appeals

On June 20, 2006, the United States Trustee filed a motion requesting that the Bankruptcy Court appoint a Chapter 11 trustee pursuant to Bankruptcy Code § 1104(a) (the "Trustee Motion").  The Debtors and the Creditors Committee vigorously opposed the Trustee Motion and filed separate

memoranda of law in opposition. The Bankruptcy Court entered an order (the "Trustee Denial Order") on June 30, 2006, denying the Trustee Motion.

The United States Trustee filed a notice of appeal (the "Appeal") of the Trustee Denial Order on July 10, 2006. The appeal was assigned to United States District Court Judge Colleen McMahon. The District Court heard oral argument on the Appeal on November 17, 2006. On February 2, 2007, Judge McMahon issued a decision and order affirming the Trustee Denial Order (the "District Court Trustee Order"). See In re Bayou Group, LLC, 363 B.R. 674 (S.D.N.Y. 2007).

On April 6, 2007, the United States Trustee filed a notice of appeal of the District Court Trustee Order to the United States Court of Appeals for the Second Circuit. On June 28, 2007, the United States Trustee filed its Appellate Brief. The Debtors and the Creditors Committee filed separate Appellee Briefs on September 28, 2007. The United States Trustee filed its Reply Brief On October 12, 2007. The Second Circuit heard oral argument on September 17, 2008. On May 1, 2009, the Second Circuit issued a decision and order affirming the District Court's decision. See In re Bayou Group, LLC, Case No. 07-1508-bk.

5.   **Extension of the Debtors' Exclusive Periods**

By four separate orders of the Bankruptcy Court, the period during which the Debtors have the exclusive right to file a plan or plans of reorganization has been extended through and including November 30, 2007, and the period during which the Debtors have the exclusive right to solicit acceptances therefore has been extended through and including January 30, 2008.

D.   **Adversary Proceedings Against Redeeming Investors**

At the direction of the Sole Managing Member, the Bayou Hedge Funds have commenced and pursued 150 adversary proceedings against investors who redeemed all or part of their investments in the Bayou Hedge Funds, including 119 adversary proceedings against defendants who received redemption payments from the Bayou Hedge Funds within two years of the Petition Date and 31 adversary proceedings against defendants who received redemption payments from the Bayou Hedge Funds prior to May 30, 2004. As described in more detail below, the Debtors have entered into Bankruptcy Court-approved settlement agreements with the defendants in 142 of these 150 adversary proceedings, for an aggregate recovery of approximately $56 million. In the eight remaining adversary proceedings, the Bayou Hedge Funds have been awarded summary judgment on their claims to recover a total of $24,794,307 in redemption payments, but the defendants in those adversary proceedings have filed an appeal, which is currently pending in the United States District Court for the Southern District of New York. Bayou Management also commenced and pursued one adversary proceeding against an investor who received a redemption payment from Bayou Management; that defendant agreed in a court-approved settlement to return the entirety of the redemption payment in the amount of $674,283.

Further detail concerning the adversary proceedings is as follows. In the months after the Petition Date, the Bayou Hedge Funds commenced and pursued 119 adversary proceedings, and Bayou Management commenced one adversary proceeding, against investors who received redemption payments from the Bayou Hedge Funds on or after May 30, 2004 (within two years of the bankruptcy filing). The Debtors have commenced Adversary Proceedings against every Investor of which they are aware who sought and received a full redemption of its Investment during the two-year period prior to the Petition Date.

The principal claims in these adversary proceedings were fraudulent conveyance claims arising under section 548 of the Bankruptcy Code. Under Bankruptcy Code §§ 548(a)(1)(A) and 550, the

Debtors may avoid and recover the entirety of any redemption payment made to an investor within two years of the Petition Date and with "actual intent to hinder, delay, or defraud" present or future creditors. Under Bankruptcy Code § 548(c), once the Debtors establish their prima facie case of actual fraud, the burden shifts to each defendant to prove any affirmative defense that it received the redemption payment for "value" and in "good faith," *i.e.,* without actual or inquiry notice of problems with the Bayou Hedge Funds and without conducting a diligent investigation allaying such inquiry notice. Under Bankruptcy Code § 548(a)(1)(B), the Debtors may avoid and recover any portion of the redemption payments made to an investor within two years of the Petition Date and at a time when the Debtors were insolvent, and for which the Debtors received "less than a reasonably equivalent value" in return. In other words, the Debtors may avoid and recover any redemption payments of "fictitious profits."

By the end of 2007, the Debtors entered into court-approved settlement agreements with the defendants in 87 of those adversary proceedings. In 66 of these 87 settlement agreements, the defendant agreed to return between 50% and 61% of the Redemption Payment equal to the defendant's principal Investment and the entire portion of the Redemption Payment consisting of purported profits, if any, on that Investment. Each of these defendants waived any and all claims against the Debtors' Estates and is not an Investor Creditor. In two of the 87 settlement agreements, the defendants agreed to return 100% of the Redemption Payments; pursuant to the terms of the settlement agreement, one of those defendants is now an Investor Creditor. In 16 of the 87 settlement agreements, the Debtors accepted that the defendants took the Redemption Payments from the Debtors in "good faith" under Bankruptcy Code § 548(c). Nevertheless, each defendant agreed to return all purported profits the defendant had received. In 3 of the 87 settlement agreements, the defendant either agreed to return a smaller percentage of the Redemption Payment equal to the defendant's Principal Investment and any purported profits, or agreed to an offset of claims and distributions.

In early 2008, the Debtors commenced and pursued 31 additional adversary proceedings, with these cases filed against Bayou investors who received redemption payments from the Bayou Hedge Funds prior to May 30, 2004. The principal claims in these adversary proceedings were fraudulent conveyance claims arising under New York's Debtor and Creditor Law, as well as section 544(b) of the Bankruptcy Code. The standards for the Debtors' fraudulent transfer claims under New York law are virtually identical to those under the Bankruptcy Code. The Debtors have entered into court-approved settlement agreements with all of the defendants in these cases requiring the return of all purported profits received by the defendants.

On January 18, 2008, the Bayou Hedge Funds filed motions for summary judgment in the 33 adversary proceedings that had not settled. On October 16, 2008, the Bankruptcy Court issued a memorandum decision (the "Summary Judgment Decision"). See In re Bayou Group, LLC, 396 B.R. 810 (Bankr. S.D.N.Y. 2008). Following the Summary Judgment Decision, the Bayou Hedge Funds entered into court-approved settlement agreements with the defendants in 25 of the 33 adversary proceedings, resulting in an aggregate recovery to the Debtors' estates of over $20.5 million. The terms of these 25 settlement agreements reflected the Bankruptcy Court's disposition of the Bayou Hedge Funds' claims in the Summary Judgment Decision. In 6 the 25 settlement agreements, the defendant agreed to return between 75% and 83% of the Redemption Payment equal to the defendant's principal Investment and the entire portion of the Redemption Payment consisting of purported profits, if any, on that Investment. In 1 settlement agreement, the defendant agreed to return 56.5% of the Redemption Payment equal to the defendant's principal Investment and the entire portion of the Redemption Payment consisting of purported profits on that Investment. In 1 settlement agreement, the defendant agreed to return 44% of the Redemption Payment equal to the defendant's principal Investment and the entire portion of the Redemption Payment consisting of purported profits on that Investment. In 2 of the 25 settlement agreements, the defendant agreed to return 38% of the Redemption Payment equal to the defendant's principal Investment and the entire portion of the Redemption Payment consisting of purported profits on

that Investment. In 9 of the 25 settlement agreements, the defendant agreed to return 38% of the Redemption Payment equal to the defendant's principal Investment and the entire portion of the Redemption Payment consisting of purported profits on that Investment. In 4 of the 25 settlement agreements, the defendant agreed to return all purported profits received from the Bayou Hedge Funds. In 2 of the 25 settlement agreements, the defendant agreed to withdraw its claim against the Bayou Hedge Funds for the non-redeemed balance of its Investment.

The most notable aspects of the Adversary Proceedings are described in more detail below:

1.     **Discovery**

With court approval, the Debtors have issued numerous subpoenas pursuant to Bankruptcy Rule 2004 to obtain complete and reliable information concerning the investments in, and redemptions from, the Bayou Hedge Funds, and to identify all potential claims that the Debtors may have against investors and others who received transfers of money or other property from the Debtors prior to the Petition Date. Counsel for the Bayou Hedge Funds conducted 56 depositions of the defendants and third parties in connection with the Adversary Proceedings.

2.     **Redeemer Defendants' Motions to Dismiss**

On November 11, 2006, defendants in 95 of the Adversary Proceedings moved to dismiss the Amended Complaints (the "Motions to Dismiss"). The Motions to Dismiss were fully briefed by the parties, and Judge Hardin heard oral argument on the Motions to Dismiss on January 24, 2007. On February 23, 2007, Judge Hardin issued a Decision Denying Motions to Dismiss (the "Opinion"). See In re Bayou Group, LLC, 362 B.R. 624 (Bankr. S.D.N.Y. 2007). On February 28, 2007, Judge Hardin entered an order denying the Motions to Dismiss in their entirety (the "Order Denying Motions to Dismiss"). The Opinion denying the Motions to Dismiss is annexed hereto as Exhibit B.

On March 12, 2007, defendants in 86 of the Adversary Proceedings filed Notices of Appeal of the Order Denying Motions to Dismiss, together with motions for leave to appeal pursuant to 28 U.S.C. § 158 and supporting memoranda of law (the "Motions for Leave"). On March 22, 2007, the Debtors filed a memorandum of law in opposition to the defendants' Motions for Leave. On July 11, 2007, the Motions for Leave were denied by the Honorable Charles L. Brieant.

3.     **Certain Redeemer Defendants' Motions for Summary Judgment**

On May 15, 2007, 22 Redeemer Defendants represented by Sonnenschein Nath & Rosenthal, LLP, filed motions (the "Summary Judgment Motions") for summary judgment on the Amended Complaints. Several other Redeemer Defendants then filed similar Summary Judgment Motions. On June 15, 2007, the Debtors filed their memorandum of law in opposition to the Summary Judgment Motions. On June 29, 2007, the Redeemer Defendants filed a reply memorandum of law. On July 11, 2007, a hearing was held before the Bankruptcy Court on the Summary Judgment Motions. On August 9, 2007, the Court issued an opinion denying the Summary Judgment Motions. See In re Bayou Group, LLC, 372 B.R. 661 (Bankr. S.D.N.Y. 2007). The decision denying the Summary Judgment Motions is attached as Exhibit C hereto.

4.     **The Debtors' Motions for Summary Judgment**

On January 18, 2008, the Debtors filed motions for summary judgment in the 33 Adversary Proceedings that had not settled. On October 16, 2008, the Bankruptcy Court issued the Summary Judgment Decision. See In re Bayou Group, LLC, 396 B.R. 810 (Bankr. S.D.N.Y. 2008). On October

23

16, 2008, the Bankruptcy Court issued the Summary Judgment Decision.  In that Decision, the Bankruptcy Court held that the debtor Plaintiffs satisfied their *prima facie* under section 548(a)(1)(A) of the Bankruptcy Code in each of the adversary proceedings, *i.e.*, the Plaintiffs proved that that the Bayou Hedge Funds made each of the redemption payments to the defendants with actual intent to hinder, delay or defraud the Bayou Hedge Funds' investor creditors.

In the Summary Judgment Decision, the Bankruptcy Court articulated the "good faith" standard as follows:

> Thus, it is important for the trier of fact to understand that the test for good faith under Section 548(c) is not whether the defendant was guilty of any sort of bad faith in requesting and receiving the transfer.  The test is whether the defendant requested redemption after learning of a "red flag" which, under an "objective" standard, should have put the defendant on "inquiry notice" of some infirmity in Bayou or the integrity of its management.  The rule does not require that the "red flag" be of such specificity as to put the recipient on 'inquiry notice' of the actual fraud, or embezzlement, or looting, or whatever ultimately proves to be the cause of loss.  It is sufficient if the red flag puts the investor on notice of some potential infirmity in the investment such that a reasonable investor would recognize the need to conduct some investigation.  The 'diligent investigation' is required not because of any duty to inquire owed to a third party.  It is required only to prove the plausibility of the defendant's asserted good faith reason for redemption independent of the red flag, notwithstanding [] knowledge of the red flag, by showing that the facts learned upon inquiry reasonably allayed any concern raised by the red flag.

396 B.R. at 848.  The Bankruptcy Court added that, although the standard for "good faith" rests principally on whether the defendant was objectively on inquiry notice:

> a defendant may establish his defense if he can prove by a preponderance of the credible objective evidence that his request for redemption was in fact the result of a good faith reason other than his knowledge of 'red flags," even if he was on inquiry notice and did not make inquiry before redeeming.  By 'objective evidence' I mean independent evidence of facts, as opposed to mere 'subjective assertions of good faith' by the defendant himself or the testimony of others that cannot be objectively verified.

Id. at 849.

With respect to 15 of the adversary proceeding defendants, the Bankruptcy Court held that those defendants could not satisfy their respective good faith defense under section 548(c) of the Bankruptcy Code as a matter of law, and therefore awarded Plaintiffs summary judgment on their claims to recover the entirety of the redemption payments made to these defendants, including amounts equal to the defendants' investment principal and Purported Profits.  With respect to 12 of the adversary proceeding defendants, the Bankruptcy Court held that there was an issue of fact with respect to these defendants' good faith defenses under section 548(c) of the Bankruptcy Code, thereby requiring a trial on certain issues relating to the good faith defense.  The Bankruptcy Court held that three of the defendants met their good faith defenses as a matter of law, and therefore granted summary judgment to those defendants with respect to claims to recover redemption payments equal to the defendant's principal investment.  Lastly, the good faith of three of the defendants was not at issue on the summary judgment motions.

24

In the Summary Judgment Decision, the Bankruptcy Court also held that all of the redemption payments of Purported Profits made to the adversary proceeding defendants were constructive fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

During a hearing held on December 18, 2008, the Bankruptcy Court denied Plaintiffs' requests for awards of pre-judgment interest against those defendants ordered to return money to the Debtors' estates. On January 29, 2009, the Bankruptcy Court entered final orders in each of the adversary proceedings reflecting and implementing the Summary Judgment Decision.

5.    **Appeals**

Of the 151 adversary proceedings commenced and pursued by the Debtors against redeeming investors, only eight remain unresolved. The remaining eight adversary proceedings against redeeming investors currently are on appeal before the Honorable Paul G. Gardephe of the District Court. In its Summary Judgment Decision, the Bankruptcy Court granted summary judgment in favor of the Bayou Hedge Funds to avoid and recover the entirety of the redemption payments received by, among others, the defendants in these eight cases. These eight defendants are appealing the Summary Judgment Decision to the extent it awarded summary judgment against them for a total of $24,794,307.

E.    **Adversary Proceedings Against Non-Investors**

In addition to the 151 referenced Adversary Proceedings against redeeming Investors, the Debtors have commenced three Adversary Proceedings against non-investor defendants.

In one of the Adversary Proceedings, Bayou Management entered into a court-approved settlement agreement with a subsequent transferee of funds originating from Bayou Management; in that settlement agreement, the defendant has agreed to pay and in fact paid Bayou Management $1 million as part of a joint settlement with the United States.

Bayou Management commenced a separate Adversary Proceeding against Altegris Investments, Inc., an investment intermediary that entered into a Selling Agreement with Bayou Management. Pursuant to a court-approved settlement agreement, Altegris agreed to release and waive certain potential claims against the Debtors and to a conditional future settlement payment of $67,500 (conditioned upon the resolution of the claim filed by Altegris against the Debtors).

The Debtors have also commenced an Adversary Proceeding against the Debtors' prepetition clearing broker, Goldman Sachs Execution and Clearing L.P. Due to conflicts, this matter is being handled under the direction of the Creditors Committee. This case is proceeding in a FINRA arbitration by consent of the parties. The Creditors Committee, on behalf of the Debtors, has asserted claims totaling $20.5 million in the arbitration.

In addition, the Debtors asserted a claim against Hennessey Group LLC for $751,864 and are in the process of attempting to reach a negotiated resolution of such claim. If no resolution is reach, the Debtors or the Litigation Trusts may pursue said claim

IV.    **OVERVIEW OF THE PLAN**

A.    **General**

This Section of the Disclosure Statement summarizes the Plan, which is set forth in its entirety as Exhibit A hereto. This summary is qualified in its entirety by reference to the Plan. **YOU SHOULD**

**READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN.**

In general, a Chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the Plan. Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class. Under Bankruptcy Code § 1124, a class of claims is "impaired" under a plan unless the plan (i) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class, or (ii) provides, among other things, for the cure of existing defaults and reinstatement of the maturity of claims in such class. Classes 2 and 3 are impaired under the Plan, and holders of Claims in these Classes are entitled to vote to accept or to reject the Plan unless the Claims are subject to an objection filed by the Debtors or are otherwise Disputed Claims. Ballots are being furnished herewith to all holders of Claims in Classes 2 and 3 that are entitled to vote to facilitate their voting to accept or to reject the Plan. The Plan defines "Disputed Claims" as, with respect to any Claim which has not otherwise been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court,

(a)     if no Proof of Claim has been filed by the applicable deadline: (i) a Claim that has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated; or (ii) a Claim that has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but as to which the Debtors, either of the Litigation Trusts, or any other party-in-interest has either (1) interposed an objection, in whole or in part, or request for estimation, (2) filed a motion to disallow or expunge, in whole or in part, which has not been withdrawn or determined by a Final Order or otherwise resolved or settled by the parties thereto or (3) commenced an Adversary Proceeding or other Cause of Action against the holder of such Claim that has not yet been resolved, withdrawn, or settled; or

(b)     if a Proof of Claim has been filed by the applicable deadline: (i) a Claim for which a timely objection, in whole or in part, request for estimation, or motion to disallow or expunge, in whole or in part, is interposed which has not been withdrawn or determined by a Final Order of the Bankruptcy Court; or (ii) a Claim whose holder is a defendant in an Adversary Proceeding (including, without limitation, any Defendant) or other Cause of Action that has not yet been resolved, withdrawn, or settled; or

(c)     if a request for payment of an Administrative Expense Claim has been filed by the applicable deadline: (i) a Claim for which no corresponding Claim has been or hereafter is listed on the Debtors' books and records; (ii) a Claim for which a corresponding Claim has been or hereafter is listed on the Debtors' books and records, but the nature or amount of the Claim as asserted in the request for payment varies from the nature or amount of such Claim as listed on the Debtors' books and records; or (iii) a Claim for which either (1) a timely objection, in whole or in part, or request for estimation or (2) a motion to disallow or expunge, in whole or in part, or an Adversary Proceeding is interposed against the holder of such Claim which has not been withdrawn or determined by a Final Order of the Bankruptcy Court or otherwise resolved or settled by the parties thereto.

(d)     the Investment Intermediary Claims, the Off-Shore Claims and the Off-Shore Investors Claims against any of the Debtors other than against Bayou Management will be deemed disputed for the purposes of the Plan.

A Chapter 11 plan may also specify that certain classes of claims or equity interests are to have their claims or equity interests remain unaltered by the plan. Such classes are referred to as "unimpaired,"

26

and because of the favorable treatment accorded to such classes, they are conclusively deemed under Bankruptcy Code § 1126(f) to have accepted the plan and, therefore, need not be solicited to vote to accept or to reject the plan. Under Plan, holders of Claims in Class 1 (Priority Non-Tax Claims) are unimpaired and are not entitled to vote.

A Chapter 11 plan may also specify that certain classes will not receive any distribution under the plan. Under Bankruptcy Code § 1126(g), such classes are conclusively deemed to have rejected the plan and, therefore, need not be solicited to accept or to reject the plan. Holders of Equity Interests in Class 4 will not receive any recovery under the Plan on account of such Equity Interests and that Class is, therefore, conclusively deemed to reject the Plan. No ballot is enclosed for holders of Class 4 Equity Interests.

The "Effective Date" of the Plan means the date on which each of the conditions to the effectiveness of the Plan specified in Plan Section 9.2 have been satisfied.

B.    **Assets for Distribution Under the Plan**

The Plan provides for the distribution to holders of Allowed Investor Creditor Unsecured Claims against the Debtors of such holder's Pro Rata Share of the Assets of the Litigation Trusts, the proceeds of which will be distributed by the Litigation Trustees in accordance with the terms of the Plan and the respective Litigation Trust Agreements, after the payment of and/or setting aside of sufficient funds to be able to pay (as applicable), Allowed Administrative Expense Claims (including Professional Fees), Allowed Priority Tax Claims, Allowed Secured Claims (if any), Allowed Priority Non-Tax Claims, and Allowed Non-Investor General Unsecured Claims.

C.    **Description of Classification and Treatment of Claims**
       **and Equity Interests Under the Plan Against the Debtors**

1.    **Unclassified Claims**

As contemplated under the Bankruptcy Code, Administrative Expense Claims, Secured Claims, and Priority Tax Claims are not classified under the Plan. In order to confirm the Plan, Allowed Administrative Expense Claims, Allowed Secured Claims (if any), and Allowed Priority Tax Claims must be paid in full or in a manner otherwise agreeable to the holders of those Claims. The Debtors will have sufficient Cash available on the Effective Date to pay all of the foregoing in full.

a.    **Administrative Expense Claims**

Administrative Expense Claims are all Claims for costs and expenses of administration of these Cases with priority under Bankruptcy Code § 507(a)(2), costs and expenses allowed under Bankruptcy Code § 503(b), the actual and necessary costs and expenses of preserving the respective Estates of the Debtors, the Professional Fees of the Debtors and the Creditors Committee, in each case to the extent allowed by an order of the Bankruptcy Court under Bankruptcy Code § 328, 330(a), or § 331, and any fees or charges assessed against the respective Estates under 28 U.S.C. § 1930; provided, however, that the holder of an Administrative Claim (except for an Administrative Claim based upon Professional Fees, the allowance and timing for filing of applications for Professional Fees being governed by Plan Section 2.2) arising on or prior to the Confirmation Date must file a request for payment on or before 30 days after the Confirmation Date for such Administrative Claim to be eligible to be considered an Allowed Claim. Thus, in addition to unpaid Professional Fees, Administrative Expense Claims may generally include, but are not limited to, any unpaid amounts owed to any Vendors during these Cases, tax obligations incurred after the commencement of these Cases, and certain statutory fees and expenses.

27

Under the Plan, except to the extent such holder has otherwise agreed to a different or less favorable treatment of its Allowed Claim, each holder of an Allowed Administrative Expense Claim will receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, Cash equal to the Allowed amount of such Administrative Claim either (a) on the Effective Date or (b) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order or a stipulation of amount and nature of such Administrative Claim is executed by the Litigation Trustee and the holder of the Administrative Claim; provided, however, that any Allowed Administrative Expense Claims representing obligations incurred in the ordinary course during the pendency of these Cases, if any, will be paid in accordance with the terms and conditions of the particular transactions and any agreements related thereto.

In addition, all Persons seeking an award by the Bankruptcy Court of Professional Fees are required to file their respective final applications for allowance of Professional Fees for services rendered and reimbursement of expenses incurred by the date that is ninety (90) days after the Confirmation Date, and in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, will be paid in full in such amounts as are allowed by the Bankruptcy Court (A) within thirty (30) days of the date upon which the order relating to any such Professional Fee Claim is entered, or (B) upon such other terms as may be mutually agreed upon between the holder of such a Claim for Professional Fees and the Litigation Trustee.

The Debtors understand that the former members of the Unofficial Creditors Committee will file an application seeking allowance of the Unofficial Committee Fees as administrative expenses under section 503(b) of the Bankruptcy Code, and the Debtors intend to support its allowance in full. The Debtors understand that certain parties are expected to oppose said motion. For the purposes of the Plan, the Debtors classified the Unofficial Committee Fees as Administrative Expense Claims. No distribution will be made on account of the Unofficial Committee Fees unless, and only to the extent that, they are allowed under section 503(b) of the Bankruptcy Code by the Bankruptcy Court. The Debtors believe that these fees created enormous value by enabling the filing of these chapter 11 cases and distribution to be made to all creditors under the Plan. See Lebron v. Mechem Financial Inc., 27 F.3d 937 (3d Cir. 1994) (holding that prepetition expenses of creditor were allowed administrative expenses under § 503(b)(3)(D) because efforts at uncovering fraud were substantial contribution to estate); see also In re Texaco, Inc., 90 B.R. 622 (Bankr. S.D.N.Y. 1988). Absent the filing of these cases, Marwil, as the federal equity receiver, would have no authority to bring and prosecute the Adversary Proceedings. See Eberhardt v. Marcu, 530 F.3d 122, 133-35 (2d Cir. 2008). Thus, the Committee's efforts played a significant role in creating the "common fund" in this case. Thus, in addition to the Unofficial Committee's substantial contribution in these cases, these efforts are also compensable in accord with "common fund" case law. See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 121-22 (2d Cir. 2005).

The Debtors estimate that, as of the Effective Date, the total Allowed Administrative Expense Claims will be approximately $26 million (or $27 million if the Bankruptcy Court allows the Unofficial Committee Fees as having an administrative expense priority), of which $20 million has been allowed and paid pursuant to interim orders of the Bankruptcy Court.

In accordance with the Interim Compensation Order, as of the Debtors have paid the following Professional Fees during the Cases through June 30, 2009:

| Professional | Role in Case | Amount |
|---|---|---|
| Dechert LLP | Bankruptcy and Litigation Counsel to the Debtors | $12,108,064.21 |
| Klestadt & Winters, LLP | Special Counsel to the Committee/Debtors | 928,385.67 |
| Navigant Consulting Inc. | Financial Advisors to the Debtors | 1,819,071.01 |
| K & L Gates LLP | Litigation Counsel to the Committee | 2,226,877.99 |

| | | |
|---|---|---|
| Kasowitz Benson Torres & Friedman, LLP | Bankruptcy Counsel to the Committee | 1,645,351.10 |
| Paritz & Company, P.A. | Accountants to the Debtors | 46,917.50 |
| Rich & Intelisano, LLP | Special Litigation Counsel to the Committee | 328,542.23 |
| | **Total** | **$19,103,209.71** |

As indicated in the monthly operating reports, the Debtors have paid the Sole Managing Member, in accordance with the Appointment Order, as follows during the Cases through June 30, 2009:

| Sole Managing Member | Fees | Expenses |
|---|---|---|
| Jeff J. Marwil | $800,000 | $0.00 |

The Debtors have paid the following other Administrative Expenses during the Cases:

| Name | Role in Case | Amount |
|---|---|---|
| The Trumbull Group | Claims and Notice Agent | $189,807.59 |
| The Garden City Group, Inc. | Claims and Notice Agent | 103,747.09 |
| United States Trustee | Statutory Fees | 53,350.90 |
| Kerwick Capital | DIP Lender (successor) | 670,250.66 |
| Creek Long/Short Holdings, L.L.C. | DIP Lender (original) | 31,344.00 |
| | **Total** | **$1,048,500.24** |

As of June 30, 2009, the Debtors' outstanding Administrative Expenses are as follows:

| Name | Role in Case | Amount |
|---|---|---|
| Dechert LLP | Bankruptcy and Litigation Counsel to the Debtors | $1,578,856.55 |
| Klestadt & Winters, LLP | Special Counsel to the Committee/Debtors | 28,146.60 |
| Navigant Consulting Inc. | Financial Advisors to the Debtors | 300,258.60 |
| K & L Gates LLP | Litigation Counsel to the Committee | 66,774.80 |
| Kasowitz Benson Torres & Friedman, LLP | Bankruptcy Counsel to the Committee | 482,471.80 |
| Unofficial Committee Fees | Unofficial Committee | 1,010,629.00 |
| | **Total** | **$3,490,375.91** |

### b.    Priority Tax Claims

Priority Tax Claims are any Claims of a governmental unit of the kind entitled to priority in payment as specified in Bankruptcy Code §§ 502(i) and 507(a)(8). Under the Plan, each holder of an Allowed Priority Tax Claim, if any, will receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, Cash equal to the amount of such Allowed Claim on the later of (a) the Effective Date and (b) the date that is 10 days after the Allowance Date, except to the extent such holder has agreed to a less favorable treatment of such Allowed Claim.

As of the date hereof, the Debtors believe that, as of the Effective Date, the total amount of Allowed Priority Tax Claims will be approximately $733 against the Bayou Hedge Funds and $3,818 against the Bayou Non-Fund Debtors.

### 2.    Classified Claims and Equity Interests

Other Claims and Equity Interests are divided into four Classes under the Plan, and the proposed treatment of Claims and Equity Interests in each Class is described in the Plan and in the chart set forth above in this Disclosure Statement. Such classification takes into account the different nature and priority of the Claims and Equity Interests. The Plan contains one class of Priority Non-Tax Claims (Class 1) that is unimpaired, two classes of impaired Claims (Classes 2 and 3), and one Class of impaired Equity Interests (Class 4). The meaning of "impairment," and the consequences thereof in connection with voting on the Plan, are set forth in Article 5, Section A, "Overview of the Plan – General."

29

Unless otherwise indicated, the characteristics and amount of the Claims or Equity Interests in the following Classes are based on information available to the Debtors including, investor questionnaires, the books and records of the Debtors, banking records, and Proofs of Claim.

For purposes of the Plan and unless otherwise indicated, holders of Allowed Claims against the Bayou Hedge Funds will receive distributions only from the Bayou Hedge Funds Litigation Trust and holders of Allowed Claims against Bayou Management will receive distributions only from Bayou Management Litigation Trust.

a. **Description of Classification and Treatment of Claims and Equity Interests Under the Plan Against the Bayou Hedge Funds**

(i) **Priority Non-Tax Claims (Class 1)**

The Claims in Class 1 consist of any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, that is entitled to priority pursuant to Bankruptcy Code § 507(a) or (b).  Under the Plan, holders of Allowed Claims in Class 1 that have not already been paid in full (if any) will receive Cash equal to the amount of such Allowed Claim on the later of (a) the Effective Date and (b) the date that is 10 days after the Allowance Date, except to the extent such holder has agreed to a less favorable treatment of such Allowed Claim.

As of the date hereof, the Bayou Hedge Funds do not believe that there will be any Allowed Priority Non-Tax Claims.

(ii) **Non-Investor General Unsecured Claims (Class 2)**

Class 2 consists of all Allowed Non-Investor General Unsecured Claims, which are all (a) Allowed Claims of Vendors and (b) any and all Rejection Claims against any of the Bayou Hedge Funds, in each instance that are not otherwise classified in the Plan.  Except as may otherwise be set forth in the Plan, Class 2 does not consist of any Claims of any of the Investor Creditors, the Investment Intermediaries, or the Bayou Off-Shore Hedge Funds.

Except to the extent such holder has agreed to a less favorable treatment of its Allowed Claim, each holder of an Allowed Class 2 Claim will receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, distributions from the Bayou Hedge Funds Litigation Trustee until such Claim is paid in full, in the time and manner as set forth in the Plan and the Bayou Hedge Funds Litigation Trust Agreement. There will be no distributions to holders of Allowed Investor Creditor Unsecured Claims unless and until holders of Allowed Non-Investor General Unsecured Claims have been reserved for or paid in full.  The Bankruptcy Court has held that the Allowed Investor Creditor Unsecured Claims are supported by a number of legal theories.  Under applicable law and the controlling agreements governing their investments in the Bayou Hedge Funds, investors were and are deemed to be equity holders in the Bayou Hedge Funds, with contractual rights to redemption of their investments.  In re Bayou Group, LLC, 372 B.R. 661, 665 (Bankr. S.D.N.Y. 2007).  Further, it was undisputed in these cases that the Investor Creditors had valid claims for fraudulent inducement, for damages and for rescission, against the Bayou Hedge Funds.  Id.  As the Court held "[o]n this premise, all of the non-redeeming investors have tort claims against the debtors for rescission or damages for the entire amount of their principal investments in the Funds."  Id.  However, under Section 510(b) of the Bankruptcy Code, the Allowed Investor Unsecured Claims are subordinated to the level of equity because generally a claim for damages arising from the purchase or sale of a security is treated, for purposes of distribution, as the security from which it is derived.  Bayou, 372 B.R. at 666.  This is why Non-Investor General Unsecured Claims are given priority in the Plan over Allowed Investor Unsecured Claims.

Because holders of Allowed Claims in Class 2 will receive their Pro Rata Share of the Bayou Hedge Funds Litigation Trust, the estimated percentage recovery to holders of Allowed Non-Investor General Unsecured Claims in Class 2 is dependent on, among other things, the total amount of Non-Investor General Unsecured Claims that become Allowed Claims, and the net value of the Bayou Hedge Funds Litigation Trust and all other Bayou Hedge Funds Litigation Trust Assets that is ultimately realized. However, the Bayou Hedge Funds estimate that the aggregate amount of Non-Investor General Unsecured Claims will be between $0 and $432,034, after deducting duplicate Claims, amended and superseded Claims, unsupported Claims, and Claims that are subject to other objections.

Altegris Investments Inc. ("Altegris") has filed amended claims against the Debtors in the amount of $531,612.49 ("Altegris' Claims"). The Debtors classified Altegris' Claims in Class 3 because they believe that Altegris' Claims are subject to subordination under Section 510(b) of the Bankruptcy Code. Altegris disagrees and asserts that its Claims have been improperly classified as Class 3 claims and should instead be classified as Class 2 claims. Thus, Altegris contends that the proposed classification and treatment of Altegris' Claims in Class 3 violates various provisions of the Bankruptcy Code, including, Sections 1122, 1129(a) and 1129(b). In addition, the Debtors believe that Altegris only has a valid claim against Bayou Management and not against the Bayou Hedge Funds. Altegris disagrees and asserts that under its agreement with the Debtors both Bayou Management and the Bayou Hedge Funds are jointly and severally liable for payment on Altegris' Claims. Altegris also contends, and the Debtors dispute, that under the indemnification provisions set forth in its agreement, Altegris is entitled to amend the amount of Altegris' Claims to include any additional legal fees and expenses it incurs in connection with successfully prosecuting any objections it makes to confirmation of the Plan. To the extent the parties do not resolve their differences, and litigation ensues, the Debtors shall reserve an amount to be agreed upon by the Debtors and Altegris or as ordered by the Court. If Alegris' Claims are eventually reclassified as Class 2 claims, the amount available for distribution on account of Class 3 claims shall be reduced by the allowed amount of Altegris' Claims.

(iii)    **Other Unsecured Claims (Class 3)**

Class 3 consists of all Allowed Investor Creditor Unsecured Claims, which are all Allowed Claims of Investor Creditors, Allowed Investment Intermediary Claims, which are Allowed Claims of Investment Intermediaries, and Allowed Off-Shore Claims, which are Allowed Claims of investors in the Bayou Off-Shore Hedge Funds. Except as may otherwise be set forth in the Plan, Class 3 does not consist of any Claims of Vendors, Rejection Claims, Unofficial Committee Fees, or Contingent Defendant Claims.

Each Investor Creditor who did not receive any Redemption Payment from the Bayou Hedge Funds and has filed a Proof of Claim, will have an Allowed Claim against the Bayou Hedge Funds Litigation Trust in the amount of its Investment in the Bayou Hedge Funds and an Allowed Claim against Bayou Management in the amount of its Investment in the Bayou Hedge Funds, in the amounts listed on Schedule IC-1 to the Plan. Each Investor Creditor who received a partial Redemption Payment from the Bayou Hedge Funds and has filed a Proof of Claim, will have an Allowed Claim in the amount of the outstanding balance of its Investment in the Bayou Hedge Funds and against Bayou Management, in the amounts listed on Schedule IC-1 to the Plan. All of the remaining Redeemer Defendants received a full Redemption Payment in satisfaction of their claims. Thus, no reserve need be made for the claims of any of the Redeemer Defendants – any possible claim by the Redeemer Defendants may be resolved by setoff or other adjustment of the amounts recovered by the Debtors. The Tom and Nancy Juda Living Trust are the only Redeemer Defendant that has retained a claim against the Debtors. This Redeemer Defendant settled in the form of full repayment of the Redemption Payment, thus shall have an Allowed Claim against the Bayou Hedge Funds Litigation Trust in the amount of their Investment. No Claims will be allowed for interest, punitive damages, or purported profits reported by the Bayou Hedge Funds.

Subject to payment in full of, or reserve for, all Allowed Non-Investor General Unsecured Claims, except to the extent such holder has agreed to a less favorable treatment of its Allowed Claim, each holder of an Allowed Other Unsecured Claim will receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, such holder's Pro Rata Share of the Cash distributed by the Bayou Hedge Funds Litigation Trust, subject to the amounts placed in the Bayou Hedge Funds Litigation Trust Reserve by the Bayou Hedge Funds Litigation Trustee, in the time and manner as set forth in this Plan and the Bayou Hedge Funds Litigation Trust Agreement. Nothing herein shall limit, expand, or otherwise affect such holder's right, if any, to receive a distribution from the United States of the Government Funds. However, no distributions shall be made to holders of Allowed Other Unsecured Claims against any of the Bayou Hedge Funds until all holders of Allowed Non-Investor General Unsecured Claims (if any) against any of the Bayou Hedge Funds have been reserved for or paid, in full, in the manner set forth in the Plan.

The Bayou Hedge Funds and the Bayou Hedge Funds Litigation Trust expressly reserve the right to commence an adversary proceeding or other Bayou Hedge Funds Cause of Action against any Investor Creditor with respect to any Redemption Payment(s) received thereby, although the Bayou Hedge Funds are not currently aware of any such causes of action. In the event the Bayou Hedge Funds or the Bayou Hedge Funds Litigation Trust does commence an adversary proceeding or other Bayou Hedge Funds Cause of Action against an Investor Creditor, such Investor Creditor shall retain any and all of its Defendant Defenses, and shall be entitled to assert or pursue such Defendant Defenses against the Bayou Hedge Funds and/or the Bayou Hedge Funds Litigation Trust (as applicable) in any manner that is legally permissible at the applicable time. The Claim of any Investor Creditor that is a defendant in a Bayou Hedge Funds Cause of Action will be deemed a Disputed General Unsecured Claim for all purposes under the Plan.

The aggregate amount of Other Unsecured Claims filed against the Debtors exceeded $2 billion. However, after deducting duplicate Claims, amended and superseded Claims, previously paid Claims, unsupported Claims, and Claims that are subject to other objections, the Debtors estimate that the aggregate Allowed Other Unsecured Claims in Class 3 will be between $245,432,103 and $299,822,635.

Based upon all available information, the Debtors believe that the range of likely recoveries is between 9.6% (assuming no further recoveries by the Bayou Hedge Funds and a maximum allowance of claims) and 28.6% (assuming the Debtors' judgment against the 8 Redeemer Defendants is affirmed on appeal, the estate recovers on all other pending litigation claims, and claims are allowed at the lower end of the range projected by the Debtors).

(iv)   <strong><u>Equity Interests (Class 4)</u></strong>

Class 4 consists of the Equity Interests in the Bayou Hedge Funds. Equity Interests are the interest of any holder of an equity security of any of the Bayou Hedge Funds represented by any issued and outstanding member interests or other instrument evidencing a present ownership interest in any of the Bayou Hedge Funds, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest. The Class thus includes all membership interests owned by affiliates or members of the management of the Bayou Hedge Funds and any outstanding options, warrants, or rights to purchase such stock.

On the Effective Date, all Equity Interests issued by the Bayou Hedge Funds will be canceled and deemed terminated and of no force and effect and the holders of Equity Interests will neither receive nor retain any property or interest in property on account of such Equity Interest.

b.    **Description of Classification and Treatment of Claims and Equity Interests Under the Plan Against the Bayou Non-Fund Debtors**

(i)    **Priority Non-Tax Claims (Class 1)**

The Claims in Class 1 consist of any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, that is entitled to priority pursuant to Bankruptcy Code § 507(a) or (b).  Under the Plan, holders of Allowed Claims in Class 1 that have not already been paid in full (if any) will receive Cash equal to the amount of such Allowed Claim on the later of (a) the Initial Distribution Date and (b) the date that is 10 days after the Allowance Date, except to the extent such holder has agreed to a less favorable treatment of such Allowed Claim.

As of the date hereof, the Debtors do not believe that there will be any Allowed Priority Non-Tax Claims.

(ii)    **Non-Investor General Unsecured Claims (Class 2)**

Class 2 consists of all Allowed Non-Investor General Unsecured Claims, which are all (a) Allowed Claims of Vendors, and (b) any and all Rejection Claims against the Bayou Non-Fund Debtors, in each instance that are not otherwise classified in the Plan.  Except as may otherwise be set forth in the Plan, Class 2 does not consist of any Claims of any of the Investor Creditors, the Investment Intermediaries, or the Bayou Off-Shore Hedge Funds.

Except to the extent such holder has agreed to a less favorable treatment of its Allowed Claim, each holder of an Allowed Class 2 Claim will receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, distributions from the Bayou Management Litigation Trustee until such Claim is paid in full, in the time and manner as set forth in the Plan and the Bayou Management Litigation Trust Agreement.  There will be no distributions to holders of Allowed Investor Creditor Unsecured Claims unless and until holders of Allowed Non-Investor General Unsecured Claims have been reserved for or paid in full.  This is because under § 510(b) of the Bankruptcy Code, for purposes of distribution, a claim arising from rescission of a purchase or sale of a security of a debtor, or damages arising from a purchase or sale of such security, or for reimbursement or contribution allowed under § 502 on account of such claim is subordinated to the level of equity.  Because allowed Investor Creditor Unsecured Claims are subordinate claims, all other creditors of the Debtors are senior for the purposes of distribution.

Because holders of Allowed Claims in Class 2 will receive their Pro Rata Share of the Bayou Management Litigation Trust, the estimated percentage recovery to holders of Allowed Non-Investor General Unsecured Claims in Class 2 is dependent on, among other things, the total amount of Non-Investor General Unsecured Claims that become Allowed Claims, and the net value of the Bayou Management Litigation Trust and all other Bayou Management Litigation Trust Assets that is ultimately realized.  However, Bayou Management estimates that the aggregate amount of Allowed Non-Investor General Unsecured Claims will be between $8,511 and $527,160, after deducting duplicate Claims, amended and superseded Claims, unsupported Claims, and Claims that are subject to other objections.  With respect to the impact of the dispute with Altegris, please see the discussion in paragraph C.2.a(ii) of section IV.

(iii)    **Other Unsecured Claims (Class 3)**

Class 3 consists of all Allowed Investor Creditor Unsecured Claims, which are all Allowed Claims of Investor Creditors, Allowed Investment Intermediary Claims, which are Allowed Claims of

33

Investment Intermediaries, and Allowed Off-Shore Claims, which are Allowed Claims of investors in the Bayou Off-Shore Hedge Funds. Except as may otherwise be set forth in the Plan, Class 3 does not consist of any Claims of Vendors, Rejection Claims, Unofficial Committee Fees, or Contingent Defendant Claims.

Each Investor Creditor who did not receive any Redemption Payment from the Bayou Hedge Funds and has filed a Proof of Claim, will have an Allowed Claim against the Bayou Hedge Funds Litigation Trust in the amount of its Investment in the Bayou Hedge Funds and an Allowed Claim against Bayou Management in the amount of its Investment in the Bayou Hedge Funds, in the amounts listed on Schedule IC-1 to the Plan. Each Investor Creditor who received a partial Redemption Payment from the Bayou Hedge Funds and has filed a Proof of Claim, will have an Allowed Claim in the amount of the outstanding balance of its Investment in the Bayou Hedge Funds and against Bayou Management, in the amounts listed on Schedule IC-1 to the Plan. All of the remaining Redeemer Defendants received a full Redemption Payment in satisfaction of their claims. Thus, no reserve need be made for the claims of any of the Redeemer Defendants – any possible claim by the Redeemer Defendants may be resolved by setoff or other adjustment of the amounts recovered by the Debtors. The Tom and Nancy Juda Living Trust are the only Redeemer Defendant that has retained a claim against the Debtors. This Redeemer Defendant settled in the form of full repayment of the Redemption Payment, thus shall have an Allowed Claim against the Bayou Hedge Funds Litigation Trust in the amount of their Investment. No Claims will be allowed for interest, punitive damages, or purported profits reported by the Bayou Hedge Funds.

Subject to payment in full of, or reserve for, all Allowed Non-Investor General Unsecured Claims, except to the extent such holder has agreed to a less favorable treatment of its Allowed Claim, each holder of an Allowed Other Unsecured Claim will receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, such holder's Pro Rata Share of the Cash distributed by the Bayou Management Litigation Trust, subject to the amounts placed in the Bayou Management Litigation Trust Reserve by the Bayou Management Litigation Trustee, in the time and manner as set forth in this Plan and the Bayou Management Litigation Trust Agreement. Nothing herein shall limit, expand, or otherwise affect such holder's right, if any, to receive a distribution from the United States of the Government Funds. However, no distributions shall be made to holders of Allowed Other Unsecured Claims against the Bayou Non-Fund Debtors until all holders of Allowed Non-Investor General Unsecured Claims (if any) against the Bayou Non-Fund Debtors have been reserved for or paid, in full, in the manner set forth in the Plan.

The Bayou Non-Fund Debtors and the Bayou Management Litigation Trust expressly reserve the right to commence an adversary proceeding or other cause of action against any Investor Creditor with respect to any Redemption Payment(s) received thereby, although the Bayou Non-Fund Debtors are not currently aware of any such causes of action. In the event the Bayou Non-Fund Debtors or the Bayou Management Litigation Trust commence an adversary proceeding or other cause of action against an Investor Creditor, such Investor Creditor shall retain any and all of its Defendant Defenses, and shall be entitled to assert or pursue such Defendant Defenses against the Bayou Non-Fund Debtors and/or the Bayou Management Litigation Trust (as applicable) in any manner that is legally permissible at the applicable time. The Claim of any Investor Creditor that is a defendant in an adversary proceeding or cause of action commenced by any of the Bayou Non-Fund Debtors will be deemed a Disputed General Unsecured Claim for all purposes under the Plan.

After deducting duplicate Claims, amended and superseded Claims, previously paid Claims, unsupported Claims, and Claims that are subject to other objections, the Debtors estimate that the aggregate Allowed Other Unsecured Claims in Class 3 will be between $282,672,103 and $300,034,635. Based upon all available information, the Debtors believe that the likely recovery of Class 3 will be de minimis.

34

(iv)    **Equity Interests (Class 4)**

Class 4 consists of the Equity Interests in the Bayou Non-Fund Debtors. Equity Interests are the interest of any holder of an equity security of any of the Bayou Non-Fund Debtors represented by any issued and outstanding member interests or other instrument evidencing a present ownership interest in any of the Bayou Non-Fund Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest. The Class thus includes all membership interests owned by affiliates or members of the management of any of the Bayou Non-Fund Debtors and any outstanding options, warrants, or rights to purchase such stock.

On the Effective Date, all Equity Interests issued by any of the Bayou Non-Fund Debtors will be canceled and deemed terminated and of no force and effect and the holders of Equity Interests will neither receive nor retain any property or interest in property on account of such Equity Interest.

D.    **Reservation of "Cramdown" Rights**

The Bankruptcy Code permits the Bankruptcy Court to confirm a Chapter 11 plan over the dissent of any class of claims or equity interests as long as the standards in Bankruptcy Code § 1129(b) are met. This power to confirm a plan over dissenting classes – often referred to as "cramdown" – is an important part of the reorganization process. It assures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Debtors reserve the right to seek confirmation of the Plan notwithstanding the rejection of the Plan by any Class entitled to vote. In the event a Class of Claims eligible to vote does vote to reject the Plan, the Debtors will request the Bankruptcy Court to rule that the Plan meets the requirements specified in Bankruptcy Code § 1129(b) with respect to any such Class. The Debtors will also seek such a ruling with respect to Class 4 (Equity Interests), which is deemed to reject the Plan under Bankruptcy Code § 1126, as the holders of interests in Class 4 will not receive any distribution under the Plan.

E.    **Provisions Governing Distributions Under the Plan**

1.    **Payments and Transfers by the Debtors on and After the Effective Date**

On and after the Effective Date, in the time and manner set forth in Articles II and IV of the Plan, the Debtors shall remit to the respective holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims, and Allowed Secured Claims (if any), an amount in Cash equal to 100% of the amount of such Allowed Claim and the Litigation Trust Assets, expressly including the Adversary Proceedings and all Causes of Action, shall be automatically be deemed transferred to the respective Litigation Trust, free and clear of all Liens, Claims, and encumbrances, but subject to any obligations imposed by the Plan, on behalf of holders of Allowed Class 2 and 3 Claims who are entitled to receive a distribution from the Litigation Trusts under the terms and conditions of the Plan.

2.    **Allocation of Plan Distribution Between Principal and Interest**

To the extent applicable to a particular Claim, all distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

3.     **Withholding and Reporting Requirements**

In connection with the Plan and all instruments issued in connection therewith and distributed thereunder, the Debtors and the Litigation Trusts, as the case may be, will comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan will be subject to any such withholding or reporting requirements.

4.     **Minimum Distributions**

No payment of Cash less than $100.00 shall be made by the Litigation Trusts or the Debtors to any holder of a Claim.  Any Litigation Trust Assets or Cash of the Debtors which are undistributable in accordance with Plan Section 5.6 will be distributed to a charitable organization exempt from federal income tax under section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "Tax Code") to be selected by, and unrelated to, the Litigation Trustee or the Debtors.  This amount reflects the point in which the Debtors believe the expected cost of distribution will equal or exceed the amount distributable.

F.     **Means for Implementation and Execution of the Plan**

1.     **Substantive Consolidation**

The Plan provides for the substantive consolidation of the Bayou Hedge Funds' Estates.  Under the Plan, on the Effective Date, all of the Bayou Hedge Funds and their respective Estates will be deemed merged into Bayou Superfund and its Estate, and (i) all remaining assets and liabilities of the Bayou Hedge Funds will be deemed merged into Bayou Superfund, (ii) all guarantees of any of the Bayou Hedge Funds of the payment, performance, or collection of obligations of another of the Bayou Hedge Funds will be eliminated and canceled, (iii) any obligation of any of the Bayou Hedge Funds and all guarantees thereof executed by one or more of the other Bayou Hedge Funds will be treated as a single obligation, and such guarantees will be deemed a single Claim against the consolidated Bayou Hedge Funds, (iv) all joint obligations of two or more of the Bayou Hedge Funds and all multiple Claims against such entities on account of such joint obligations will be treated and allowed only as a single Claim against the consolidated Bayou Hedge Funds, (v) all Claims between or among the Bayou Hedge Funds will be canceled, and (vi) each Claim filed or scheduled in the Chapter 11 Case of any of the Bayou Hedge Funds will be deemed filed or scheduled against the consolidated Bayou Hedge Funds and a single obligation of the consolidated Bayou Hedge Funds on and after the Effective Date.

The Plan also provides for the substantive consolidation of the Bayou Non-Fund Debtors' Estates.  Under the Plan, on the Effective Date, all of the Bayou Non-Fund Debtors and their respective Estates will be deemed merged into Bayou Management and its Estate, and (i) all remaining assets and liabilities of the Bayou Non-Fund Debtors will be deemed merged into Bayou Management, (ii) all guarantees of any of the Bayou Non-Fund Debtors of the payment, performance, or collection of obligations of another of the Bayou Non-Fund Debtors will be eliminated and canceled, (iii) any obligation of any of the Bayou Non-Fund Debtors and all guarantees thereof executed by one or more of the other Bayou Non-Fund Debtors will be treated as a single obligation, and such guarantees will be deemed a single Claim against the consolidated Bayou Management, (iv) all joint obligations of two or more of the Bayou Non-Fund Debtors and all multiple Claims against such entities on account of such joint obligations will be treated and allowed only as a single Claim against the consolidated Bayou Management, (v) all Claims between or among the Bayou Non-Fund Debtors will be canceled, and (vi) each Claim filed or scheduled in the Chapter 11 Case of any Bayou Non-Fund Debtor will be deemed filed or scheduled against the consolidated Bayou Management and a single obligation of the consolidated Bayou Management on and after the Effective Date.

a.    **Law Governing Substantive Consolidation**

Substantive consolidation is an equitable remedy that a bankruptcy court may be asked to apply in Chapter 11 cases of affiliated debtors or other entities, among other circumstances.  All of the entities in the substantively consolidated group are treated as if they were a single corporate and economic entity, and thus a creditor of one of the substantively consolidated entities is treated as a creditor of the entire substantively consolidated group of entities.  In particular, substantive consolidation usually results in the pooling of the assets and liabilities of the affected entities, combining the creditors of the affected entities for the purpose of voting on the plan, eliminating inter-entity claims, and paying allowed claims from a common fund.

Section 1123(a)(5)(C) authorizes substantive consolidation as a means of plan implementation.  See also In re Stone & Webster, Inc., 286 B.R. 532, 541-43 (Bankr. D. Del. 2002).  In addition, it is well-established that Bankruptcy Code § 105(a) empowers a bankruptcy court to authorize substantive consolidation.  FDIC v. Colonial Realty Co., 966 F.2d 57, 59 (2d Cir. 1992); In re WorldCom, Inc., 2003 WL 23861928, at *34 (Bankr. S.D.N.Y. Oct. 31, 2003).  "The sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors."  Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.2d 515, 518 (2d Cir. 1988).

In the case of Augie/Restivo, the United States Court of Appeals for the Second Circuit, the circuit in which these Cases are pending, articulated a two-prong test for evaluating a request for substantive consolidation.  If either of the following factors is satisfied, then substantive consolidation is appropriate:  (i) whether creditors dealt with the debtors as a single economic unit and did not rely on their separate identity in extending credit, or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors.  Id.; Colonial Realty, 966 F.2d at 61; In re WorldCom, 2003 WL 2386192, at *35-36.

In these Cases, it is the second Augie/Restivo factor – the "affairs of the debtors are so entangled that consolidation will benefit all creditors" – that supports substantive consolidation of the Bayou Hedge Funds' Estates.  Here, there has been a commingling of assets and business functions, and all creditors, as opposed to select creditors, will benefit from substantive consolidation.  Augie/Restivo, 860 F.2d at 518.

One bankruptcy court in this District recently enumerated the following factual circumstances that support a finding that the second Augie/Restivo factor has been satisfied:

- common management and control of the debtors;

- financial reporting on a consolidated basis;

- the substantial operational integration and entanglement of the debtors' business operations, including, among other things, the presentation of products and services to the marketplace on an integrated basis and the existence of centralized administrative functions, such as cash management, purchasing, human resources, and finance;

- the debtors' present inability to create accurate and reliable historical financial statements on a separate legal entity basis;

- financial entanglement resulting from internal financial management being conducted on a business line and functional basis, rather than legal entity basis;

- inability to account accurately and reliably for intercompany claims, resulting from, among other things, a lack of proper internal controls; and

37

- acute lack of institutional knowledge and documentation making reconstruction of historical financial information on a separate legal entity basis exceedingly difficult and perhaps impossible.

See, e.g., In re WorldCom, 2003 WL 23861928, at *37.

Based on those and similar factual considerations, the WorldCom court and other courts have found that the second prong of the Augie/Restivo test had been satisfied, and therefore authorized substantive consolidation of the debtors. In re WorldCom, the bankruptcy court concluded that the second prong of the Augie/Restivo test was satisfied where "the Debtors' operational and financial affairs are so entangled that the accurate identification and allocation of assets and liabilities either could never be accomplished or, even if it could be accomplished, would take so long and be so costly such that creditors as a whole would be substantially harmed by the effort." In re WorldCom, 2003 WL 23861928, at *37. See also In re Bonham, 229 F.3d 750, 766-67 (9th Cir. 2000) (holding that entanglement factor of Augie/Restivo test is satisfied if disentangling the debtors' affairs would be "needlessly expensive and possibly futile"); In re Drexel Burnham Lambert Group, 138 B.R. 723, 766 (Bankr. S.D.N.Y. 1992) (ordering substantive consolidation where "[e]stablishing to [which of the Debtors] actual liability, if any, should be allocated would be a Herculean task consuming years of costly professional services, thereby draining significant amounts of value from the Debtors' Estates").

In the specific context of fraudulent schemes, numerous courts in the Second Circuit and elsewhere have ordered substantive consolidation of debtors operated jointly in furtherance of a fraudulent scheme. For example, in In re Bonham, the United States Court of Appeal for the Ninth Circuit, after adopting the Augie/Restivo test, affirmed the bankruptcy court's order substantively consolidating two closely-held corporations that were used by their common principal to perpetrate a fraudulent scheme on investors because "[i]n light of the multiplicity of investors and claims and the lack of cooperation on the part of the [principal], the bankruptcy court did not clearly err in determining that the exercise of disentangling the affairs" of the principal and the two corporations "would be needlessly expensive and possibly futile. . . . In short, substantive consolidation will allow a truly equitable distribution of assets by treating the corporate shells as a single economic unit." 229 F.3d at 767-68; see also In re AppOnline.com, Inc., 296 B.R. 602 (Bankr. E.D.N.Y. 2003); S.E.C. v. Goren, 2002 WL 32963582 (E.D.N.Y. March 6, 2002); see also In re Global Trading Invs., LLC, 2006 WL 3040918 (Bankr. D.N.J. Oct. 25, 2006).

b.      **Factual Circumstances Justify Substantive Consolidation Under the Applicable Law**

The Bayou Hedge Funds believe, as more particularly described herein, that there is ample factual basis to justify the substantive consolidation of their Estates under the applicable law.

The Bayou Hedge Funds are interrelated entities that were jointly operated by common principals on a consolidated basis in furtherance of a fraudulent scheme. Israel and/or Marino were the sole officers, directors, and managers of each of the Bayou Hedge Funds. The Bayou Hedge Funds prepared financial statements, reports, and other documents on a consolidated basis (albeit fraudulently), and otherwise maintained common sets of books and records for the Bayou Hedge Funds. Other financial information and marketing materials disseminated to the public, including to customers, investors, and suppliers, were all prepared and presented on a consolidated basis.

The Bayou Hedge Funds operated as a single integrated economic unit, with their investment funds inextricably commingled. The Bayou Principals determined, based on their own internal criteria, in which of the Bayou Hedge Funds an investor would be placed; the subscription agreement the investor

38

executed was identical but for the name of the fund. All communications to investors were sent on a consolidated basis regardless of the particular Bayou Hedge Fund in which the investor held membership interests. The Bayou Principals reported a common trading strategy for all of the Bayou Hedge Funds, and, conducted trades by pooling the investment funds from all of the Bayou Hedge Funds without regard to corporate formalities. All of the investors in the Bayou Hedge Funds purchased their participation interests by making payment to a central account. The value of each of the individual Bayou Hedge Funds was based solely on the value of the common asset pool.

The Debtors have submitted a forensic accounting analysis in the Adversary Proceedings establishing that investor funds contributed to the Bayou Hedge Funds were commingled, transferred and used without regard to the specific fund in which an investor had contributed. Indeed, that analysis formed part of the basis for the Bankruptcy Court's award of summary judgment to the Debtors on their *prima facie* case on their fraudulent conveyance claims. In re Bayou Group, LLC, 396 B.R. at 831-43. According to that analysis, the managers of the Bayou Hedge Funds commingled cash between and among the Bayou Hedge Funds' bank accounts, together with the bank accounts of other affiliates, without regard for entity separateness. The analysis also concluded that it is highly unlikely and certainly cost-prohibitive to identify the particular assets belonging to any one of the Bayou Hedge Funds and segregate those assets into separate assets on a separate entity or fund basis. According to the analysis, the Bayou Hedge Funds, which were perpetrating a massive fraud, apparently did not keep records of the inter-fund transfers or which money was being taken or used for what purpose.

Indeed, the indiscriminate pooling of investment funds was the linchpin of the Bayou Hedge Funds' ability to keep their fraudulent scheme afloat. Because the assets of the Bayou Hedge Funds were depleted for purposes of satisfying redemption requests, the Bayou Hedge Funds used new investments in any of the Bayou Hedge Funds to pay redemptions to old investors in any of the Bayou Hedge Funds. Thus, a redemption payment to an investor in Bayou Superfund may have been paid using new funds contributed by an investor in Bayou No Leverage, and so forth. In order to make the redemption payments, the Bayou Hedge Funds simply transferred money from the common asset pool into the account of the applicable Bayou Hedge Fund. Israel and Marino also siphoned money from that common asset pool for their personal benefit, and used the funds in that common asset pool to pay both legitimate and fraudulent operating expenses for all of the Bayou Hedge Funds.

In the absence of substantive consolidation, the Debtors would need to determine how to allocate among the Bayou Hedge Funds each Redemption Payment avoided and recovered by the Debtors from an Investor. For example, if the Debtors recovered a redemption payment from a Bayou Superfund redeeming investor, the Debtors could not simply distribute that money only to Investor Creditors of Bayou Superfund. Instead, the Debtors would have to attempt to identify the origin of the money used to pay that redemption and account for various inter-fund transfers and credits. This would require a detailed analysis of whether particular money was lost in trading by the Debtors' pre-petition principals, or transferred to a different fund.

Based on these factual circumstances, and as described in the forensic accounting analysis submitted in the Adversary Proceedings, it likely would be futile, and at the very least prohibitively expensive and time-consuming, to attempt to disentangle the assets and liabilities of the individual Bayou Hedge Funds, particularly with respect to the inter-fund transfers and resulting inter-fund claims, in an attempt to allocate the avoided and recovered redemption payments. On summary judgment in this case, the Court (i) admitted the Debtors' expert's report, finding that the expert was qualified, his methodology was "fundamentally unassailable," and his report was reliable; (ii) "accept[ed] the findings and conclusions set forth in the Lenhart Report as established in these adversary proceedings;" and (iii) found that the Debtors' assets were commingled and "the unwinding of [such assets] would probably not be possible and, at the very least, would be both prohibitively expensive and time consuming." Bayou

39

Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC), 396 B.R. 810, 832, 834, 838 (Bankr. S.D.N.Y. 2008).  The Bayou Hedge Funds, in the course of carrying out the fraud, did not keep accurate NAV statements or records of inter-fund transfers.  Thus, there is no apparent way to know which investment funds were used to pay particular redemption payments.  Israel and Marino, who pled guilty to securities fraud felonies within months after the Bayou fraud was discovered by authorities, are incarcerated and have never been available to perform the detailed analysis and review of the financial records that would be necessary, even assuming they could be trusted to do so.  The Bayou Hedge Funds do not have any current employees, and none of their pre-petition employees are available or have the knowledge and/or experience to adequately assist with this process.  It is also important to note that the Investor Creditors did not become creditors by virtue of lending money to any particular hedge fund based on an analysis of that hedge fund's creditworthiness, but became creditors to the extent of their original unredeemed investment "by reason of their tort claims for rescission or damages for fraudulent inducement."  In re Bayou Group, LLC, 372 B.R. 661, 665-66 (Bankr. S.D.N.Y. 2007).

In view of the foregoing, the Bayou Hedge Funds believe that substantive consolidation of the Bayou Hedge Funds will benefit all creditors of the Bayou Hedge Funds.  If the Bayou Hedge Funds were forced to undertake the laborious process of attempting to disentangle each of the Bayou Hedge Funds' assets and liabilities, including all investments, redemptions and inter-fund transfers, the distributions to all creditors would be delayed substantially and the Bayou Hedge Funds' Estates would be forced to spend extensive funds to prepare such an accounting.  The Bayou Hedge Funds do not believe that substantive consolidation of their Estates will substantially change the amount of distribution that an Investor Creditor could receive if each Estate were treated separately.  Indeed, the Bayou Hedge Funds believe that all creditors of the Bayou Hedge Funds will receive a greater distribution by substantively consolidating the Bayou Hedge Funds by avoiding the substantial administrative costs that would have to be incurred in the absence of such substantive consolidation.

The Debtors do not believe, however, that it is appropriate or permissible under the Second Circuit's Augie/Restivo test to substantively consolidate the Estates of the Bayou Hedge Funds with the Estates of any of the non-fund affiliates, including Bayou Management.  First, such substantive consolidation would be contrary to the first prong of the Augie/Restivo test because Bayou Management and the other non-fund entities were treated both internally and externally as separate economic entities.  Unlike the Bayou Hedge Funds, the Bayou investors did not have any membership or other participation or ownership interests in Bayou Management or any other non-fund entities.  Bayou Management and the other non-fund entities were wholly-owned by the Bayou Principals, and principally by Samuel Israel.  Bayou Management's relationship with the Bayou Hedge Funds was solely as agent, and the investors in the Bayou Hedge Funds had no right to any profits earned by Bayou Management or the other non-fund entities.  That the investors in the Bayou Hedge Funds have fraud claims against Bayou Management does not change this analysis.  Bayou Management entered into separate contractual arrangements independent of the Bayou Hedge Funds relating to the operation of Bayou Management, for which the Bayou Hedge Funds and their investors had no liability.  Thus, neither the investors nor any third parties with contractual relationships with Bayou Management had any expectation that Bayou Management and the Bayou Hedge Funds were a single economic unit.

Moreover, such substantive consolidation would be inconsistent with the second prong of the Augie/Restivo test because it would substantially decrease the distribution to Investor Creditors of the Bayou Hedge Funds with no corresponding benefit to those Investor Creditors.  Rather, such substantive consolidation would only benefit the creditors of Bayou Management, which would receive a windfall by gaining access to investor funds to satisfy their claims, to the detriment of the Investor Creditors of the Bayou Hedge Funds.  Thus, such substantive consolidation would not benefit all creditors, unlike substantive consolidation of the Bayou Hedge Funds.

The Bayou Non-Fund Debtors believe that the substantive consolidation of their estates is appropriate under the facts and applicable case law because no creditors of the Bayou Non-Fund Debtors will be harmed or prejudiced by the proposed consolidation. The Debtors are not aware of any Claims against Bayou Group, Bayou Advisors or Bayou Equities and therefore there is no dilution of the distributions Bayou Management's Claims. Equity Interests in any of the Bayou Non-Fund Debtors is not entitled to any distribution, with or without consolidation, resulting in no harm or prejudice.

The Plan will serve as, and will be deemed to be, a motion for entry of an order substantively consolidating the Bayou Hedge Funds, although nothing herein or in the Plan will, or shall be deemed to, prejudice or otherwise affect the Debtors' right to file a separate motion seeking substantive consolidation if they elect to do so in their sole discretion. If no objection to the substantive consolidation provided for in the Plan is timely filed by the deadline established therefore by the Bankruptcy Court, an order approving such substantive consolidation (which may be the Confirmation Order or any other order) may be entered by the Bankruptcy Court. If any such objections are timely filed and served, a hearing with respect to the proposed substantive consolidation of these Cases and the objections thereto may be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing. **IN THE EVENT THE BANKRUPTCY COURT RULES THAT ANY OF THE DEBTOR(S) OR ESTATE(S) SHALL NOT BE SUBSTANTIVELY CONSOLIDATED, THE PLAN WILL NONETHELESS BE BINDING AND IN FULL FORCE AND EFFECT WITH RESPECT TO ALL OF THE DEBTORS AND ESTATES CONSOLIDATED PURSUANT TO THE TERMS OF THE CONFIRMATION ORDER, AND THE CONSOLIDATED DEBTORS ARE AUTHORIZED AND DIRECTED TO TAKE ALL SUCH ACTIONS DURING THE PERIOD PRIOR TO THE EFFECTIVE DATE AS MAY BE NECESSARY AND CONSISTENT WITH THE PLAN TO PREPARE TO EFFECTUATE AND/OR IMPLEMENT THE PLAN UPON THE EFFECTIVE DATE.**

2.      **The Litigation Trusts**

The Assets of the Bayou Hedge Funds and the Bayou Non-Fund Debtors will be transferred to the applicable Litigation Trust on the Effective Date.

a.      **Execution of the Litigation Trust Agreements.**  On or prior to the Effective Date, the respective Litigation Trust Agreements will be executed, and all other necessary steps will be taken to establish the Litigation Trusts without any requirement of further action by the Sole Managing Member (or any other governing body) of the Debtors.  Plan Section 6.2 sets forth certain of the rights, duties, and obligations of the respective Litigation Trusts and the Litigation Trustees.  In the event of any conflict between the terms of Plan Section 6.2 (as described herein or as further set forth in the Plan) and the terms of the respective Litigation Trust Agreements, the terms of the Plan shall govern.

b.      **Purpose of the Litigation Trusts.**  The Litigation Trusts will be established for the sole purpose of liquidating and distributing their respective assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

c.      **Litigation Trust Assets.**  The Litigation Trusts' res will each consist of the respective Litigation Trust Assets as applicable.  Any Cash or other property received from third parties from the prosecution, settlement, or compromise of the Adversary Proceedings and the other Causes of Action (including any proceeds from any insurance policies, if any) or otherwise will constitute Litigation Trust Assets for purposes of distributions under the Litigation Trusts.  On the Effective Date or as soon thereafter as is practicable, the Bayou Hedge Funds and Bayou Management, as applicable, will transfer all of the Litigation Trust Assets to the appropriate Litigation Trust free and clear of all liens, Claims, and encumbrances, except to the extent otherwise provided in the Plan.

d.      **Governance of Litigation Trusts.**  The Litigation Trust will be governed by Jeff J. Marwil, not in his individual capacity, but solely as a trustee for the benefit of each of the respective Litigation Trusts.  The Litigation Trust Agreements will be acceptable to the Committee, and will in substance provide as follows: (1) for any settlement agreement into which a Litigation Trust proposes to enter, the Litigation Trustee will present the proposed settlement to the Post-Effective Date Committee and, if requested by the Post-Effective Date Committee, an explanation of the basis for the proposed settlement and an opportunity to discuss the proposed settlement; and not less than seven (7) Business Days after presenting the proposed settlement to the Post-Effective Date Committee, the respective Litigation Trustee may present the proposed settlement to the Bankruptcy Court for approval upon negative notice if the Post-Effective Date Committee will have consented to the proposed settlement or by motion on notice if the Post-Effective Date Committee will have indicated that it does not consent to such proposed settlement; (2) the fees and expenses of the Litigations Trusts will be submitted to the Post-Effective Date Committee for review on a monthly basis; and (3) conference calls will occur at reasonable regular intervals between the appropriate agent(s) of the Litigation Trusts and the Post-Effective Date Committee.

e.   **The Litigation Trustees.**  The Sole Managing Member, Jeff J. Marwil, not individually, but solely as a fiduciary for the Litigation Trusts, shall be the Litigation Trustee of each of the Litigation Trusts.  The designation of the Sole Managing Member as the Litigation Trustee shall be effective on the Effective Date without the need for (i) any further order of the Bankruptcy Court or (ii) any further action by the Sole Managing Member (or any other governing body) of the Debtors.

f.   **Role of the Litigation Trustees**

(i)   In furtherance of and consistent with the purpose of the Litigation Trusts and the Plan, the Litigation Trustee will among other things (as may be set forth in the respective Litigation Trust Agreements), (1) have the power and authority to manage, invest, and distribute the respective Litigation Trust Assets to the holders of Allowed Class 2 Claims and Allowed Class 3 Claims to the extent set forth in the Plan, (2) hold the respective Litigation Trust Assets for the benefit of the holders of Allowed Class 2 Claims and Allowed Class 3 Claims to the extent set forth in the Plan, (3) have the power and authority to hold, manage, sell, and distribute Cash or non-Cash Litigation Trust Assets obtained through the exercise of its power and authority, (4) have the power and authority to prosecute, settle, and otherwise resolve, in the names and on behalf of the applicable Debtors, their Estates, or the name of the applicable Litigation Trust, the Adversary Proceedings and all other Causes of Action other than the Committee-Controlled Causes of Action, including the power and authority to commence an Adversary Proceeding or other Cause of Action against any Investor Creditor that received a Redemption Payment at any time prior to the Closing of the Cases, (5) have the power and authority to prosecute and resolve objections to any Disputed Class 2 Claims or Disputed Class 3 Claims (or any portion thereof) in the name and on behalf of the applicable Debtors, their Estates, or the name of the applicable Litigation Trust, and any Disputed Administrative Expense Claims, Disputed Priority Tax Claims, or Disputed Priority Non-Tax Claims in the name and on behalf of the applicable Debtors or their Estates, (6) have the power and authority to perform such other functions as are provided in the Plan and the respective Litigation Trust Agreements, (7) have the power and authority to retain and compensate professionals to assist it in performing the functions as provided in the Plan and the Litigation Trust Agreements, (8) have the power and authority to perform or delegate such other functions and services and duties as it deems reasonably necessary or appropriate, (9) have the power and authority to administer the closure of all of the Cases, and (10) have the power and authority to ensure that each of the Debtors completes any and all of the acts required by the Plan following the Effective Date, if any, and to otherwise take any and all reasonably necessary or appropriate steps to effectuate the dissolution of any of the Debtors pursuant to the terms of the Plan (including, without limitation, Plan Section and 6.5(f)) and applicable state law.  The Litigation Trustee will be responsible for all decisions and duties with respect to the Litigation Trusts and the respective Litigation Trust Assets, subject to (a) the approval of the Bankruptcy Court after notice and a hearing (as appropriate), (b) the terms and conditions of the respective Litigation Trust Agreements and (c) the consent of the Post-Effective Date Committee.  In all circumstances, the Litigation Trustee will act in the best interests of the beneficiaries of the respective Litigation Trusts and in furtherance of the purpose of the respective Litigation Trusts.

(ii)   After the certificates of cancellation, dissolution, or merger for all of the applicable Debtors have been filed in accordance with the Plan, the Litigation Trustees are authorized to exercise all powers regarding the Debtors' tax matters, including filing tax returns, to the same extent as if the respective Litigation Trusts were the applicable Debtors as debtors-in-possession.  The applicable Litigation Trusts will (A) complete and file within ninety (90) days of the filing for dissolution by the applicable Debtor(s), to the extent not previously filed, the post-petition federal, state, and local tax returns, (B) request an expedited determination of any unpaid tax liability of such Debtor(s) under Bankruptcy Code § 505(b) for all tax periods of such Debtor(s) starting after the Petition Date through the

43

liquidation of such Debtor(s) as determined under applicable tax laws, to the extent not previously requested, and (C) represent the interests and account of such Debtor(s) before any taxing authority in all matters, including, but not limited to, any action, suit, proceeding, or audit.

g.  **Nontransferability of the Litigation Trust Interests.**  The beneficial interests in the respective Litigation Trusts will not be certificated and are not transferable by the holders thereof (except as may otherwise be provided in the respective Litigation Trust Agreements).

h.  **Cash.**  The Litigation Trustees may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by Bankruptcy Code § 345, provided, however, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

i.  **Costs and Expenses of the Litigation Trusts.**  The costs and expenses of the respective Litigation Trusts, including the fees and expenses of the Litigation Trustees and the professionals he retains in accordance with Plan Section 6.2(k) (including, without limitation, the costs and expenses incurred in connection with the pursuit of the respective Causes of Action), will be paid first out of the applicable Litigation Trust Assets.  All such costs and expenses will be paid in the manner set forth in Plan Sections 6.2 and in the applicable Litigation Trust Agreement.

j.  **Compensation of the Litigation Trustees.**  The Litigation Trustees will be entitled to reasonable compensation of $20,000 per month, in total for both Litigation Trusts together, consistent with the Appointment Order and to reimbursement of reasonable costs and expenses, upon Bankruptcy Court approval after notice and a hearing.[1]  On the Effective Date, or as soon thereafter as practicable, the applicable Litigation Trust will, subject to Bankruptcy Court approval after notice and a hearing, pay to the Sole Managing Member any accrued but unpaid fees and expenses due the Sole Managing Member as calculated pursuant to the Appointment Order.

k.  **Retention of Professionals by Litigation Trusts.**  Each of the Litigation Trusts (with the consent of the Post-Effective Date Committee) and the Litigation Trustees may retain counsel and other professionals to provide professional services thereto, including in connection with the Plan or the respective Litigation Trust Agreements, without the need for any further Bankruptcy Court approval, including in connection with the prosecution or settlement of the Adversary Proceedings, all other Causes of Action, or objections to Disputed Claims against any of the applicable Debtors.  Without limiting the generality of the foregoing, each of the Litigation Trusts and the Litigation Trustees may retain

---

[1]  The Appointment Order provided that Jeff J. Marwil would be paid a reasonable fee set at the greater of $20,000 per month or 2 % of the net amount of funds distributed.  Appointment Order at ¶ 9.  The Debtors anticipate that the $20,000-per-month alternative will exceed the 2 % calculation and, thus, $20,000 per month will be the applicable fee under the Appointment Order.

any professional who previously represented any party-in-interest in these Cases on or prior to the Effective Date.  The applicable Litigation Trust shall compensate all such professionals in the manner set forth in Plan Section 6.2(i) and in the respective Litigation Trust Agreements, in each instance subject to Bankruptcy Court approval upon the filing of an appropriate application with respect thereto by such professional.

l.　**Distribution of the Litigation Trust Assets.**  The applicable Litigation Trust will, at the discretion of the Litigation Trustee, with the consent of the Post-Effective Date Committee, distribute at least semi-annually and in accordance with the respective Litigation Trust Agreement, commencing as soon as practicable on or after the Effective Date, the respective Litigation Trust Assets on hand (including any Cash received from the Debtors, and treating as Cash for purposes of Plan Section 6.2 any permitted investments under Plan Section 6.2), except such amounts (i) as would be distributable to a holder of a Disputed Claim if such Disputed Claim had been Allowed prior to the time of such distribution (but only until such Claim is resolved), if any, (ii) as are reasonably necessary to meet contingent liabilities (including with respect to any indemnification obligations owed to the applicable Litigation Trustee, pursuant to the terms and conditions of the Plan and the applicable Litigation Trust Agreement) and to maintain the value of the respective Litigation Trust Assets during liquidation, (iii) to pay anticipated future reasonable expenses (including, but not limited to, any taxes imposed on the respective Litigation Trust or in respect of the respective Litigation Trust Assets), and (iv) to satisfy other liabilities incurred by the applicable Litigation Trust in accordance with the Plan or the later of (a) the Effective Date in the event that the United States has by then established a reserve with respect to the Government Funds and (b) the date that is 10 Business Days following the initiation of the distribution of the Government Funds Litigation Trust Agreement.

m.　**Federal Income Tax Treatment of the Litigation Trusts**

(i)　<u>Litigation Trust Assets Treated as Owned by Holders of Allowed Class 2 Claims and Allowed Class 3 Claims</u>.  For all federal income tax purposes, all parties (including, without limitation, the Debtors, the respective Litigation Trusts, and the holders of Allowed Class 2 Claims and Allowed Class 3 Claims), will each treat the transfer of the respective Litigation Trust Assets to the applicable Litigation Trust for the benefit of the holders of Allowed Class 2 Claims and Allowed Class 3 Claims against the applicable Debtor(s), whether Allowed on or after the Effective Date, as (A) a transfer of the respective Litigation Trust Assets directly to the holders of Allowed Class 2 Claims and Allowed Class 3 Claims in satisfaction of such Claims (other than to any extent allocable to Disputed Class 2 Claims or Disputed Class 3 Claims) followed by (B) the transfer by such holders to the applicable Litigation Trust of the respective Litigation Trust Assets in exchange for beneficial interests in the applicable Litigation Trust.  Accordingly, the holders of such Allowed Claims will be treated for federal income tax purposes as the grantors and owners of their respective shares of the applicable Litigation Trust Assets.

(ii)　<u>Tax Reporting</u>

(A)　As will be set forth in the respective Litigation Trust Agreements, each Litigation Trust will file returns as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Plan Sections 6.2(m)(ii).  The Litigation Trust will also

annually send to each record holder of a Allowed Class 3 Claim against the applicable Litigation Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. The respective Litigation Trust's taxable income, gain, loss, deduction, or credit will be allocated (subject to Plan Section 6.2(m)(ii)(c)) to the holders of Allowed Class 3 Claims to the extent provided for in the Plan, in accordance with their relative beneficial interests in the applicable Litigation Trust.

(B)     As soon as possible after the Effective Date, but in no event later than ninety (90) days after the Effective Date, the Litigation Trust will make a good faith estimate of the value of the respective Litigation Trust Assets. Such estimate of value will be made available from time to time, to the extent relevant, and used consistently by all parties (including, without limitation, the Debtors, the Litigation Trust, and the holders of Allowed Class 3 Claims) for all federal income tax purposes. Each Litigation Trust will also file (or cause to be filed) any other statements, returns, or disclosures that are required by any governmental unit.

(iii)     Litigation Trust Claims Reserve.

(A)     Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Bayou Hedge Funds Litigation Trust of a private letter ruling if the Bayou Hedge Funds Litigation Trust so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Bayou Hedge Funds Litigation Trust), the Bayou Hedge Funds Litigation Trust will (i) treat any Bayou Hedge Funds Litigation Trust Asset allocable to, or retained on account of, Disputed Class 2 Claims and Disputed Class 3 Claims (in an amount and manner as set forth in Plan Section 7.2(a)), if any, as held by one or more discrete trusts for federal income tax purposes (the "Bayou Hedge Funds Litigation Trust Claims Reserve"), consisting of separate and independent shares to be established in respect of each Disputed Class 2 Claim and Disputed Class 3 Claim, in accordance with the trust provisions of the Tax Code (section 641 et seq.), (ii) treat as taxable income or loss of the Bayou Hedge Funds Litigation Trust Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Bayou Hedge Funds Litigation Trust that would have been allocated to the holders of Disputed Class 2 Claims or Disputed Class 3 Claims, if any, had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), (iii) treat as a distribution from the Bayou Hedge Funds Litigation Trust Claims Reserve any increased amounts distributed by the Bayou Hedge Funds Litigation Trust as a result of any Disputed Class 2 Claims or Disputed Class 3 Claims resolved earlier in the taxable year, to the extent such distributions relate to taxable income or loss of the Bayou Hedge Funds Litigation Trust Claims Reserve determined in accordance with the provisions hereof, and (iv) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes. All holders of Allowed Class 2 Claims and Allowed Class 3 Claims against any of the Bayou Hedge Funds will report, for tax purposes, consistent with the foregoing.

(B)     Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Bayou Management Litigation Trust of a private letter ruling if the Bayou Management Litigation Trust so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Bayou Management Litigation Trust), the Bayou Management Litigation Trust will (i) treat any Bayou Management Litigation Trust Asset allocable to, or retained on account of, Disputed Class 2 Claims or Disputed Class 3 Claims (in an amount and manner as set forth in Plan Section 7.2(a)), if any, as held by one or more discrete trusts for federal income tax purposes (the "Bayou Management Litigation Trust

46

Claims Reserve"), consisting of separate and independent shares to be established in respect of each Disputed Class 2 Claim or Disputed Class 3 Claim, in accordance with the trust provisions of the Tax Code (section 641 et seq.), (ii) treat as taxable income or loss of the Bayou Management Litigation Trust Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Bayou Management Litigation Trust that would have been allocated to the holders of Disputed Class 2 Claims or Disputed Class 3 Claims, if any, had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), (iii) treat as a distribution from the Bayou Management Litigation Trust Claims Reserve any increased amounts distributed by the Bayou Management Litigation Trust as a result of any Disputed Class 2 Claims or Disputed Class 3 Claims resolved earlier in the taxable year, to the extent such distributions relate to taxable income or loss of the Bayou Management Litigation Trust Claims Reserve determined in accordance with the provisions hereof, and (iv) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes. All holders of Allowed Class 2 Claims and Allowed Class 3 Claims against Bayou Management will report, for tax purposes, consistent with the foregoing.

(C)    The Litigation Trust will be responsible for payments, out of the applicable Litigation Trust Assets, of any taxes imposed on the respective Litigation Trusts or the respective Litigation Trust Assets, including the respective Litigation Trust Claims Reserves. In the event, and to the extent, any Cash (if any) retained on account of Disputed Class 2 Claims or Disputed Class 3 Claims in the applicable Litigation Trust Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Class 2 Claims or Disputed Class 3 Claims, such taxes will be (i) reimbursed from any subsequent Cash amounts (if any) retained on account of Disputed Class 2 Claims or Disputed Class 3 Claims or (ii) to the extent such Disputed Class 2 Claims or Disputed Class 3 Claims have subsequently been resolved, deducted from any amounts distributable by the Litigation Trust as a result of the resolutions of such Disputed Class 2 Claims or Disputed Class 3 Claims.

(D)    Prior to making a final distribution dissolving the Litigation Trust and closing the Debtors' Cases, the Litigation Trustee may apply (i) to the Bankruptcy Court for an order authorizing final distribution, closing the Debtors' cases, and releasing the Litigation Trustee and the Litigation Trusts from any and all claims, debts, or liabilities, including any and all claims, debts, or liabilities for taxes to any and all taxing authorities, and/or (ii) to the Bankruptcy Court, under Section 505 of the Bankruptcy Code, the Internal Revenue Service and/or any other taxing authority for a determination of any tax liability payable by the Debtors and the Litigation Trusts. The Litigation Trustee shall not be required to make a final distribution unless the Litigation Trustee determines that the Litigation Trusts, the Debtors and the Litigation Trustee have no remaining liabilities for taxes of any kind.

n.    **Dissolution.** The Litigation Trustee and the respective Litigation Trusts will be discharged or dissolved, as the case may be, at such time as (i) all applicable Disputed Class 2 Claims and Disputed Class 3 Claims have been resolved, (ii) all of the applicable Litigation Trust Assets have been liquidated, and (iii) all distributions required to be made by the Litigation Trust under the Plan have been made, but in no event will the respective Litigation Trusts be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (and, in the case of any extension, within six (6) months prior to the end of such extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely

47

affect the status of the applicable Litigation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the applicable Litigation Trust Assets or the dissolution of the applicable Debtors.

o.  **Indemnification of Litigation Trustee.**  The Litigation Trustee or the individuals comprising the Litigation Trustee, as the case may be, and the respective Litigation Trusts' agents and professionals, will not be liable for actions taken or omitted in its or their capacity as, or on behalf of, the applicable Litigation Trust, except upon a finding by the Bankruptcy Court that it or they acted or failed to act as the result of misfeasance, bad faith, gross negligence, or in reckless disregard of its or their duties and each will be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its or their actions or inactions in its or their capacity as, or on behalf of, the applicable Litigation Trust, except for any actions or inactions involving misfeasance, bad faith, gross negligence, or in reckless disregard of its or their duties.  Any indemnification claim of the Litigation Trustee (and the other parties entitled to indemnification under Plan section 6.2(o)) will be satisfied from the applicable Litigation Trust Assets, subject to the approval of the Bankruptcy Court after notice and a hearing.  The Litigation Trustee will be entitled to rely, in good faith, on the advice of its retained professionals.

p.  **Closing of these Cases.**

(i)  Bayou Superfund and Bayou Management Cases.  When all Disputed Claims have become Allowed Claims, have been disallowed by a Final Order, or have been otherwise fully resolved, and all of the respective Litigation Trust Assets have been distributed in accordance with the Plan (including, without limitation, pursuant to Plan Sections 6.2), the Litigation Trustee will seek authority from the Bankruptcy Court to close the Case(s) of the applicable Debtor(s) in accordance with the Bankruptcy Code and the Bankruptcy Rules; provided, however, that nothing in the Plan or the applicable Litigation Trust Agreement will prevent the Litigation Trustee from seeking authority from the Bankruptcy Court to close any or all of these Cases at any time prior thereto, in accordance with the Bankruptcy Code and the Bankruptcy Rules.

(ii)  All Debtors other than Bayou Superfund and Bayou Management.  On the Effective Date, or as soon thereafter as is reasonably practicable, the Cases of Bayou Fund, Bayou No Leverage, Bayou Affiliates, Bayou Accredited, Bayou Group, Bayou Advisors and Bayou Equities shall each be closed, in each instance without any or other further order of the Bankruptcy Court or action by any such Debtors, the Sole Managing Member, other governing body of any such Debtors, or the Litigation Trustee, following which any and all proceedings that could have been brought or otherwise commenced in the Case of any such Debtor shall be brought or otherwise commenced in the Bayou Fund Case, and each such Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions.

q.  **Closing of these Cases by Charitable Gift.**  If at any time the Litigation Trustee determines that the expense of administering the applicable Litigation Trust so as to make a final distribution to its beneficiaries is likely to exceed the value of the assets remaining in the applicable Litigation Trust, the Litigation Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to close the applicable Case(s), (ii) donate any balance to a charitable organization exempt from federal income tax under section 501(c)(3) of the Tax

48

Code that is unrelated to any of the Debtors, the Creditors Committee or its members, the Litigation Trustee, and any insider of the Litigation Trustee, and (iii) close any or all of these Cases in accordance with the Bankruptcy Code and Bankruptcy Rules.  Notice of such application will be given electronically, to the extent practicable, to those parties who have filed requests for notices in these Cases and whose electronic addresses then remain current and operating.

3.   Debtors' Post-Confirmation Role; Dissolution

As soon as practicable on or after the Effective Date:

a.   **Payments and Transfers.**  Bayou Superfund or Bayou Management, acting through the Sole Managing Member, or the Litigation Trustee, as the case may be, will, on behalf of all of the Debtors and the Estates (as applicable) make payments and transfers to holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims, in the time and manner as set forth in Plan Section 5.2(a).

b.   **Administration of Taxes.**  Except to the extent otherwise provided in the Plan or the Litigation Trust Agreements, Bayou Superfund or Bayou Management, acting through the Sole Managing Member, or the Litigation Trustee, as the case may be will be responsible for all tax matters until certificates of cancellation, dissolution, or merger for Bayou Superfund or Bayou Management are filed in accordance with Plan Section 6.5(f).

c.   **Effective Date Payments and Transfers.**  On the Effective Date, or as soon thereafter as is reasonably practicable, Bayou Management and Bayou Superfund, as applicable, will make the payments and transfers to the Litigation Trusts described in Plan Section 5.2(a).

d.   **Claims Administration and Prosecution and Plan Distributions.** Subject to the approval of the Bankruptcy Court after notice and a hearing, (a) at any time prior to the Effective Date, the Debtors will, and (b) at any time on or after the Effective Date, the Litigation Trusts and those Debtors not dissolved as of the Effective Date will, have the power and authority to prosecute and resolve objections to any Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims and Disputed Claims.  The Litigation Trusts and any Debtor that has not been dissolved as of the Effective Date will also have the power and authority to hold, manage, and distribute Plan distributions to the holders of any Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Claims that are not satisfied in full on or prior to the Effective Date.

e.   **Dissolution.**

(i)   Dissolution of all Debtors other than Bayou Superfund and Bayou Management; Closing of those Cases.  On the Effective Date, or as soon thereafter as is reasonably practicable, the Cases of Bayou Fund, Bayou No Leverage, Bayou Affiliates, Bayou Accredited, Bayou Group, Bayou Advisors, and Bayou Equities  will each be closed, in each instance without any or other further order of the Bankruptcy Court or action by any such Debtors, the Sole Managing Member, other governing body of any such Debtors, or the Litigation Trustee, following which any and all proceedings

49

that could have been brought or otherwise commenced in the Case of any such Debtor will be brought or otherwise commenced in either the Bayou Hedge Fund Case or the Bayou Management Case, as applicable, and each such Debtor will be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of (a) each such Debtor, including without any requirement of further action by the Sole Managing Member, any other governing body of the Debtors, or the Litigation Trustee, or (b) the Bankruptcy Court; provided, however, that each such Debtor will file with the office of the Secretary of State or other appropriate office for the state of its organization a certificate of cancellation or dissolution, or, alternatively, it may be merged with and into another Debtor and so file an appropriate certificate of merger.

(ii)    Dissolution of Bayou Superfund and Bayou Management.  Within thirty (30) days after its completion of any and all acts required by the Plan, or as soon thereafter as is practicable, each of Bayou Superfund and Bayou Management will be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of each such Debtor, including without any requirement of further action by the Sole Managing Member, any other governing body of such Debtors, or the Litigation Trustee; provided, however, that each such Debtor, either acting through the Sole Managing Member or the Litigation Trustee (as the case may be) will file with the office of the Secretary of State or other appropriate office for the state of its organization a certificate of cancellation or dissolution, or, alternatively, it may be merged with and into any other then still-existing Debtor and so file an appropriate certificate of merger.

f.    **Books and Records.**  Upon the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors will transfer and assign to the Litigation Trusts full title to, and the Litigation Trusts will be authorized to take possession of, all of the books and records of the Debtors then in the Debtors' possession. The respective Litigation Trust will have the responsibility of storing and maintaining the books and records transferred hereunder until the later of (i) one year after the date the Debtors are dissolved in accordance with Plan Section 6.5(f) or (ii) the resolution of each of the Adversary Proceedings, after which time such books and records may, subject to the Effective Date, be abandoned or destroyed without further Bankruptcy Court order.  For purposes of the Plan, books and records include computer generated or computer maintained books and records and computer data, as well as electronically generated or maintained books and records or data.  The Debtors shall also transfer and assign to the Litigation Trusts all of their respective claims and rights in and to their books and records that are maintained by, or in possession of, third parties (including any governmental entities), wherever located.

g.    **Corporate Action.**  Upon the Effective Date, the Debtors and the Sole Managing Member are authorized to perform each of the actions and effect each of the transfers required by the terms of the Plan, in the time period allocated therefore, and all matters provided for under the Plan that may or would otherwise require approval of the member or comparable governing bodies of the Debtors will be deemed to have occurred and will be in effect from and after the Effective Date pursuant to the applicable general corporation law (or other applicable governing law) of the states in which the Debtors are incorporated or organized, without any requirement of further action by the member or other governing body of the Debtors.  Each of the Debtors, acting either through the Sole Managing Member or the Litigation Trustee (as the case may be) will be authorized, following the completion of all disbursements, other transfers, and other actions required of the Debtors by the Plan, to file its certificate of cancellation, dissolution, or merger

as contemplated by Plan Section 6.5(f). The filing of such certificates of cancellation, dissolution, or merger will be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including, without express or implied limitation, any action by the member or other governing body of the Debtors.

h.   **Effectuating Documents and Further Transactions.** The Sole Managing Member is authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, without any requirement of further action by the Sole Managing Member or other governing body of the Debtors.

i.   **Release of Liens.** Except as may otherwise be provided in the Plan or in any contract, instrument, release, or other agreement or document created or assumed in connection with the Plan, on the Effective Date, any and all mortgages, deeds of trust, liens, pledges, or other security interests against the remaining property of any Debtor or any Estate (if any) will be fully released and discharged and of no further force and effect.

j.   Post-Effective Date Committee

(i)   On the Effective Date, the Post-Effective Date Committee will be deemed formed and constituted and each of the then members of the Creditors Committee so willing to serve will be the initial members thereof. In the event that fewer than 2 Persons are willing to serve on the Post-Effective Date Committee on the Effective Date, or there is no Post-Effective Date Committee member serving in such capacity for a period of 30 consecutive days at any time following the Effective Date, then the Litigation Trustee may, during such vacancy and thereafter, ignore any reference in this Plan, the Litigation Trust Agreements, or the Confirmation Order to a Post-Effective Date Committee, and all references to the Post-Effective Date Committee's ongoing duties and rights in this Plan, the Litigation Trust Agreements, and the Confirmation Order will be null and void; provided, however, that in the event there are any Committee-Controlled Causes of Action then remaining or pending, the Litigation Trustee will file a motion in the Bankruptcy Court seeking the appointment of an additional Trustee or similar fiduciary solely for the purpose of prosecuting such then remaining or pending Committee-Controlled Causes of Action. The by-laws of the Post-Effective Date Committee will provide a reasonable process for the replacement or successions of the initial members in the event of resignation or incapacity.

(ii)   Function and Duration. The Post-Effective Date Committee will conduct itself in accordance with by-laws, the form of which will be included in the Plan Supplement and/or as an exhibit to the Litigation Trust Agreements, and will have the functions set forth in the Plan, including Section 6.10 hereof, the Litigation Trust Agreements, and the Confirmation Order. Without limiting the generality of the foregoing, the Post-Effective Date Committee will have (i) all of the rights and powers of an official committee of creditors appointed pursuant to 11 U.S.C. § 1103, and (ii) the power and authority on and after the Effective Date to investigate, prosecute, settle, and otherwise resolve, in the name and on behalf of the Debtors, the Estates, or the name of the Litigation Trusts, each of the Committee-Controlled Causes of Action, provided, however, the Post-Effective Date Committee's authority to settle or compromise either of the Committee-Controlled Causes of Action will be subject to Bankruptcy Court approval under Bankruptcy Rule 9019 after notice and a hearing.

(iii)    Indemnification of the Members of the Post-Effective Date Committee. The members of the Post-Effective Date Committee and the Post-Effective Date Committee's agents and professionals, shall not be liable for actions taken or omitted in their capacity as, or on behalf of, the Post-Effective Date Committee, except upon a finding by the Bankruptcy Court that they acted or failed to act as the result of misfeasance, bad faith, gross negligence, or in reckless disregard of their duties and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of their actions or inactions in their capacity as, or on behalf of, the Post-Effective Date Committee, except for any actions or inactions involving misfeasance, bad faith, gross negligence, or in reckless disregard of their duties.  Any indemnification claim of the parties entitled to indemnification under this section 6.10(c) shall be satisfied from the applicable Litigation Trust Assets, subject to the approval of the Bankruptcy Court after notice and a hearing.  The members of the Post-Effective Date Committee shall be entitled to rely, in good faith, on the advice of the Post-Effective Date Committee's retained professionals.

G.    **Procedures for Disputed Claims**

1.    **Objections to Claims.**  Subject to the other provisions of the Plan, at any time prior to the Effective Date, the Debtors will be entitled to object (in whole or in part) to Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Class 2 Claims or Class 3 Claims.  On and after the Effective Date, (a) the Litigation Trusts will be entitled to object (in whole or in part) to Class 2 Claims or Class 3 Claims , and (b) the Litigation Trustee, acting on behalf of the Debtors and the Debtors' Estates will be entitled to object (in whole or in part) to any remaining and unpaid Administrative Expense Claims, Priority Tax Claims, or Priority Non-Tax Claims.  Any objections to Claims will be served and filed on or before the later of (i) one hundred eighty (180) days after the Effective Date, and (ii) such date as may be fixed by the Bankruptcy Court, for cause, whether fixed before or after the date specified in clause (i) above (the "Claims Objection Bar Date").

2.    Certain Claims of Investor Creditors Automatically Deemed Disputed.  Subject to Claims that are deemed Disputed under the Plan, each Investor Creditor will be deemed to have an Allowed Class 3 Claim for purposes of voting under the Plan in an amount equal to 100% of the amount of such Investor Creditor's Investment less any unreturned Redemption Payments, if any, each in the amounts listed on Schedule IC-1 to the Plan. In determining the amount of an Investor Creditor's Allowed Claim, Redemption Payments returned to the Debtors pursuant to a stipulation approved by the Bankruptcy Court shall not be subtracted from the Investment.  Notwithstanding any other provision of the Plan, and without limiting the generality of the foregoing, (a) any Claim of any Investor Creditor will automatically be deemed a Disputed Claim and shall be disallowed and expunged without any other or further order of the Bankruptcy Court solely with respect to any amount exceeding the amount of such claimant's Investment less Redemption Payments, if any; (b) any Investor Creditor's claims for any other amount or Claim, including any contractual, statutory, or other legal claim for profits, interest, pre-judgment interest, treble damages, compensatory damages, or punitive damages, and any amount of a reinvestment in the Bayou Hedge Funds or an exchange, transfer, or rollover from one Bayou Hedge Fund to another Bayou Hedge Fund that is comprised of purported profits or appreciation on such holder's initial principal Investment in the Bayou Hedge Funds shall be disallowed and expunged, and the Bayou Hedge Funds Litigation Trust shall not place any funds in the Bayou Hedge Funds Litigation Trust Claims Reserve on account of any such Disputed portion of any Claim of any Investor Creditor; and (c) Investor Intermediary Claims, Off-Shore Claims and Off-Shore

Investors Claims against any of the Debtors other than Bayou Management, are deemed Disputed.  Without limiting the generality of the foregoing, the Debtors and the Bayou Hedge Funds Litigation Trust, as applicable, each further reserve the right to otherwise object (in whole or in part) to the Claims of Investor Creditors.

3.    **No Distribution Pending Allowance of any Disputed Portion of a Claim;
      Reserve for Certain Disputed Class 2 Claims and Certain Disputed Class 3 Claims**

  a.    Except as may otherwise be set forth in the Plan or any Final Order of the Bankruptcy Court, no payment or distribution provided under the Plan will be made by the Litigation Trusts on account of any (wholly or partially) Disputed Claim unless and until the entirety of such Disputed Claim becomes an Allowed Claim.  Until such time, (a) with respect to any (wholly or partially) Disputed Class 2 Claim, the Litigation Trusts will (except as otherwise set forth in the Plan or any other Final Order of the Bankruptcy Court, or as otherwise may be agreed upon by the holder of the applicable Disputed Class 2 Claim) withhold from the respective Litigation Trusts an amount as may be necessary to equal 100% of the amount of the actual distributions to which the holders of such Disputed Class 2 Claims would otherwise be entitled under this Plan if such Disputed Claims were Allowed in their Disputed Claims Amount, and (b) with respect to any (wholly or partially) Disputed Class 3 Claim, the Litigation Trusts will (subject to the limitations of Plan Section 7.2(b), and except as otherwise set forth in the Plan or any other Final Order of the Bankruptcy Court) withhold on a Pro Rata basis from the property to be distributed to the holders of Allowed Class 3 Claims, as applicable, from the respective Litigation Trusts the portion, if any, of such property allocable to such Disputed Class 3 Claim (as applicable) as may be necessary to equal 100% of the amount of the actual distributions to which the holders of such Disputed Claims would otherwise be entitled under this Plan if such Disputed Claims were Allowed in their Disputed Claims Amount.[2]  The Litigation Trustee will hold such property in the Bayou Hedge Funds Litigation Trust Claims Reserve or the Bayou Management Litigation Trust Claims Reserve, as applicable, in accordance with Article VII of the Plan and Plan Section 6.2(m)(ii)(c).  If any Disputed Class 2 Claim or Disputed Class 3 Claim (or any portion of such Claim) is later disallowed, the Litigation Trust Assets previously reserved and held in the Bayou Hedge Funds Litigation Trust Claims Reserve and/or the Bayou Management Litigation Trust Claims Reserve (as applicable) on account of such Disputed Class 2 Claim or Disputed Class 3 Claim in accordance with Plan Section 7.2(a) (if any) will be released as and to the extent the Litigation Trusts determine such property is no longer necessary to fund the remaining unresolved Disputed Class 2 Claims or Disputed Class 3 Claims (as applicable), and such Litigation Trust Assets will be distributed in accordance with Section 6.2 hereof and the terms of the applicable Litigation Trust Agreement.

---

[2]    For the avoidance of doubt, the amount reserved would constitute 100% of the distribution to which the holder of a Disputed Claim is entitled to if the Claim is Allowed in full, not 100% of the face amount of the Claim.

b.    Notwithstanding anything to the contrary set forth in this Plan, the applicable Litigation Trust will not allocate or reserve any Cash or other property in such Litigation Trust on account of any Contingent Defendant Claims or any other Claim of a Defendant. All of the remaining Redeemer Defendants received a full Redemption Payment. Subject to the Plan, in the event that a Final Order is entered against a Defendant in an Adversary Proceeding, such judgment may be adjusted, by court order or by agreement between the parties, to account for any distribution such Redeemer Defendant would otherwise receive herein.

Certain Redeemer Defendants have expressed the view that if a Redeemer Defendant loses its Adversary Proceeding and is required to return the entirety of its Redemption Payment then such Redeemer Defendant will have a Claim against the Bayou Hedge Funds for the full amount of its Redemption Payment, including purported profits. The Debtors disagree. If or when a proof of claim is filed for such amounts, the amounts stated in the proof of claim shall be deemed allowed in accordance with § 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007.

4.    <u>Treatment of Claims of Redeemer Defendants Who Satisfy Judgments Entered Against Them.</u>  Redeemer Defendants with respect to which the Bankruptcy Court at any time entered judgment in favor of the Bayou Hedge Funds or the Bayou Hedge Funds Litigation Trust, as applicable, against such Redeemer Defendant in an Adversary Proceeding, upon payment in full of the amount of such judgment by the Redeemer Defendant, and not before, such Redeemer Defendant will be deemed to have an Allowed General Unsecured Claim in Class 3 against the Bayou Hedge Funds and/or the Bayou Hedge Funds Litigation Trust (as applicable) and an Allowed General Unsecured Claim in Class 3 against Bayou Management or the Bayou Management Litigation Trust (as applicable) in an amount equal to such Redeemer Defendant's Investment less any Redemption Payments that were not returned to the Bayou Hedge Funds or the Bayou Hedge Funds Litigation Trust as part of satisfaction of the judgment against such Redeemer Defendant or otherwise, and shall be entitled to appropriate distributions on account thereof.

5.    **Resolution of Disputed Claims.**  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, following the Effective Date, the Litigation Trustee either on behalf of the Litigation Trusts, with respect to Class 2 Claims or Class 3 Claims, or on behalf of the Debtors and the Debtors' Estates with respect to all other Claims, will have the right to the exclusion of all others (except as to applications for allowances of Professional Fees under Bankruptcy Code §§ 330 and 503 and as set forth in the Order Authorizing and Approving Settlement Agreement Between the Debtors and the Tom and Nancy Juda Living Trust dated June 4, 2007) to make and file objections to Class 2 Claims or Class 3 Claims, and will serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable, but in no event later than the Claims Objection Bar Date then in effect. From and after the Confirmation Date, all objections will be litigated to a Final Order except to the extent the Debtors or the Litigation Trusts, as the case may be, elects to withdraw any such objection filed or the Debtors or the Litigation Trusts, as the case may be, and the holder of a Claim elects to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim upon entry of a Final Order by the Bankruptcy Court after notice and a hearing.

6.    **Estimation.** To the extent not undertaken or completed as of the Voting Deadline, the Debtors or the Litigation Trusts, as the case may be, may at any time request that the

Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to Bankruptcy Code § 502(c), regardless of whether any party-in-interest previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during the litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Litigation Trustee, as the case may be, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  On and after the Confirmation Date, Claims that have been estimated may be compromised, settled, withdrawn, or otherwise resolved subsequently, without approval of, or any further order of, the Bankruptcy Court.

7.    **Allowance of Disputed Claims.**  If, on or after the Effective Date, any Disputed Claim becomes, in whole or in part, an Allowed Claim, the Litigation Trusts will, no later than the fifteenth (15th) Business Day of the first month following the month in which the Disputed Claim becomes an Allowed Claim, distribute to the holder thereof the distribution(s), if any, that such holder would have received had its Claim been Allowed on the Effective Date or the Allowance Date (as applicable), except as otherwise provided herein (including, without limitation, with respect to the limitation set forth in Plan Sections 4.1(c), 4.2(c), and 6.2(l) that no distributions will be made by the Litigation Trustee on account of Allowed Class 3 Claims until the Government Funds have been distributed).

H.   **Treatment of Executory Contracts and Unexpired Leases**

1.    **Executory Contracts and Unexpired Leases.**  Except as provided in the Plan Supplement, on, subject to, and conditioned upon the occurrence of, the Effective Date, any and all remaining Executory Contracts to which any Debtor is still a party, if any, will be deemed rejected as of and subject to the Effective Date, except for any Executory Contract, if any, that (i) has been assumed or rejected pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date or (ii) is the subject of a separate motion to assume or reject filed under Bankruptcy Code § 365 by the Debtors prior to the Effective Date.

2.    **Approval of Rejection of Executory Contracts and Unexpired Leases.**  Except as provided in the Plan Supplement, or if an Executory Contract is subject to a motion to assume on the Confirmation Date, entry of the Confirmation Order will constitute the approval, pursuant to Bankruptcy Code § 365(a), of the rejection of any and all Executory Contracts rejected as of, and subject to and conditioned upon the occurrence of, the Effective Date pursuant to the Plan, without any other or further notice or order.  The Debtors are not aware of any Executory Contracts that remain subject to rejection.

3.    **Rejection Claims**

a.    In the event that the rejection of any Executory Contract by any of the Debtors pursuant to the Plan, if any, results in damages to the other party or parties to such Executory Contract, a Claim for such damages, if not heretofore evidenced

by a filed Proof of Claim, will be forever barred and will not be enforceable against the Debtors, the Estates, the Litigation Trustee, the Litigation Trust, or any property to be distributed under the Plan or the Litigation Trust unless a Proof of Claim is filed with the Bankruptcy Court and served upon the Debtors and the Litigation Trustee on or before the date that is thirty (30) days after the Confirmation Date (the "Plan Rejection Bar Date"); provided, however, that the Plan Rejection Bar Date will apply only to Rejection Claims with respect to those Executory Contracts that are to be rejected under and pursuant to the Plan. Any holder of a Rejection Claim for an Executory Contract that is not to be rejected pursuant to the Plan, but whose Rejection Claim instead arises under an Executory Contract that either has already been rejected by an order of the Bankruptcy Court or is the subject of a separate motion to reject pending on the Confirmation Date, must file, or must have filed, as the case may be, a Proof of Claim for such Rejection Claim by the date provided in any order relating to such Rejection Claim.

b.     Any Allowed Claims arising out of the rejection of an Executory Contract, if any, will be classified as Class 2 Claims for all purposes under the Plan.

## V.     Effects of Confirmation of Plan

A.   **Vesting of Assets in Litigation Trust**

1.     On the Effective Date, the property of the Estates will vest in the Debtors and, in accordance with Article VI of the Plan and subject to the exceptions contained therein, the Litigation Trust Assets will be deemed automatically transferred to the respective Litigation Trust.

2.     From and after the Effective Date, the Litigation Trusts may dispose of the Litigation Trust Assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan and the respective Litigation Trust Agreements.

3.     As of the Effective Date, all Assets of the Debtors and the Litigation Trusts will be free and clear of all Claims, liens, or encumbrances except as may be provided in the Plan or the Confirmation Order.

B.    **Release of Assets from Bankruptcy Court Jurisdiction**.  Until the Effective Date, the Bankruptcy Court will retain jurisdiction over the Debtors and their Assets and properties. Thereafter, jurisdiction of the Bankruptcy Court will be limited to the subject matter set forth in Article XI of the Plan.

C.    **Binding Effect**.  Subject to Plan Section 9.4, on and after the Confirmation Date, the provisions of the Plan will bind any holder of a Claim against, or Equity Interest in, any of the Debtors and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired or Allowed under the Plan or any Final Order of the Bankruptcy court and whether or not such holder has affirmatively voted to accept the Plan.

D.    **Term of Injunctions or Stays**.  Unless otherwise expressly provided in the Plan, all injunctions or stays arising under or entered during these Cases under Bankruptcy Code § 105 or § 362, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the closing of these Cases.

E.    **Causes of Action**

    1.    **Rights to Commence Causes of Action**

        a.    The Debtors expressly reserve any and all rights and causes of action they may have, whether an action has been commenced or not, and do not waive any claim or right, except as expressly stated.  The Debtors are not currently aware of any causes of action that they seek to pursue.

    2.    **Rights to Enforce Causes of Action Prior to the Effective Date**

        a.    The Debtors' Rights.  On and after the Confirmation Date and prior to the Effective Date, except as otherwise provided in the Plan or any other Final Order of the Bankruptcy Court with respect to the Committee-Controlled Causes of Action or otherwise, the Debtors will have the exclusive right to enforce any and all Causes of Action against any Person (including the Adversary Proceedings, other than the Committee-Controlled Causes of Action).  Prior to the Effective Date, the Debtors may abandon, settle, or release any or all Causes of Action (including the Adversary Proceedings, but not including either of the Committee-Controlled Causes of Action), as they deem appropriate, upon entry of a Final Order pursuant to a motion filed in accordance with Bankruptcy Rules 2002 and 9019 and posting a copy of such motion on the Website.

        b.    The Creditors Committee's Rights.  On and after the Confirmation Date and prior to the Effective Date, the Creditors Committee may conduct investigations, bring complaints, and prosecute either of the Committee-Controlled Causes of Action on behalf of the Debtors and the Debtors' Estates.  Prior to the Effective Date, the Creditors Committee may abandon, settle, or release either or both of the Committee-Controlled Causes of Action, as it deems appropriate, upon entry of a Final Order pursuant to a motion filed in accordance with Bankruptcy Rules 2002 and 9019 and posting a copy of such motion on the Website.

    3.    **Rights to Enforce Causes of Action on and After the Effective Date**

    a.    The Debtors' Rights.  On and after the Effective Date, except as otherwise provided in the Plan or any other Final Order of the Bankruptcy Court with respect to the Committee-Controlled Causes of Action or otherwise, the Litigation Trusts will have the exclusive right to enforce any and all remaining Causes of Action against any person (including the Adversary Proceedings, other than the Committee-Controlled Causes of Action).  The respective Litigation Trusts may pursue, abandon, settle, or release any or all remaining Causes of Action (including the Adversary Proceedings, but not the Committee-Controlled Causes of Action), upon entry of a Final Order pursuant to a motion filed in accordance with Bankruptcy Rule 2002 and 9019 and posting a copy of such motion on the Website.

    b.    The Post-Effective Date Committee's Rights.  On and after the Effective Date, the Post-Effective Date Committee will have the exclusive right to enforce any remaining Committee-Controlled Cause of Action against any Person.  The Post-Effective Date Committee may abandon, settle, or release any remaining Committee-Controlled Causes of Action upon entry of a Final Order pursuant to a motion filed in accordance with Bankruptcy Rules 2002 and 9019 and posting a copy of such motion on the Website.

4.    **Rights to Assert Defendant Defenses.  Each Defendant whose Adversary Proceeding or other Cause of Action (whether such action was commenced either (a) prior to or (b) on or after the Confirmation Date) either (i) has not been resolved or settled prior to the Effective Date or (ii) is commenced on or after the Effective Date, will retain, until such Adversary Proceeding or other Cause of Action is ultimately resolved or settled, any and all of its Defendant Defenses, and will be entitled to assert or pursue such Defendant Defenses against the applicable Debtors or Litigation Trust in any manner as may then still be legally permissible at the applicable time.**

5.    **Injunction.**  Notwithstanding anything contained in the Plan to the contrary including the provisions of Plan Section 10.4, on and after the Confirmation Date, all Persons will be permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively, or otherwise) on account of or respecting any claim, debt, right, or cause of action of the Debtors for which the Debtors, the Litigation Trusts, the Creditors Committee and/or the Post-Effective Date Committee retain sole and exclusive authority to pursue in accordance with the Plan.  No holder of a Claim against, or Equity Interest in, any Debtor may, on account of such Claim or Equity Interest, seek or receive any payment or other distribution from (if any), or seek recourse against, any Debtor, Estate, the Litigation Trustee, the Litigation Trusts, the Litigation Trust Claims Reserves, the Sole Managing Member, or the respective property of any of the foregoing, except as otherwise expressly provided in this Plan, whether or not the Claim or Equity Interest of such holder is impaired or Allowed under the Plan or any Final Order of the Bankruptcy Court, and whether or not such holder has affirmatively voted to accept the Plan.

6.    **Injunction Against Interference with the Plan.**  Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties-in-interest, along with their respective present and former employees, agents, officers, directors, and principals, will be enjoined from taking any actions to interfere with the implementation or consummation of the Plan, whether or not the Claim or Equity Interest of such holder is

impaired or Allowed under the Plan or any Final Order of the Bankruptcy Court, and whether or not such holder has affirmatively voted to accept the Plan.

F.   **Retention of Jurisdiction by Bankruptcy Court**

The Bankruptcy Court will retain jurisdiction over all matters arising under, arising out of, or related to these Cases and the Plan pursuant to, and for the purposes of, Bankruptcy Code §§ 105(a) and 1142 and for, among other things, the following purposes:

1.   To hear and determine any motions, if any, for the assumption, assumption and assignment, or rejection of Executory Contracts and the allowance of any Claims resulting therefrom;

2.   To determine any motion, adversary proceeding (including, without limitation, the Adversary Proceedings, whether or not such proceeding has been resolved on or prior to the Effective Date), application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date, including, without limitation, any proceeding to recover pursuant to a Cause of Action;

3.   To ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

4.   To consider Claims or the allowance, disallowance, classification, priority, compromise, estimation, or payment of any Claim and any and all objections (in whole or in part) thereto;

5.   To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

6.   To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

7.   To hear and determine any application to modify the Plan in accordance with Bankruptcy Code § 1127, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

8.   To hear and determine all applications under Bankruptcy Code §§ 330, 331, and 503(b) for awards of Professional Fees relating to services rendered and reimbursement of expenses incurred prior to the Confirmation Date, to hear and determine all applications for compensation rendered by professionals relating to services rendered and reimbursement of expenses incurred on and after the Confirmation Date, and to hear and determine the amounts due and payable to the Sole Managing Member and the Litigation Trustee under the Appointment Order, including any claim for indemnification;

9.   To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Litigation Trust, the Litigation Trust Agreement, the Confirmation Order, any transactions or payments contemplated hereby,

59

or any agreement, instrument, or other document governing or relating to any of the foregoing;

10. To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

11. To hear and determine any motions and other actions (including the Adversary Proceedings and all other Causes of Action) seeking to recover any remaining assets of the Debtors, property of the Estates, and Litigation Trust Assets, wherever located;

12. To determine such other matters and for such other purposes as may be provided in the Plan, the Confirmation Order, or the Litigation Trust Agreements;

13. To hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code §§ 346, 505, and 1146 (including, without limitation, matters with respect to any taxes payable by the Litigation Trust or any other trust or reserve as may be established in furtherance of the Plan or the Litigation Trust Agreements);

14. To hear and determine applications of the Debtors or the Litigation Trusts under Bankruptcy Rule 9019 or otherwise to settle or resolve any Adversary Proceedings, Bayou Hedge Funds Causes of Action, or Bayou Management Causes of Action;

15. To hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; and

16. To enter a final decree closing any of these Cases.

G.   **Dissolution of the Creditors Committee.**

On and after the Effective Date, the Creditors Committee shall be dissolved and the members thereof and the professionals retained by the Creditors Committee in accordance with Bankruptcy Code §§ 327, 328, or 1102 shall be discharged from their respective fiduciary obligations, except that the Creditors Committee and its professionals shall have the right to (a) pursue, review, and object to any applications for payment of Professional Fees in accordance with Plan Section 2.2, and (b) litigate any appeals pending as of the Effective Date.

H.   **Exemption from Transfer Taxes.**

Pursuant to Bankruptcy Code § 1146(a), the issuance, transfer, or exchange of any security under the Plan (including, without limitation, any securities, if any, representing beneficial interests in the Litigation Trusts, to the extent they constitute "securities" under applicable law); the assignment or surrender of any lease or sublease under the Plan; the making or delivery of any deed or other instrument of transfer pursuant to, in implementation or furtherance of, in connection with, or as contemplated by, the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition of assets contemplated by the Plan (including the transfers of assets to and by the Litigation Trusts); and the revesting, transfer, assignment, or sale of any real or personal property of any of the Debtors pursuant to, in implementation of, or as contemplated by the Plan, will not be subject to any stamp, real estate transfer, mortgage recording, sales, use, or other similar tax.

I.      **Exculpation and Release.**

**Except as provided in the Plan or the Confirmation Order, and subject to the Appointment Order, none of the Debtors, the Sole Managing Member, the Litigation Trustee, the Creditors Committee, the Post-Effective Date Committee, nor any of their respective representatives, members officers, directors, shareholders, employees, advisors, attorneys, affiliates, or agents acting in such capacity shall have or incur any liability to, or be subject to any right or action, and are released by, any holder of a Claim or Equity Interest or any other party in interest, or any of their respective agents, direct or indirect shareholders, employees, representatives, financial advisors, attorneys, or affiliates, or any of their respective successors or assigns, for and from any act or omission in connection with, relating to, or arising out of, the Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, the Adversary Proceedings, and any all other Causes of Action, or the property to be distributed under the Plan and the Litigation Trust Agreements, except for fraud, willful misconduct, gross negligence, malpractice, criminal conduct, or unauthorized use of confidential information that causes damage. Nothing in this Section shall limit the liability of professionals to their client contrary to the requirements of DR 6-102 of the Code of Professional Responsibility.**

## VI.      ALTERNATIVES TO THE PLAN

The Debtors have determined that the Plan is the most practical means of providing maximum recoveries to creditors in these Cases. Alternatives to the Plan which have been considered and evaluated by the Debtors during the course of these Cases include (i) liquidation of the Debtors' remaining assets under Chapter 7 of the Bankruptcy Code or (ii) an alternative Chapter 11 plan. The Debtors' thorough consideration of these alternatives to the Plan has led them to conclude that the Plan, in comparison, provides a greater recovery to creditors on a more expeditious timetable and in a manner which minimizes inherent risks in any other course of action available to the Debtors.

A.      **Liquidation Under Chapter 7 of the Bankruptcy Code**

If the Plan or any other Chapter 11 plan for the Debtors cannot be confirmed under Bankruptcy Code § 1129(a), these Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, in which event a trustee would be elected or appointed to liquidate any remaining assets of the Debtors for distribution to creditors pursuant to Chapter 7 of the Bankruptcy Code. If a trustee is appointed and the remaining assets of the Debtors are liquidated under Chapter 7 of the Bankruptcy Code, all creditors holding Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims (as well as holders of various other Claims) may receive distributions of a lesser value on account of their Allowed Claims and likely would have to wait a longer period of time to receive such distributions than they would under the Plan. A Chapter 7 trustee, who would lack the Debtors', the Creditors Committee's, and their respective advisors' and professionals' knowledge of the Debtors' affairs, would be required to invest substantial time and resources to investigate the facts underlying the multitude of Claims filed against the Estates and the potential Causes of Action.

The Debtors believe that since this is a liquidating plan, the only differences between distributions under this plan and distributions under a Chapter 7 would be (i) higher administrative expenses resulting from the appointment of a chapter 7 trustee and a new set of professionals not familiar with the case and (ii) a potential decrease in collections on account of the outstanding claims being prosecuted by the Debtors' professionals. The combination of these two elements is likely to result in lower distributions to creditors although the magnitude of this impact is unknown.

B.     **Alternative Chapter 11 Plan**

      If the Plan is not confirmed, the Debtors or any other party-in-interest (if the Debtors' exclusive period in which to file a Chapter 11 plan has expired) could attempt to formulate an alternative Chapter 11 plan which might provide for the liquidation of the Debtors' assets other than as provided in the Plan. However, since substantially all of the Debtors' assets are Causes of Action (including the Adversary Proceedings) or proceeds thereof, the Debtors believe that any alternative Chapter 11 plan will necessarily be substantially similar to the Plan.  The Debtors thus further believe that any attempt to formulate an alternative Chapter 11 plan would necessarily delay creditors' receipt of distributions yet to be made and would likely decrease such distribution as a result of, among other things, increased Administrative Expenses.  Accordingly, the Debtors believe that the Plan will enable all creditors entitled to receive distributions thereunder to realize the greatest possible recovery on their respective Claims with the least possible delay and without entailing undue additional administrative and other expenses.

C.     **Certain Risk Factors**

      HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE) PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS ASSOCIATED WITH THE PLAN AND ITS IMPLEMENTATION.

      1.     **Risk of Decreased or Delayed Distributions to Holders of Class 3 Claims**

          a.     **Higher Actual Amounts of Other Kinds of Allowed Claims.**  If the total amount of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Secured Claims, and Allowed Priority Non-Tax Claims exceeds the estimates set forth in this Disclosure Statement or otherwise, the amount of Cash available for distribution to holders of Allowed Class 3 Investor Creditor Unsecured Claims would decrease.

          b.     **Material Disputed Claims.**  Depending on the resolution of Disputed Claims, the actual total amount of all Allowed Class 3 Claims may exceed the total amount of such Claims estimated by the Debtors in the formulation of the Plan as well as the estimates thereof set forth above in this Disclosure Statement. Accordingly, the distribution that will ultimately be received by any particular holder of an Allowed Class 3 Unsecured Claim may be adversely affected by the aggregate amount of all such Allowed Claims.

          c.     **The Causes of Action.**  The Litigation Trust Assets that may be distributed pursuant to the Plan consists almost entirely of proceeds actually obtained in connection with the Causes of Action (including the Adversary Proceedings). The ability of the Debtors and the Litigation Trusts to collect additional significant proceeds from the Causes of Action is speculative.

          d.     Risk of Delayed Distribution.  The Plan presents a risk of delayed distribution, including as a result of the amount of time that will be necessary to resolve the remaining Adversary Proceedings through the remaining appeals and further

proceedings in the Bankruptcy Court, district court or court of appeals. Similarly, litigation delays may be caused by resolution of Disputed Claims.

### 2.    Risk of Non-Confirmation of the Plan; Feasibility

Even if all impaired Classes of Claims vote to accept the Plan, or, with respect to a Class that rejects or is deemed to reject the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which can exercise substantial discretion, may determine that the Plan does not meet the requirements for confirmation under Bankruptcy Code § 1129(a) and (b). Bankruptcy Code § 1129(a) requires, among other things, a demonstration that the value of distributions to creditors and equity security holders who vote to reject the Plan or are deemed to reject the Plan not be less than the value of distributions such creditors and equity security holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

Certain of the Redeemer Defendants, and potentially others, may object to confirmation of the Plan on the grounds that the Plan has not been promulgated in good faith or that substantive consolidation is not warranted or for other reasons.  Although the Debtors believe that the Plan is well-founded and confirmable, such objections pose some risk that should be considered.

If the Plan is not confirmed and consummated, there can be no assurance that these Cases will continue rather than be converted to a liquidation under Chapter 7 of the Bankruptcy Code, or that any alternative plan would be on terms as favorable to holders of the various Allowed Claims as the terms of the Plan.  If a liquidation under Chapter 7 were to occur, the Debtors believe that distributions to holders of Allowed Claims under the Plan would be reduced and/or delayed.  Additionally, the Debtors believe that in a liquidation under Chapter 7, before holders of Allowed Claims received any distributions, additional administrative expenses of a Chapter 7 trustee and such trustee's attorneys, accountants, or other professionals would likely cause a substantial diminution in the value of the Estates.  In addition, certain additional claims may arise by reason of the liquidation under Chapter 7.  The basis for the Debtors' belief in this regard is set forth in more detail under Article VII Section A of this Disclosure Statement, entitled "Liquidation Under Chapter 7 of the Bankruptcy Code."

### 3.    Non-Consensual Confirmation

Because Class 4 is deemed to reject the Plan, the Debtors will (i) seek confirmation of the Plan from the Bankruptcy Court by employing the "cramdown" procedures set forth in Bankruptcy Code § 1129(b) and/or (ii) modify the Plan in accordance with Plan Section 12.9.  In order to confirm the Plan under Bankruptcy Code § 1129(b), the Bankruptcy Court must determine that, in addition to satisfying all other requirements for confirmation, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not accepted the Plan.  The Debtors reserve the right to amend, modify, supplement, revoke, or withdraw the Plan, including to amend or modify the Plan or any exhibits or schedules thereto in order to satisfy the requirements of Bankruptcy Code § 1129(b), if necessary.  Such amendments may include, but are not limited to, the alteration or elimination of distributions to various Classes.

### 4.    Risk of Non-Occurrence of Consummation of the Plan.

Consummation of the Plan is conditioned upon certain events enumerated in Plan Section 9.2. There can be no assurance, however, that such events will occur.  Accordingly, even in the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will ultimately be consummated.

## VII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE DISCUSSION CONTAINED IN THIS DISCLOSURE STATEMENT AS TO FEDERAL TAX CONSIDERATIONS IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES.  SUCH DISCUSSION IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED IN SUCH DOCUMENTS.  EACH TAXPAYER SHOULD SEEK FEDERAL TAX ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of Investor Creditor Unsecured Claims.  The following summary does not address the federal income tax consequences to (i) holders whose Claims are entitled to satisfaction in full (e.g., holders of Allowed Administrative Expense Claims, Allowed Secured Claims (if any), Allowed Priority Non-Tax Claims, and Allowed Priority Claims) or (ii) holders of Equity Interests.

The holders of Claims to which the following discussion is addressed should be aware that the tax consequences described below are unclear under existing law and, as a result, alternative tax results are possible.

The following summary is based on the Tax Code, existing and proposed Treasury regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof.  These rules are subject to change, possibly on a retroactive basis, and any such change could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this summary addresses neither state, local, or foreign income, alternative minimum tax consequences, or other tax consequences of the Plan, nor the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, persons holding a General Unsecured Claim as part of a hedging, integrated constructive sale or straddle, and investors in pass-through entities).

Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.

IRS Circular 230 Notice:  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT:  (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD SEEK ADVICE

BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    **Consequences to the Debtors**

In general, the federal income tax consequences to the Debtors will depend on whether the Debtors are treated for federal income tax purposes as partnerships rather than as associations taxable as corporations. The Debtors do not anticipate that an application will be made to the IRS for a ruling on the classification of the Debtors for tax purposes.

1.    **Classification**

If a Debtor is classified as a "partnership" for federal income tax purposes and is not a "publicly traded partnership," it will not be subject to any federal tax. Instead the holders of the Equity Interests of such Debtors will be subject to tax on their distributive shares of such Debtor's income and gain (if any) and, subject to certain limitations described below, will be entitled to claim distributive shares of such Debtor's losses and deductions. On the other hand, if a Debtor were to be classified as an association taxable as a corporation or as a "publicly traded partnership," the holders of Equity Interests therein would be treated as shareholders of a corporation. Consequently, items of income, gain, loss and deduction would not flow through to the holders of Equity Interests to be accounted for on their individual federal income tax returns and the taxable income of the Debtor would be subject to federal income tax imposed on the taxable income of such Debtor.

The total number of holders of the Equity Interests in the Debtors may exceed 100. Thus, the safe harbor for avoiding "publicly traded partnership" status may not be satisfied. However, because the Debtors expect that the Equity Interests in the Debtors will neither be traded on an established securities market nor will be readily tradable on a secondary market (or substantial equivalent thereof), and because the Debtors are not aware of any election that would otherwise cause the Debtors to be treated as associations taxable as corporations, the Debtors intend to take the position that they are each partnerships for U.S. federal income tax purposes. All of the following discussion assumes the Debtors will be treated as partnerships for U.S. federal income tax purposes, although there is no assurance the IRS will agree with this position.

2.    **Transfer of Assets to Litigation Trusts**

As discussed below in this Section, pursuant to the Plan, each of the Debtors will be treated for U.S. federal income tax purposes as transferring the portion of their assets, if any, that comprise part of the Litigation Trust Assets directly to the holders of Allowed Class 3 Claims, who will then be treated as transferring such assets to the Litigation Trusts. For U.S. federal income tax purposes, such transfer will be a taxable event. Accordingly, the transfer of Litigation Trust Assets by the Debtors may result in the recognition of income or gain by the Debtors, depending in part on the value of such assets on the Effective Date.

3.    **Cancellation of Debt**

In general, the Tax Code provides that a corporate debtor in a bankruptcy case must reduce certain of its tax attributes – such as NOL carryforwards and current year NOLs, tax credits, and tax basis in assets – by the amount of any cancellation of debt ("COD"). COD is the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefore. However, because the Debtors have historically taken and will continue to take the position that they are each partnerships for U.S. federal income tax purposes, any COD income with

65

respect to a particular Debtor would flow through to the holders of the Equity Interests of such Debtor. Generally, the holders of any Equity Interests would be liable for income tax on such COD income, which is taxed at ordinary income tax rates, unless such holder of any Equity Interest is in bankruptcy or is insolvent. The rules for allocating such COD income are unclear under these circumstances, but the Debtors will use a method that allocates any such COD as equitably as possible and in a manner reasonably expected to be respected by the IRS. The allocation of any such COD income to a holder of an Equity Interest would also increase the basis that such holder has in its Equity Interest in a Debtor, which would increase any loss (or, possibly, reduce any gain) associated with that equity interest (discussed below).

As a result of the implementation of the Plan, the Debtors do not expect to incur significant COD.

**Holders of Equity Interests are urged to consult their tax advisors regarding the tax consequences of the transfer of the Litigation Trust Assets to the Litigation Trusts and of any COD income incurred by the Debtors.**

B.     <u>Consequences to Holders of Allowed Investor Creditor Unsecured Claims</u>

Pursuant to the Plan, the holders of Allowed Investor Creditor Unsecured Claims will receive, in full satisfaction and release of such Claims, their Pro Rata Share of the beneficial interests in the Litigation Trusts.

1.     <u>Treatment of Transfers to the Litigation Trusts</u>

**As discussed below in this Section, the Litigation Trusts have been structured to qualify as "grantor trusts" for federal income tax purposes. Accordingly, each holder of an Allowed General Unsecured Claim in Class 3 will be treated for federal income tax purposes** as directly receiving, and as a direct owner of, its allocable percentage of the Litigation Trust Assets as of the Effective Date. Accordingly, the amounts realized by a holder will take into account its undivided interests of the Litigation Trust Assets and the proceeds thereof as if it were the direct holder of such assets.

Pursuant to the Plan and the Litigation Trust Agreements, the Litigation Trustees will make a good-faith valuation of the Litigation Trust Assets, and all parties (including the holders of Allowed Investor Creditor Unsecured Claims) must consistently use such valuation for all federal income tax purposes. The valuation will be made available as necessary for tax reporting purposes (on an asset or aggregate basis, as relevant).

2.     <u>Gain or Loss – Generally</u>

In general, a holder of an Allowed General Unsecured Claim will recognize gain or loss in an amount equal to the difference between (i) the aggregate fair market value of the holder's undivided interest in the Litigation Trust Assets received in respect of its Allowed Claim, taking into account any liabilities assumed by the Litigation Trusts or to which the Litigation Trust Assets are subject to and determined without taking into account the portion of the Litigation Trust Assets (and/or the proceeds thereof) allocable to, or retained on account of, Investor Creditor Unsecured Claims that remain Disputed, and (ii) such holder's adjusted tax basis in such Claim.

Any amount a holder receives following the Effective Date as a distribution in from the Litigation Trusts (other than possibly as a result of the subsequent disallowance of a Disputed Claim) should generally not be included for federal income tax purposes in the holder's amount realized in respect of its Allowed Claim but should be separately treated as a distribution received in respect of such holder's

interest in the Litigation Trust. *See* "4. Tax Treatment of the Litigation Trust and Holders of Beneficial Interests," below.

As and when any Disputed Investor Creditor Unsecured Claims become disallowed, holders of certain previously Allowed Investor Creditor Unsecured Claims may, pursuant to the Plan and the Litigation Trust Agreements, become entitled to an increased share of the proceeds of the Litigation Trust Assets. For federal income tax purposes, the "receipt" of such increased share (other than amounts attributable to earnings previously taxed to the appropriate Litigation Trust Claims Reserve) may be treated as additional consideration in satisfaction of such holder's Allowed Claim in an amount equal to the fair market value of such increased share at such time (with the potential for the recognition of gain at such time). Under the Tax Code, a portion of such amounts may be treated as imputed interest. In addition, it is also possible that any loss and a portion of any gain realized by a holder in satisfaction of an Allowed General Unsecured Claim may be deferred until such time as such holder has received its final distribution, if any, from the Litigation Trusts. Holders of Investor Creditor Unsecured Claims are urged to consult their tax advisors regarding the possible applicability of such deferral provisions.

Where gain or loss is recognized by a holder in respect of its Allowed General Unsecured Claim, the character of such gain or loss (as long-term or short-term gain or loss, or ordinary income or loss) will be determined by a number of factors, including the tax status of the holder, whether the Claim in respect of which any property was received constituted a capital asset in the hands of the holder or was incurred in connection with the conduct by such holder of a trade or business, and how long it had been held, whether such Claim was acquired at a market discount, and whether and to what extent the holder had previously claimed a loss or bad debt deduction in respect of such Claim. Holders should consult their tax advisor.

In general, a holder's initial aggregate tax basis in its interest in the Litigation Trust Assets will equal the fair market value of such interest when received, and the holding period for such interest generally will begin the day following the receipt of such interest.

3.      **Distributions in Discharge of Accrued But Unpaid Interest**

Pursuant to the Plan, to the extent applicable to a particular Claim, all distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, as determined for U.S. federal income tax purposes, and thereafter, to the remaining portion of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim), including, without limitation, any portion of the Claim representing accrued original issue discount ("OID") or accrued but unpaid interest. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

In general, to the extent that an amount received (whether stock, cash, or other property) by a holder of debt is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest previously included in its gross income is not paid in full. However, the IRS has privately ruled that a holder of a security, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly, it is also unclear whether, by analogy, a holder of a Claim that does not constitute a security would be required to recognize a capital loss, rather than an ordinary loss, with respect to any previously included OID that is not paid in full. Each holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

4.    **Tax Treatment of the Litigation Trusts and Holders of Beneficial Interests**

Upon the Effective Date, the Litigation Trusts will be established for the benefit of holders of Allowed Investor Creditor Unsecured Claims, whether Allowed on or after the Effective Date.

a.    **Classification of the Litigation Trusts**

The Litigation Trusts are intended to qualify as liquidating trusts for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity).

However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a Chapter 11 plan. The Litigation Trusts have been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Litigation Trustees, and the holders of Investor Creditor Unsecured Claims) are required to treat, for U.S. federal income tax purposes, the Litigation Trusts as grantor trusts of which the holders are the owners and grantors. The following discussion assumes that the Litigation Trusts will be so respected for federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Litigation Trusts as grantor trusts. Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS successfully to challenge such classification, the federal income tax consequences to the Litigation Trusts, the holders of Investor Creditor Unsecured Claims, and the Debtors could vary from those discussed herein (including the potential for an entity level tax on any income of the Litigation Trusts).

b.    **General Tax Reporting by the Litigation Trusts and Beneficiaries**

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Litigation Trustees, and the holders of Investor Creditor Unsecured Claims) must treat the transfer of assets to the Litigation Trusts, and any amounts subsequently transferred to the Litigation Trusts (but only at such time as actually transferred to the Litigation Trusts, in accordance with the terms of the Plan), as a transfer of such assets directly to the holders of Allowed Investor Creditor Unsecured Claims, followed by the transfer of such assets by the holders to the Litigation Trusts. Consistent therewith, all parties must treat the Litigation Trusts as grantor trusts of which such holders are the owners and grantors. Thus, such holders (and any subsequent holders of interests in the Litigation Trusts) will be treated as the direct owners of an undivided interest in the assets of the Litigation Trust for all U.S. federal income tax purposes. Pursuant to the Plan, the Litigation Trustees will determine the fair market value of the assets of the Litigation Trusts as of the Effective Date (which assets will generally have a tax basis equal to their fair market value, if any, on the Effective Date), and all parties, including, without limitation, the holders of Allowed Investor Creditor Unsecured Claims, should consistently use such valuation for all federal income tax purposes where valuation is relevant in determining gain, loss, or tax basis. The valuation will be made available as necessary for tax reporting purposes (on an asset or aggregate basis, as relevant).

Accordingly, except as discussed below (in connection with pending Disputed Claims), each holder should report on its U.S. federal income tax return its allocable share of any income, gain, loss, deduction, or credit recognized or incurred by the Litigation Trusts, in accordance with its Pro Rata Share of the proceeds of the Litigation Trust Assets. The character of items of income, deduction, and credit to any holder and the ability of such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

The U.S. federal income tax reporting obligations of a holder are not dependent upon the Litigation Trust's distributing any cash or other proceeds. Therefore, a holder may incur a federal income tax liability with respect to its allocable share of the income of the Litigation Trust even if the Litigation Trusts have not made a concurrent distribution to the holder. In general, other than in respect of cash originally retained on account of Disputed Claims and distributions resulting from unclaimed distributions, a distribution of cash by the Litigation Trusts to a holder will not be taxable to the holder as such holder is regarded for U.S. federal income tax purposes as already owning the underlying assets or realizing the income.

The Litigation Trustees will file with the IRS returns for the Litigation Trusts as grantor trusts pursuant to Treasury Regulation section 1.671-4(a). The Litigation Trustee will also send to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction, or credit and will instruct the holder to report such items on its federal income tax return or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. Such items generally would be reported on the holder's state and/or local tax returns in a similar manner. The Litigation Trustees will also file, or cause to be filed, all appropriate tax returns with respect to any Litigation Trust Assets allocable to Disputed Claims, as discussed below.

## c.     Tax Reporting for the Litigation Trust Claims Reserve

Absent definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Litigation Trustees of a private letter ruling if the Litigation Trustees so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustees), the Litigation Trustees will:

(i)     treat all Litigation Trust Assets allocable to, or retained on account of, Disputed Class 3 Claims, as held in a discrete trust (termed, the Litigation Trust Claims Reserve) for federal income tax purposes, consisting of separate and independent shares to be established in respect of each Disputed Claim, in accordance with the trust provisions of the Tax Code (section 641 et seq. of the Tax Code);

(ii)     treat as taxable income or loss of the Litigation Trust Claims Reserve with respect to any given taxable year the portion of the taxable income or loss of the Litigation Trusts that would have been allocated to the holders of such Disputed Class 2 Claims had such claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such claims are unresolved);

(iii)     treat as a distribution from the Litigation Trust Claims Reserve any increased amounts distributed by the Litigation Trusts as a result of any Disputed Class 3 Claim resolved earlier in the taxable year, to the extent such distribution relates to taxable income or loss of the Litigation Trust Claims Reserve determined in accordance with the provisions of the Plan; and

(iv)     to the extent permitted by applicable law, report consistently for state and local income tax purposes.

In addition, pursuant to the Plan, all holders of Claims are required to report consistently with such treatment.

Accordingly, subject to issuance of definitive guidance, the Litigation Trustees will report on the basis that any amounts earned by the Litigation Trust Claims Reserve and any taxable income of the

Litigation Trusts allocable to it are subject to a separate entity level tax, except to the extent such earnings are distributed during the same taxable year.  The Litigation Trustees will use funds from the Liquidation Trust Litigation Trust Claims Reserve to pay any taxes on such income, although any amounts earned by or attributable to the Litigation Trust Claims Reserve and distributed to a holder during the same taxable year will be includible in such holder's gross income, and such holder would pay the taxes under those circumstances.

     5.      **Other Creditors or Interest Holders**

     Each other Creditor (including the holders of Allowed Class 2 or 3 Claims) or holder of an Equity Interest will generally recognize taxable income or loss upon satisfaction of its claim or Equity Interest in an amount that is equal to the difference between (a) the amount of any cash and the fair market of any property received in respect of its claim or Equity Interest, if any (excluding any cash or property received in respect of a claim for accrued interest) and (b) the creditor's tax basis in its Claim (other than any Claim for such accrued interest) or the Equity Interest holder's tax basis in its Equity Interest.

     The determination of the character of such income or loss as long-term or short-term capital gain or loss or as ordinary income or loss will depend upon a number of factors, including, among other things, the tax status of the creditor or Equity Interest holder, whether the Claim or Equity Interest constitutes a capital asset in the hands of the creditor or Equity Interest holder, whether the Claim or Equity Interest has been held for more than one year, and whether and to what extent the creditor or Equity Interest holder has previously claimed a loss or bad debt deduction (or charged a reserve for bad debts) with respect to the Claim or Equity Interest.

     6.      **Distribution of Government Funds**

     The Debtors believe that the distribution of the Government Funds by the United States will not be deemed to be a distribution of Assets by the Debtors or by the Litigation Trusts.  The Debtors have not requested a ruling from the IRS or obtained an opinion of counsel with respect to the distribution of the Government Funds.  Accordingly, holders of Claims receiving a distribution of Government Funds should consult their tax advisers regarding the taxation of the receipt of any such funds in conjunction with a distribution under the Plan.

     7.      **Information Reporting and Withholding**

     All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding (including employment tax withholding).  Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate (currently 28%).  Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.

     Recently effective Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated after January 1, 2003, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  These categories are very broad; however, there are numerous

exceptions.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

THE FOREGOING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## VIII.   VOTING PROCEDURES AND REQUIREMENTS

### A.   Ballots and Voting Deadline

IT IS IMPORTANT THAT THE HOLDERS OF ALLOWED CLAIMS IN CLASSES 2 and 3, TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR TO REJECT THE PLAN.  All known holders of Claims entitled to vote on the Plan have been sent a ballot together with this Disclosure Statement.  Such holders should read the ballot carefully and follow the instructions contained therein. Please use only the ballot that accompanies this Disclosure Statement.

The Debtors have engaged The Garden City Group, Inc., as their Notice and Balloting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.  **IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE NOTICE AND BALLOTING AGENT AT THE ADDRESS SET FORTH BELOW BEFORE THE VOTING DEADLINE OF 4:00 P.M.  (PREVAILING EASTERN TIME), ON DECEMBER 14, 2009.**

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE NOTICE AND BALLOTING AGENT AT THE NUMBER SET FORTH BELOW.  ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE NOTICE AND BALLOTING AGENT AT:

if by mail:

The Garden City Group, Inc.
Attn: Bayou Group LLC Balloting Agent
Re:  Bayou Group, LLC
PO Box 9000 #6510
Merrick, NY  11566-9000

if by mail, hand delivery, or overnight courier:

The Garden City Group, Inc.
Attn: Bayou Group LLC Balloting Agent
Re:  Bayou Group, LLC
105 Maxess Road
Melville, NY  11747

B.      **Holders of Claims Entitled to Vote.**

Classes 2 and 3 are the only Classes of Claims under the Plan that are impaired and entitled to vote to accept or reject the Plan.  Each holder of a Claim in Class 2 and 3 as of the Voting Record Date established by the Debtors for purposes of this solicitation may vote to accept or reject the Plan (other than holders of Claims subject to an objection filed by the Debtors or that are otherwise Disputed Claims.

C.      **Vote Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a Chapter 11 plan by a class of claims occurs when holders of at least two-thirds in dollar amount and more than one-half in number of the allowed claims of that class that cast ballots for acceptance or rejection of the Chapter 11 plan vote to accept the plan.  Thus, acceptance of the Plan by Class 2, for example, will occur only if at least two-thirds in dollar amount and a majority in number of the holders of such Class 2 Claims that cast their Ballots vote to accept the Plan.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

D.      **Voting Procedures**

1.      **Holders of Claims in Classes 2 and 3**

All holders of Claims in Class 2 and 3 that are entitled to vote on the Plan should complete the enclosed Ballot and return it to the Notice and Balloting Agent so that it is received by the Notice and Balloting Agent before the Voting Deadline.

2.      **Withdrawal of Ballot**

Any voter that has delivered a valid ballot may withdraw its vote by delivering a written notice of withdrawal to the Notice and Balloting Agent before the Voting Deadline.  To be valid, the notice of withdrawal must be (i) signed by the party who signed the ballot to be revoked and (ii) received by the Notice and Balloting Agent before the Voting Deadline.  The Debtors may contest the validity of any withdrawals.

Any holder that has delivered a valid ballot may change its vote by delivering to the Notice and Balloting Agent a properly completed subsequent ballot, so as to be received before the Voting Deadline. In the case where more than one timely, properly completed ballot is received, only the ballot that bears the latest date will be counted.

## IX.      CONFIRMATION AND CONSUMMATION PROCEDURES

As described more fully below, in addition to the explicit conditions precedent to confirmation and effectiveness that are contained in the Plan, the Bankruptcy Court will confirm the Plan only if it (1) is accepted by all impaired Classes of Claims and Equity Interests or, if rejected by an impaired Class, that the Plan does "not discriminate unfairly" and is "fair and equitable" as to such Class; (2) is feasible; and (3) is in the "best interests" of creditors that are impaired under the Plan.

A.       **Conditions Precedent to Effectiveness of Plan**

It is a condition to confirmation of the Plan that the Clerk of the Bankruptcy Court will have entered the Confirmation Order which, among other things, will:

1.       authorize and approve in all respects the Plan and all transactions contemplated thereby or in connection therewith; and

2.       be in form and substance and contain finding and conclusions in support of confirmation of the Plan that are reasonably satisfactory to the Debtors.

B.       **Conditions Precedent to Effective Date**

It is a condition to the occurrence of the Effective Date that the following will have occurred on or before the Effective Date:

1.       No stay of the Confirmation Order shall then be in effect; and

2.       The Litigation Trust Agreements shall have been executed and the Litigation Trustee appointed in such capacity.

Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If the Debtors decide that one of the conditions precedent set forth in Plan Section 9.2 cannot be satisfied, then the Debtors will file a notice of the failure of the Effective Date with the Bankruptcy Court.

If each of the conditions to consummation and the occurrence of the Effective Date has not been satisfied on or before the first Business Day that is one hundred eighty (180) days after the Confirmation Date, or such later date as is agreed by the Debtors, the Confirmation Order may be vacated by the Bankruptcy Court upon an appropriate motion by the Debtors.  If the Confirmation Order is vacated pursuant to Plan Section 9.4, the Plan will be null and void in all respects, and nothing contained in the Plan will constitute a waiver or release of any Claims against any of the Debtors.

C.       **Requirements of Bankruptcy Code § 1129(a)**

The following requirements must be satisfied pursuant to Bankruptcy Code § 1129(a) before the Bankruptcy Court may confirm a plan:

1.       The plan complies with the applicable provisions of the Bankruptcy Code;

2.       The proponent of a plan complies with the applicable provisions of the Bankruptcy Code;

3.       The plan has been proposed in good faith and not by any means forbidden by law;

4.       Any payment made or to be made by the proponent, by the debtor or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

5.       The proponent of a plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or voting trustee of

73

the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan;

6.    The proponent of the plan has disclosed the identity of any insider (as defined in Bankruptcy Code § 101) that will be employed or retained by the reorganized debtor and the nature of any compensation for such insider;

7.    Any governmental regulatory commission with jurisdiction over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval;

8.    With respect to each impaired class of claims or interests —

   a.    each holder of a claim or interest of such class (a) has accepted the plan; or (b) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date; or

   b.    if Bankruptcy Code § 1111(b)(2) applies to the claims of such class due to its election to retain a lien, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less the value of such holder's interest in the estate's interest in the property that secures such claims;

9.    With respect to each class of claims or interests such class has (a) accepted the plan; or (b) such class is not impaired under the plan (subject to the "cramdown" provisions discussed below; *See* "Section F "Requirements of Bankruptcy Code § 1129(b)");

10.    Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

   a.    with respect to a claim of a kind specified in Bankruptcy Code §§ 507(a)(2) and 507(a)(3), on the effective date of the plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim;

   b.    with respect to a class of claim of the kind specified in Bankruptcy Code § 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7), each holder of a claim of such class will receive (A) if such class has accepted the plan, deferred cash payments of a value, on the effective date of the plan, equal to the allowed amount of such claim; or (B) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

   c.    with respect to a priority tax claim of a kind specified in Bankruptcy Code § 507(a)(8), the holder of such claim will receive on account of such claim regular installment payments in cash (i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim; (ii) over a period not later than 5 years after the date of the order for relief under Bankruptcy Code §§ 301, 302, or 303; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under Bankruptcy Code § 1122(b)).

11.     If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any "insider," as defined in Bankruptcy Code § 101;

12.     Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan;

13.     All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan; and

14.     The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in Bankruptcy Code § 1114, at the level established pursuant to subsection (e)(1)(B) or (g) of Bankruptcy Code § 1114, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The Debtors believe that the Plan meets all the applicable requirements of Bankruptcy Code § 1129(a) other than those pertaining to voting, which has not yet taken place. Certain Redeemer Defendants, however, believe that the Plan does not meet all of the applicable requirements of Bankruptcy Code § 1129(a) for a number of reasons and intend to vigorously object to the confirmation of the Plan on these grounds among other reasons.

D.     **Best Interests Test**

The Bankruptcy Code requires that any holder of an impaired claim or equity interest either (i) accept the Plan, or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

The first step in determining whether this test has been satisfied is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a Chapter 7 liquidation case. The gross amount of cash that would be available for satisfaction of claims and equity interests would be the sum consisting of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by the unencumbered cash hold by the Debtors at the time of the commencement of the Chapter 7 case.

The next step is to reduce that gross amount by the costs and expenses of liquidation and by such additional administrative and priority claims that might result from the use of Chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with Bankruptcy Code § 726. Finally, the present value of such allocations (taking into account the time necessary to accomplish the liquidation) are compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a Chapter 7 trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. Other liquidation costs include the expenses incurred during these Cases allowed in the Chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals for the Debtors and the Creditors Committee, and costs and expenses of members of the Creditors Committee, as well as other compensation claims. In addition, claims would

arise by reason of the breach or rejection of any obligations incurred and any leases or contracts assumed or entered into by the Debtors during the pendency of these Cases that were not assigned to a third party (if any).

The foregoing types of claims, costs, expenses, fees, and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-petition priority and unsecured Claims.

The Debtors submit that each impaired Class will receive under the Plan a recovery at least equal in value to the recovery such Class would receive pursuant to a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

After consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in these Cases, including (i) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, and (ii) the substantial increases in claims that would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtors under Chapter 7.

In particular, and among other reasons, in light of the anticipated lower administrative costs resulting from the proposed distribution under the Plan as compared to under a Chapter 7 liquidation scenario (especially given the increased costs attendant to the appointment of a Chapter 7 trustee), the Debtors believe that Class 3 (Other Unsecured Claims) will receive under the Plan a recovery equal to or "greater" in value than the recovery such Class would receive pursuant to a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

The Debtors also believe that the value of any distributions to each Class of Allowed Claims in a Chapter 7 case, including all Secured Claims (if any), would likely be less than the value of distributions under the Plan because such distributions in a Chapter 7 case would not occur for a substantial period of time. In the event litigation was necessary to resolve claims asserted in a Chapter 7 case, the delay could be prolonged and administrative expenses increased.

E.     **Feasibility**

Bankruptcy Code § 1129(a)(11) provides that a Chapter 11 plan may be confirmed only if the Court finds that such plan is feasible. A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor. Since the Plan provides for the liquidation of the Debtors, the Bankruptcy Court should find that the Plan is feasible if it determines that the Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet its post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan and closing these Cases. The Debtors believe that the Plan satisfies the feasibility requirement imposed by the Bankruptcy Code.

F.     **Requirements of Bankruptcy Code § 1129(b)**

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class, and (c) the plan is "fair and equitable" and does not "discriminate unfairly" to any impaired class

that has not accepted the plan.  These so called "cramdown" provisions are set forth in Bankruptcy Code § 1129(b).

1.   **Fair and Equitable**

In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."  Because the holders of Equity Interests in Class 4 will not receive any recovery under the Plan and are, therefore, deemed to have rejected the Plan, the Court may only confirm the Plan if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class.

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

- Secured Creditors.  Each holder of an impaired secured claim either (i) retains its liens on the property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date, of at least the allowed amount of such claim, or (ii) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale (or if sold, on the proceeds thereof), or (iii) receives the "indubitable equivalent" of its secured claim.

- Unsecured Creditors.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- Equity Interests.  Either (i) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan.

These requirements are in addition to other requirements established by case law interpreting the statutory requirement.

The Debtors believe the Plan will satisfy the "fair and equitable" requirement notwithstanding that Class 4 (Equity Interests) is deemed to reject the Plan because no Class that is junior to such Class will receive or retain any property on account of the Claims or Equity Interests in such Class.  Because at least one Class of Claims is not being paid in full, the existing Equity Interests are being extinguished.

2.   **Unfair Discrimination**

The "unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  A Chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is

77

entitled to receive for its claims or equity interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The Debtors do not believe that the Plan discriminates unfairly against any impaired Class of Claims or Equity Interests and thus, satisfies the requirements for nonconsensual confirmation of the Plan..

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code which requires that a Chapter 11 plan place each claim or equity interest into a class with other claims or equity interests that are "substantially similar." The Plan establishes Classes of Claims and Equity Interests as required by the Bankruptcy Code and summarized above. Administrative Expense Claims (as well as Professional Fee Claims) and Priority Tax Claims are not classified.

IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE REQUIREMENTS OF BANKRUPTCY CODE § 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.

G.     **Confirmation Hearing**

Bankruptcy Code § 1128(a) requires the Bankruptcy Court, after appropriate notice, to hold the Confirmation Hearing. The Confirmation Hearing is currently scheduled for December 21, 2009 at 10:00 a.m. (Prevailing Eastern Time), or as soon thereafter as counsel may be heard, before the Honorable Robert D. Drain, United States Bankruptcy Court Judge, at the United States Bankruptcy Court for the Southern District of New York, White Plains Division, 300 Quarropas Street, White Plains, New York 10601. The Confirmation Hearing may be adjourned from time to time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned confirmation hearing.

Bankruptcy Code § 1128(b) provides that any party-in-interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, must set forth the name of the objector and the nature and amount of claims or interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court (with a copy to Chambers) and served upon: (a) the Debtors, c/o Proskauer Rose LLP, 70 W. Madison St., Chicago, Illinois 60602-4252 (Attn: Jeff J. Marwil, Esq.); (b) Dechert LLP, Attorneys for the Debtors, 1095 Avenue of the Americas, New York, New York 10036 (Attn: Shmuel Vasser, Esq. and Andrew L. Buck, Esq.); (c) Klestadt & Winters LLP, 292 Madison Avenue, New York, New York 10017-6314 (Attention: Tracy L. Klestadt, Esq.); (d) Kasowitz Benson Torres & Friedman, LLP, Bankruptcy Counsel for the Committee, 1633 Broadway, New York, New York 10019 (Attention: Joseph A. Gershman, Esq.) and K & L Gates LLP, 1601 K Street, NW, Washington, DC 20006-1600 (Attention: Richard Kirby, Esq.); and (e) the Office of the United States Trustee for the Southern District of New York, 271 Cadman Plaza East, Suite 4529, Brooklyn, New York 11201 (Attn: Andy Velez-Rivera, Esq.), so as to be **ACTUALLY RECEIVED** no later than December 14, 2009 at 4:00 p.m. (Prevailing Eastern Time).

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

At the Confirmation Hearing, the Bankruptcy Court must determine whether the requirements of Bankruptcy Code § 1129 have been satisfied and, upon demonstration of such compliance, the Bankruptcy Court will enter the Confirmation Order.

## X.     **RECOMMENDATION AND CONCLUSION**

The Debtors believe that confirmation and implementation of the Plan is preferable to all other alternatives.  The Debtors have also determined that confirmation of the Plan will provide all Creditors holding Allowed Claims with a recovery greater than or equal to what it would receive if the Debtors were liquidated under Chapter 7.  Consequently, the Debtors urge all holders of Claims in voting Classes to vote to accept the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before the Voting Deadline.

Dated:  November 3, 2009

**Respectfully submitted,**

BAYOU GROUP, LLC
BAYOU MANAGEMENT, LLC
BAYOU FUND, LLC
BAYOU ACCREDITED FUND, LLC
BAYOU AFFILIATES FUND, LLC
BAYOU NO LEVERAGE FUND, LLC
BAYOU SUPERFUND, LLC
BAYOU ADVISORS, LLC
BAYOU EQUITIES, LLC


By:/s/ Jeff J. Marwil _____
    Jeff J. Marwil
    Sole Managing Member